1  Jeff S. Westerman (SBN 94559)
   jwesterman@milberg.com
2  Andrew J. Sokolowski (SBN 226685)
   asokolowski@milberg.com
3  MILBERG LLP
   300 South Grand Avenue, Suite 3900
4  Los Angeles, California 90071
   Telephone: (213) 617-1200
5  Facsimile: (213) 617-1975

6  BROWER PIVEN, A Professional Corporation
   David A.P. Brower
7  brower@browerpiven.com
   Jessica Sleater
8  sleater@browerpiven.com
   488 Madison Avenue, 8th Floor
9  New York, New York 10022
   Telephone: (212) 501-9000
10 Facsimile: (212) 501-0300

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 3 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

11 Counsel for Lead Plaintiff and Liaison Counsel for the Class

12 [Additional Counsel Appear on Signature Page]

13              UNITED STATES DISTRICT COURT

14    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

15 | RAMON GOMEZ, On Behalf of Himself and All Others Similarly Situated, | Lead Case No. CV09-03216 CBM-Ex |

16

17                    Plaintiff,     (Consolidated with Nos. CV09-03671 CBM; CV09-03967 CBM)

18     vs.

   BIDZ.COM, INC., and DAVID      CONSOLIDATED CLASS
19 ZINBERG,                       ACTION COMPLAINT FOR
                                  VIOLATIONS OF THE FEDERAL
20                   Defendants.   SECURITIES LAWS

21 ROLAND POMFRET, On Behalf of    JURY TRIAL DEMANDED
   Himself and All Others Similarly
22 Situated,

23                    Lead Plaintiff,

24     vs.

25 BIDZ.COM, INC., DAVID ZINBERG,
   and LAWRENCE Y. KONG,
26                   Defendants.

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

JURISDICTION AND VENUE .......................................................................... 1

PARTIES ......................................................................................................... 2

CLASS ACTION ALLEGATIONS ................................................................... 6

SUBSTANTIVE ALLEGATIONS ................................................................. 10

 Materially False and Misleading Statements Issued During the Class Period .......................................................................... 10

OTHER FALSE AND MISLEADING STATEMENTS, SCHEMES, AND ARTIFICES TO DEFRAUD DURING THE CLASS PERIOD ................. 47

 BIDZ Uses "Shill Bidders" to Artificially Inflate the Sell Price for Its Online Auctions ................................................................. 47

 Bidz Used Bogus Appraisals to Artificially Inflate the Selling Prices of Auction Items.................................................................. 51

 The Truth Regarding Some of the Company's Fraudulent Schemes Emerges ........................................................................................ 51

LOSS CAUSATION .................................................................................... 59

ADDITIONAL SCIENTER ALLEGATIONS ............................................... 62

DEFENDANTS' ASSOCIATIONS AND PROPENSITY TO ENGAGE IN UNLAWFUL CONDUCT CONSISTENT WITH SCIENTER ALLEGATIONS ....................................................................................... 68

 Bidz Sold Unlicensed Securities Before it Attempted an IPO..................... 69

 Bidz Is the Target of Numerous Lawsuits Relating to Its Business Practices ......................................................................................... 69

 Bidz Has Been Connected to Numerous People With Questionable Backgrounds.................................................................................... 69

NO SAFE HARBOR .................................................................................... 70

COUNT I Violation of Section 10(b) of the Exchange Act  and Rule 10b-5 Promulgated Thereunder  (Against Defendants)........................................... 71

COUNT II Violation of Section 20(a) of the Exchange Act  (Against the Individual Defendants) .................................................................................. 74

i

DOCS\490115v1

PRAYER FOR RELIEF ........................................................................................... 75

JURY TRIAL DEMANDED .................................................................................. 75

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1.     Lead Plaintiff, Roland Pomfret, brings this Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") individually and on behalf of all other purchasers of the securities of Bidz.com, Inc. ("Bidz" or "Company") between July 31, 2007 and November 10, 2008, inclusive (the "Class Period"). Such purchasers, along with Plaintiff, are collectively referred to herein as the "Class." This Complaint is brought against Bidz, the Company's President, Chief Executive Officer, and Chairman of the Board of Directors, David Zinberg, and the Chief Financial Officer and director Lawrence Y. Kong (collectively, with the Company, "Defendants").

2.     This Complaint is alleged upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, based upon Plaintiff's counsel's investigation, including review of Bidz's public filings with the United States Securities and Exchange Commission ("SEC"); conference calls; wire and press releases published by and regarding Bidz; securities analysts' reports and advisories; information available in the media and on the Internet; and interviews with at least fifteen knowledgeable persons ("CW(s)"), including former Bidz employees, who held positions that provided them with personal access to the information which they reported. Additional facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth in this Complaint that will be revealed after a reasonable opportunity for discovery.

## **JURISDICTION AND VENUE**

3.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

1

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

4.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

5.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, Bidz's principal executive offices are located within this District.

6.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**<u>PARTIES</u>**

7.     Plaintiff Roland Pomfret ("Plaintiff") purchased Bidz securities, in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Bidz securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Bidz that was misrepresented and omitted during the Class Period was revealed.  The Plaintiff's Certification of Roland Pomfret containing a detailed list of his transactions in Bidz securities during the Class Period is attached hereto as Exhibit A.

8.     Defendant Bidz is a Delaware corporation with its principal executive offices located at 3562 Eastham Drive, Culver City, California 90232.  Bidz characterizes itself as a "leading online retailer of jewelry, featuring a live auction format." Bidz offers its products through a continuous live format, featuring a $1

2

minimum opening bid, and a unique 15-second auction extension period that allows the auctions to continue until all bids are received. The majority of the auctions are short-term, often lasting less than one hour. Their product inventory includes gold, platinum, and silver jewelry set with diamonds, rubies, emeralds, sapphires, and other precious and semi-precious stones, watches, and accessories. According to Bidz, it is the "second largest online retailer of jewelry." Bidz's stock is quoted on the NASDAQ Stock Market LLC under the symbol "BIDZ." NASDAQ is a well-developed, efficient market for securities.

9. Defendant David Zinberg ("Zinberg") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors since the Company was founded in 1998. Defendant Zinberg served as the Secretary from inception until March 2001. Defendants Zinberg is the brother of Marina Zinberg, Vice President of the Company (and formerly the corporate secretary and treasurer). Defendant Zinberg and his sister, Marina Zinberg, control over 62% of the Company's shares. As a result, defendant Zinberg dominates and controls the Company. Defendant Zinberg is a Class I director whose term expires at the 2010 annual meeting of stockholders. Defendant Zinberg was paid $201,244 in compensation in 2007 (consisting of $181,250 in salary and $19,994 in all other compensation) and paid $433,434 in 2008 (consisting of $241,667 in salary, $169,360 in bonuses, and $22,407 in all other compensation). During the Class Period, defendant Zinberg signed and certified false and misleading SEC filings and knowingly issued numerous false and/or misleading statements about Bidz's financial condition and prospects. Defendant Zinberg sold 115,000 shares of Bidz stock during the Class Period, for proceeds of $1,124,877.

10. Defendant Lawrence Y. Kong ("Kong") is, and at all relevant times was, Chief Financial Officer ("CFO") and a director of Bidz. Defendant Kong has

3

1    served as the CFO since January 2001, as Secretary and Treasurer since March
2    2006, and as a director since July 2003. Defendant Kong earned a Bachelor of
3    Science in Accounting from the University of South Alabama in June 1982 and a
4    Master of Business Administration in Finance from the University of Chicago in
5    June 1984.   Defendant Kong passed the Certified Public Accountant examination
6    (State of Illinois) in 1983 and is a member of the American Institute of Certified
7    Public Accountants.   Defendant Kong has over 20 years of experience in
8    accounting, financial management and consultancy.   Defendant Kong is the
9    husband of Ms. Claudia Y. Liu ("Liu"), the Chief Operating Officer.  Defendant
10   Kong is a Class II director whose term expires at the 2011 annual meeting of
11   stockholders.   Defendant Kong was paid $814,205 in compensation in 2007
12   (consisting of $235,000 in salary, $338,048 in bonuses, $224,330 in option awards,
13   and $16,828 in all other compensation) and $743,663 in 2008 (consisting of
14   $235,000 in salary, $302,930 in bonuses, $182,413 in option awards, and $23,320
15   in all other compensation).   His wife, Liu, was paid $628,614 in 2007 and
16   $524,448 in 2008.  During the Class Period, defendant Kong signed and certified
17   false and misleading SEC filings and knowingly issued numerous false and/or
18   misleading statements about Bidz's financial condition and prospects.  Defendant
19   Kong sold 195,000 shares of Bidz stock during the Class Period, for proceeds of
20   $1,921,442.

21         11.    Defendants Zinberg and Kong are collectively referred to herein as the
22   "Individual Defendants."   Bidz and the Individual Defendants are collectively
23   referred to herein as "Defendants."

24         12.    During the Class Period, the Individual Defendants, as senior
25   executive officers and/or directors of Bidz, were privy to confidential and
26   proprietary non-public information concerning Bidz's operations, finances,
27   financial condition, products, markets and present and future business prospects,

28
4
CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1   via: their direct "hands on" involvement in Bidz's business; access to internal

2   corporate documents (including the Company's operating plans, budgets and

3   forecasts, and reports of actual operations compared thereto), conversations and

4   connections with other corporate officers and employees; attendance at

5   management and/or board of directors meetings and committees thereof; and

6   reports and other information provided to them.  Because of their possession of

7   such information, the Individual Defendants knew or recklessly disregarded that

8   the adverse facts specified herein were misrepresented and/or had not been

9   disclosed to, and were being concealed from, the investing public.

10       13.   The Individual Defendants are liable as direct participants in the

11  wrongs complained of herein.  In addition, the Individual Defendants, by reason of

12  their status as senior executive officers and/or directors, were "controlling persons"

13  within the meaning of Section 20(a) of the Exchange Act and had the power and

14  influence to cause the Company to engage in the unlawful conduct complained of

15  herein.  Because of their positions of control, the Individual Defendants were able

16  to and did, directly or indirectly, control the conduct of Bidz's business.

17       14.   The Individual Defendants, because of their positions with the

18  Company, controlled and/or possessed the authority to control the contents of

19  Bidz's reports, press releases and presentations to securities analysts and the

20  investing public.  The Individual Defendants were provided with copies of Bidz's

21  misleading reports and press releases prior to or shortly after their issuance, and

22  had the ability and opportunity to prevent their issuance or cause them to be

23  corrected.

24       15.   As senior executive officers and/or directors and as controlling

25  persons of a publicly traded company whose common stock was, and is, governed

26  by the federal securities laws and registered with the SEC pursuant to the

27  Exchange Act, and was, during the Class period, traded on the NASDAQ, the

28
5

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Bidz's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Bidz's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these obligations.

16. The Individual Defendants are liable as participants in the fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of Bidz securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Bidz's business, operations and management and the intrinsic value of Bidz's securities and caused Plaintiff and other members of the Class to purchase Bidz securities at artificially inflated prices, and to suffer significant economic losses when the truth was revealed.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Bidz securities during the Class Period and who were damaged thereby (*i.e.*, the "Class"). Excluded from the Class are Defendants, the predecessors, successors, parents and subsidiaries of defendant Bidz, the current or former officers, directors, partners, and other employees of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS
DOCS\490115v1

18. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bidz's common shares were actively traded on the NASDAQ under the symbol "BIDZ." While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Bidz or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including Internet and publication notice and notice to brokerage firms who held securities and/or traded Bidz securities on behalf of their customers during the Class Period.

19. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a member of the Class and will rigorously represent the interests of Class members in the same manner as he will represent his own interests. Plaintiff knows of no conflicts or antagonisms between his individual interests and those of other class members, and Plaintiff has retained counsel competent and experienced in class and securities litigation.

21. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

7

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to disclose material information that, under the circumstances, would render the statements made not false and misleading about the business, operations, and financial condition of the Company;

(c)    whether Defendants acted knowingly or recklessly in making materially false and misleading statements or omitting to disclose material information that, under the circumstances, would render the statements made not false and misleading during the Class Period;

(d)    whether Defendants engaged in schemes, artifices to defraud and/or manipulative conduct during the Class Period;

(e)    whether the market prices of Bidz securities were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

(f)    whether members of the Class have sustained damages and the proper measure of damages.

22.    Plaintiff intends to rely, in part, upon the presumptions of reliance created by the United States Supreme Court in connection with the reliance element of his claims and the claims of the other Class members under Sections 10(b) and 20(a) of the Exchange Act and, therefore, individual questions regarding reliance do not predominate.  In particular, with respect to Defendants' material omissions alleged herein, reliance by Plaintiff and the other members of the Class is presumed. With respect to Defendants' affirmative misrepresentations alleged herein, reliance by Plaintiff and the other members of the Class is presumed under the fraud-on- the-market doctrine, because, at all relevant times, the market for Bidz securities was efficient for the following reasons, among others:

8

DOCS\490115v1

(a)    Bidz's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, which is a highly-efficient, open, developed, and automated market, free of manipulation;

(b)    As a regulated issuer, Bidz filed periodic public reports with the SEC and the National Association of Securities Dealers (NASD);

(c)    Bidz regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Bidz was followed by numerous securities analysts and investment market professionals.

23.    As a result of the foregoing, the market for Bidz securities rapidly absorbed all publicly material information regarding Bidz and that information was reflected in the price of Bidz's securities.

24.    Plaintiff and other members of the Class purchased Bidz securities between the time that Defendants made the material misrepresentations and omissions alleged herein and when the truth was finally and fully revealed to the public.

25.    Plaintiff is thus entitled to a presumption that all purchasers of Bidz securities during the Class Period suffered similar injury because they paid inflated prices for their Bidz securities in reliance on Defendants' material misrepresentations and/or omissions and/or in reliance on the integrity of the prices for Bidz securities, and suffered economic losses when the price of Bidz's stock declined in value in direct, proximate and consequential response to the Citron Research articles and the November 10, 2008 announcement.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

26.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

27.    On August 1, 2007, the Company filed its Form 8-K with the SEC, signed by defendant Kong, attaching a press release it issued on July 31, 2007, entitled "*Bidz.com Announces Strong Preliminary Second Quarter 2007 Results And Raises Guidance*."  The press release stated, in relevant part:

> Based on preliminary estimates, the Company now expects...income before income tax of approximately $3.6 million, above the Company's previous guidance range of $2.8 $3.3 million.

> "We are pleased with our better than expected profitability for the second quarter," said David Zinberg, Chief Executive Officer of Bidz.com. "The second quarter was an exciting one, as in addition to our strong business momentum, our stock began trading on the NASDAQ Capital Market. We continue to be optimistic about our future prospects as we seek to further grow revenue and profitability and enhance shareholder value."

> 2007 Outlook

> For the full year of 2007, the Company confirms its revenue guidance of $170 $180 million, and anticipates gross margin of approximately

10

25 26%, above the Company's previous gross margin guidance of 24% 25%. The Company anticipates income before income tax for 2007 of $14 $15 million, above its previous guidance of $13 $14 million. ***The higher earnings guidance is primarily due to the increase in gross profit margins***.[1]

28.    As a result of the Company's "better-than-expected" estimated profitability for the second quarter 2007 and revised earnings guidance which, the Company stated publicly, was "primarily due to the increase in gross profit margins," the price of the Company's stock increased from a closing price of $8.15 on July 30, 2007 to closing price of $8.40 on July 31, 2007.

29.    The July 31, 2007 press release was materially false and misleading because it failed to disclose that the increased second quarter estimated profitability, as well as the increased earnings and gross profit margin guidance, were due to the fact that in May 2007, Bidz entered into a non-arms length agreement with LA Jewelers, a related party, which lacked economic substance and was conceived solely as a vehicle by which Bidz could inflate gross profit and earnings; and that, pursuant to the non-arms length related party agreement, LA Jewelers guaranteed Bidz a 20% gross profit upon Bidz's sale of LA Jewelers' products (admitted by defendant Zinberg in response to an analyst question during the November 10, 2008 earnings call also attended by defendant Kong), when no vendor would sell to Bidz and guarantee a minimum gross profit of 20% knowing that Bidz sold the products through "no reserve" auctions with "a $1 minimum opening bid." See 2007 third quarter Form 10-Q, page 13.

30.    In addition, the July 31, 2007 press release was materially false and misleading because it failed to disclose that the increased second quarter 2007

---

[1] All emphasis in bold/italics added unless otherwise noted.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS
DOCS\490115v1

1    estimated results, as well as earnings and gross profit margin guidance, were also

2    due to the fact that Bidz had begun to fraudulently decrease its cost of sales, thus

3    increasing its gross profit, through improper accounting for sham transactions with

4    certain suppliers, including LA Jewelers, a related party.

5        31.    As Generally Accepted Accounting Principles ("GAAP") explain,

6    information about transactions with related parties is useful to users of financial

7    statements in attempting to compare an enterprise's results of operations and

8    financial position with those of prior periods and with those of other enterprises. It

9    helps them to detect and explain possible differences, because there is a general

10   presumption that transactions reflected in financial statements have been

11   consummated on an arms-length basis between independent parties. However, that

12   presumption is not justified when related party transactions exist because the

13   requisite conditions of competitive, free-market dealings may not exist. Because it

14   is possible for related party transactions to be arranged to obtain certain results

15   desired by the related parties, the resulting accounting measures may not represent

16   what they usually would be expected to represent.

17       32.    Defendants, in issuing the July 31, 2007 press release, knew or

18   recklessly failed to know that the higher earnings and gross profit guidance was

19   predicated, in part, upon the future execution of non-arms-length transactions with

20   related parties that were arranged to obtain certain results desired by the related

21   parties and that, accordingly, the guidance was materially misleading.

22       33.    In addition, Defendants, in issuing the July 31, 2007 press release,

23   knew or recklessly failed to know that the higher earnings and gross profit

24   guidance was predicated, in part, upon the execution of future sham transactions

25   with certain suppliers, including LA Jewelers, which involved the recordation of

26   fictitious "marketing cost reimbursements."

27

28

12

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

34.     The "marketing cost reimbursements" were, in reality, offsetting "payments" between Bidz and the suppliers.   For example, if Bidz would ordinarily pay a supplier a fair market price of $1 million for certain jewelry, pursuant to the sham arrangement (i) Bidz would pay $1.2 million for this jewelry and (ii) the supplier would purportedly reimburse Bidz $0.2 million for marketing this jewelry.

35.     The "marketing cost reimbursements" were effectively paper round trip transactions which lacked economic substance, and provided no pecuniary benefit to either Bidz or the suppliers.   The sham transactions were designed to have, and did have, the purpose and effect only of inflating Bidz's reported financial performance because the "marketing cost reimbursements" (*i.e.*, the $0.2 million referred to in the illustrative example above) was recorded as a reduction of costs (cost of sales), the equivalent of income.   In furtherance of the accounting fraud, Defendants would "manage" the Company's gross profits and gross margins by recording a portion of the "marketing cost reimbursements" as income immediately and by deferring the remainder (which Defendants referred to as "unamortized" marketing cost reimbursements) until needed to inflate the gross profits and gross margins of subsequent accounting periods.

36.     The scenario described above is almost identical to the Tyco scenario which the SEC describes as follows in its Litigation Release No. 19657 (April 17, 2006) as follows:

> The complaint alleges that Tyco inflated its operating income by $567 million from its fiscal year 1998 through its fiscal quarter ended December 31, 2002, by means of connection fees that Tyco's ADT Security Services, Inc. subsidiary charged to dealers from whom it purchased security monitoring contracts. Because the connection fee was fully offset by a simultaneous increase in the purchase price ADT

13

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1    allocated to the dealers' security monitoring contracts, the connection

2    fee transaction lacked economic substance and should not have been

3    recorded in Tyco's income statement.

4        37.    As with Tyco, the Bidz accounting fraud resulted in an immediate

5    injection of fraudulent income (income with a 100% gross margin because there

6    was no offsetting cost), while concomitantly creating an inflated inventory figure.

7    For example, Bidz buys $100 worth of inventory, records $20 of "marketing cost

8    reimbursements" (bogus income which is reflected in Bidz's books as a reduction

9    of "cost of sales"), and ascribes a purchase price of $120 to the inventory.  The

10   effect of the fraud may be illustrated as follows:

| | Inventory as Properly Recorded at the True Dollar Amount of the <u>Acquisition Price</u> | Inventory as Improperly Recorded at the Inflated <u>Acquisition Price</u> |
|---|---|---|
| Inventory recorded | $100 | $120 |
| Bogus income recorded upon acquisition | -0- | $  20* |
| "Paid" by Bidz | $100 | $120 |
| "Received" from vendor | <u>  -0-</u> | <u>   20</u> |
| Net "paid" by Bidz | <u>$100</u> | <u>$100</u> |

*  Bidz typically recognized a portion of this bogus income immediately and deferred a portion to be recognized in a following quarter.

21       38.    On August 13, 2007, the Company filed its Form 8-K with the SEC,

22   signed by defendant Kong, attaching a press release, entitled "Bidz.com, Inc.

23   Announces Second Quarter 2007 Financial Results."  The press release reported a

24   pre-tax income for the second quarter of $3.7 million, $0.1 million more than the

25   guidance issued in the July 31, 2007 press release, and further stated, in part, the

26   following:

27

28
                                    14

**Business Outlook**

The Company expects revenues for the third quarter of 2007 to be in the range of $37-39 million, and expects income before income tax of approximately $3.0-3.2 million.  For the full year of 2007, the Company confirms its revenue guidance of $170-$180 million, and anticipates gross margin of approximately 25-26%. The Company expects income before income tax for 2007 of $14-$15 million. The Company expects its effective tax rate for the full year of 2007 to be approximately 11%, and expects to end the year with approximately 24.5 million shares outstanding.

39.    This same guidance was repeated by defendant Kong during the earnings call (also attended by defendant Zinberg) on August 13, 2007.  Further clarification on the guidance was also provided in the earnings call:

**Mark Argento - Craig-Hallum Capital:**

Good Afternoon. Two questions for you. Little bit about looking at your guidance of $3.0 to $3.2 million of pre-tax income, I'm assuming you're looking for a quarter pretty similar in terms of marketing spend and gross margins to the quarter we saw here and then you re-engage in the marketing spend in Q4. Is that a good characterization of how we should be looking at the model?

**Lawrence Kong - Chief Financial Officer:**

Yes, Mark. I think the guidance of 25% to 26% for the gross margin I think would be a good level to look for in the third quarter. I think marketing expenses may be slightly higher than the second quarter, but will be under control and that's why we feel comfortable with the $3.0 to $3.2 million profit before tax. And we are halfway into the quarter and we feel confident that we can achieve those results.

15

40.    The guidance that was set forth on August 13, 2007 was materially false and misleading because it was predicated upon the fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.  Defendant Kong, in the earnings call, in response to a question by an analyst from Craig-Hallum Capital confirmed that the co-op marketing "already kicked in."

41.    On November 13, 2007, the Company filed its Form 8-K with the SEC, signed by defendant Kong, attaching a November 12, 2007 press release, entitled "Bidz.com, Inc. Announces Record Third Quarter 2007 Financial Results," announcing "record" third quarter 2007 financial results, "record" gross margin of approximately 31.7%, and raised 2007 guidance.  The press release stated, in relevant part that:

> The Company's pre tax income for the third quarter of 2007 was $5.2 million, above the Company's original guidance of $3.0 $3.2 million, and compared to $1.0 million in the prior period in 2006. Net income for the third quarter of 2007 increased to $3.6 million, or $0.14 per fully diluted share on 26.3 million weighted average shares outstanding, compared to net income of $997,000, or $0.04 per fully diluted share on 23.8 million weighted average shares outstanding in the same period of 2006. ***The increase in net income was due primarily to higher gross profit margins*** on increased revenues.
>
> "We are very pleased to announce such strong results for the third quarter," said, David Zinberg, President and Chief Executive Officer of Bidz.com. "Our unique value proposition and continued focus on executing our business and achieving results has driven this

16

performance. ***Our new initiatives have significantly increased sales and resulted in record gross margins for the quarter***."

\*       \*       \*

In the third quarter, gross profit increased 90.6% to $12.7 million from $6.7 million in the third quarter of 2006. Gross margin in the third quarter of 2007 was 31.7%, compared with 24.6% in the same period of 2006. Gross margin benefited from the amortized co op marketing contributions that reduced our cost of sales by $833,000 or 2.1% of net revenue. The co op marketing contributions are amortized as a reduction to cost of sales over the estimated inventory turnover period. We expect gross margins for the fourth quarter to continue to improve over the corresponding prior year period as a result of continued receipt of co op marketing dollars and continued elimination of any major shipping promotions.

\*       \*       \*

Business Outlook

The Company...has ***increased its expected gross margin guidance to approximately 27 28%***. The Company now expects pre tax income for 2007 of $18.0 $18.5 million...The Company is introducing new guidance for 2008 and expects revenues to be in the range of $225 $230 million, pre tax income of approximately $23.5 $25.5 million and ***gross margin of approximately 27 28%.***

42.     The same guidance was repeated by defendant Kong during the earnings call on November 12, 2007 also attended by defendant Zinberg. Further clarification on the guidance was also provided during the earnings call:

**Liz Pierce - Roth Capital Partners**:

17

DOCS\490115v1

On the guidance, and this is where I missed it, I couldn't hear it. I think in the beginning, you were talking about the co-op advertising so obviously that has been highly effective. Did I understand that you were using that in the cost of goods, right?

**David Zinberg**:

Yes.

**Liz Pierce - Roth Capital Partners**:

But that is really why you're talking about gross margin for next year, being in that 27% to 28%, that's where the lift is coming from?

**David Zinberg**:

Exactly.

43.    The guidance was materially false and misleading because it was predicated upon the future fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

44.    Further, the November 12, 2007 press release was materially false and misleading because the reported gross profit and gross margin were materially (as the concept is discussed in SEC Staff Accounting Bulletin No, 99) inflated by related party guaranteed minimum gross profit transactions, and by sham paper round trip marketing cost reimbursement transactions as described above.

45.    On November 13, 2007, the Company filed its 2007 third quarter Form 10-Q with the SEC.  This document, which was signed by defendants Zinberg and Kong, reported the same financial information as the November 12, 2007 press release.  It belatedly disclosed the related party gross profit margin guarantee as follows:

Related Party Transactions

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

In May, 2007 we entered into an understanding with LA Jewelers whereby they will guarantee that we will earn a certain minimum gross profit margin on their merchandise. This agreement provides that in the event of a gross profit margin shortfall we will be compensated for the difference between our actual gross profit margin and the guaranteed minimum gross profit margin. As of September 30, 2007, $122,000 was outstanding and accrued under this gross profit margin guarantee. One of the owners of LA Jewelers, Saied Aframian, owns 1,228,000 shares of our common stock as of September 30, 2007.

46.    The 2007 third quarter Form 10-Q stated the following regarding co op marketing contributions:

(a)    "Beginning in the three months ended September 30, 2007, gross profit margins benefited from the amortized co op marketing contributions that reduced our cost of sales by $833,000 or 2.1% of net revenue. We expect the co op marketing contributions to improve our gross profit margins for the remainder of the fiscal year compared to the corresponding period of the prior year."

(b)    "LA Jewelers participates in our inventory co op marketing program. For the three months ended September 30, 2007 we earned $134,000 from LA Jewelers relating to co op marketing contributions and $194,000 was unamortized as of September 30, 2007."

(c)    "Receivable from vendors for co op marketing contributions is included in other current assets and amounted to $0 and $1.2 million at December 31, 2006 and September 30, 2007, respectively."

(d)    "Unamortized inventory co op marketing reserve is $0 and $1.5 million at December 31, 2006 and September 30, 2007, respectively."

19

47.    In other words, as of September 30, 2007, the Company recorded $2,333,000 of co op marketing contributions ($328,000 of which related to LA Jewelers).  $833,000 of the $2,333,000 of co op marketing contributions was used to reduce cost of sales ($134,000 of which related to LA Jewelers) and $1,500,000 of co op marketing contributions was placed in a reserve (an unamortized inventory co op marketing account) for future reductions of cost of sales.  This information was also repeated by defendant Kong during the earnings call on November 12, 2007, also attended by defendant Zinberg.

48.    The Company described its accounting for co op marketing contributions in the 2007 third quarter Form 10-Q as follows:

> Beginning in third quarter 2007 we record reserves against our inventory for co op marketing contributions from our vendors that have yet to be amortized to cost of sales. The co op marketing contributions are amortized as a reduction to cost of sales over the estimated inventory turnover period. In accordance with EITF 02 16: Accounting by a Customer (including a Reseller) for Certain Consideration Received from a Vendor, the co op marketing contributions that cannot be identified specifically to benefit the vendors are a reduction in cost of sales.

49.    At all relevant times, the described accounting failed to comply with GAAP.  The GAAP which is cited above (EITF 02 16) addresses "cash contributions" from vendors, not paper round trip or IOU (as noted above, $1.2 million of co op marketing contributions were reflected as "receivables" at September 30, 2007) transactions.  Accordingly, the provisions of EITF 02 16 were inapplicable to Bidz's co op marketing transactions.

50.    Even assuming, *arguendo*, that the co op marketing contribution transactions were legitimate cash transactions, the Company improperly inflated

20

gross profit and gross margin by recording these co op marketing contribution transactions as a reduction to cost of sales because:

(a)     As stated in EITF 02 16, "[t]he cash consideration received for cooperative advertising, to the extent that it represents a reimbursement of specific, incremental, identifiable costs incurred by the customer to sell Vendor's products, should be characterized as a reduction of those costs when recognized in the customer's income statement."

(b)     The co-op marketing contributions that were received were easily identified as specific, incremental, identifiable costs incurred by Bidz to sell the vendor's products.

51.     Bidz's marketing costs, for the most part, were easily identified as specific, incremental, identifiable costs incurred by Bidz to sell specific products. This was made clear by defendant Zinberg during the November 12, 2007 earnings call (also attended by defendant Kong):

**Ryan Randall   Randall Capital**:

"...can you just clarify your comment you made about how your merchants have to pay in more into the marketing fund if they want to sell you more inventory than you're willing to take?"

**David Zinberg**:

"I will give you an example. We can sell maybe ten Corum watches a month, and if a vendor wants to sell us 100 Corum watches a month we would take a marketing fee, buy keywords and use those Corum keywords to sell the watches."

52.     This was also confirmed by CW4, who was the Director of Business Development, PR and Marketing from February 2000 until June 2007.  CW4 was in charge of the marketing department and his job was to advertise for Bidz. CW4's duties included buying ad space, ad words, banners on websites and

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

advertising on search engines. CW4 stated that there were specific ad words used for every product. When asked about the specific ad words she/he bought for Bidz, she/he stated that she/he would use a combination of words like jewelry, rings, watches, gold jewelry, diamonds, and diamond watches. She/he also added that she/he used keywords for certain brands of watches sold on the website, like Salavetti and Tonino Lamborghini. CW6, who was a Marketing Executive and an Online Media Buyer from May 2003 until April 2005, also stated that although she/he did not personally buy ad words or choose the ad words, she/he saw and approved the use of the ad words selected for specific products. The invoices for these ad words were approved by defendant Zinberg, who then sent them to the accounting department for payment.

53.    Because Defendants referred to EITF 02 16 several times in the 2007 third quarter Form 10-Q, there is a strong inference that Defendants read EITF 02 16. Accordingly, Defendants either knew or were reckless in not knowing that the Company misapplied the provisions of EITF 02 16 in accounting for co op marketing contributions.

54.    The 2007 third quarter Form 10-Q was materially false and misleading because the reported gross profit and earnings were inflated by related party guaranteed minimum gross profit transactions, and by sham paper round trip marketing cost reimbursement transactions as described above.

55.    The impact of the Bidz's concocted related party transactions and its sham transactions was to fraudulently overstate Bidz's gross profit and net income by approximately $955,000 and $780,000, respectively, for the quarter ended September 30, 2007.

56.    Defendants knew or recklessly failed to know that the related party transactions were concocted solely to fraudulently inflate gross profit and net income because no vendor would pay to have Bidz sell its products and then

22

1    guarantee Bidz a minimum gross profit when Bidz sold through "no reserve"

2    auctions with "a $1 minimum opening bid."   For the same reason, Defendants

3    knew or recklessly failed to know that the co-op marketing transactions were sham

4    transactions.

5         57.    The 2007 third quarter Form 10-Q contained certifications by

6    defendants Zinberg and Kong which stated:

7         1.    I have reviewed this Quarterly Report on Form 10 Q of

8         Bidz.com, Inc.;

9         2.    Based on my knowledge, this report does not contain any

10        untrue statement of a material fact or omit to state a material fact

11        necessary to make the statements made, in light of the circumstances

12        under which such statements were made, not misleading with respect

13        to the period covered by this report;

14        3.    Based on my knowledge, the financial statements, and other

15        financial information included in this report, fairly present in all

16        material respects the financial condition, results of operations and

17        cash flows of the registrant as of, and for, the periods presented in this

18        report;

19        4.    The registrant's other certifying officer and I are responsible for

20        establishing and maintaining disclosure controls and procedures (as

21        defined in Exchange Act Rules 13a 15(e) and 15d 15(e)) for the

22        registrant and have:

23             a)    Designed such disclosure controls and procedures, or

24             caused such disclosure controls and procedures to be designed

25             under our supervision, to ensure that material information

26             relating to the registrant is made known to us by others,

27

28
                                       23
                   CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
                          OF THE FEDERAL SECURITIES LAWS

particularly during the period in which this report is being prepared;

b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*    *    *

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

Each of the undersigned hereby certifies, for the purposes of section 1350 of chapter 63 of title 18 of the United States Code, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002, in his capacity as an officer of Bidz.com, Inc. ("Bidz.com"), that, to his knowledge, the Quarterly Report of Bidz.com on Form 10 Q for the period ended September 30, 2007 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and that the information contained in such report fairly presents, in all material respects, the financial condition and results of operation of Bidz.com.

58.    The foregoing certifications were materially false and misleading because:

(a)    The report contained untrue statements of a material fact (*i.e.*, "gross profit margins benefited from the amortized co op marketing contributions that reduced our cost of sales by $833,000"; co op marketing contributions properly served to reduce cost of sales because they could not be identified specifically to benefit the vendors).

(b)    The report omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading (*i.e.*, co op marketing contributions which served to reduce the Company's cost of sales by $833,000 were sham paper round trip marketing cost reimbursement transactions).

(c)    For the reasons specified in "a" and "b" above and because EITF 02 16 was misapplied, the financial statements and other financial information included in the report did not fairly present in all material respects the financial condition, results of operations, and cash flows of Bidz during the period presented in the report.

25

59.     The 2007 third quarter Form 10-Q contained a section entitled "Management's Discussion And Analysis Of Financial Condition And Results Of Operations (the "MD&A") which stated:

> Beginning in the three months ended September 30, 2007, gross profit margins benefited from the amortized co op marketing contributions that reduced our cost of sales by $833,000 or 2.1% of net revenue. We expect the co op marketing contributions to improve our gross profit margins for the remainder of the fiscal year compared to the corresponding period of the prior year.

60.     The foregoing statement was materially false and misleading because, but for the misapplication of EITF 02 16, the non-arms-length related party transactions, and the inclusion of sham paper round trip marketing cost reimbursement transactions, gross profit margins would not have increased or be expected to increase for the remainder of the fiscal year.

61.     On May 18, 1989, the SEC issued an interpretive release (Securities Act Release No. 6835) which stated, in relevant part:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:
>
> > The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an

26

1    opportunity to look at the company through the eyes of

2    management by providing both a short and long term analysis

3    of the business of the company. The Item asks management to

4    discuss the dynamics of the business and to analyze the

5    financials.

6    As the Commission has stated, "[i]t is the responsibility of

7    management to identify and address those key variables and other

8    qualitative and quantitative factors which are peculiar to and

9    necessary for an understanding and evaluation of the individual

10    company."

11    62.     SEC Staff Accounting Bulletin No. 104, drawing from Regulation S-

12    K, Article 303, and Financial Reporting Release No. 36, also reiterated the

13    importance of MD&A in financial statements:

14    Management's Discussion & Analysis (MD&A) requires a discussion

15    of liquidity, capital resources, results of operations and other

16    information necessary of a registrant's financial condition, changes in

17    financial condition and results of operations.  This includes unusual or

18    infrequent transactions, known trends, or uncertainties that have had,

19    or might reasonably be expected to have, a favorable or unfavorable

20    material effect on revenue, operating income or net income and the

21    relationship between revenue and the costs of the revenue.  Changes

22    in revenue should not be evaluated solely in terms of volume and

23    price changes, but should also include an analysis of the reasons and

24    factors contributing to the increase or decrease.  The Commission

25    stated in Financial Reporting Release No. 36 that MD&A should

26    "give investors an opportunity to look at the registrant through the

27    eyes of management by providing a historical and prospective

28

27

1    analysis of the registrant's financial condition and results of

2    operations, with a particular emphasis on the registrant's prospects for

3    the future."

4    63.    Thus, the management of a public corporation must disclose in its

5    periodic reports filed with the SEC, "known trends or any known demands,

6    commitments, events or uncertainties" that are reasonably likely to have a material

7    impact on a company's sales revenues, income or liquidity, or cause previously

8    reported financial information not to be indicative of future operating results.  17

9    C.F.R. § 29.303(a)(l)-(3) and Instruction 3.

10    64.    The MD&A which was contained within the 2007 third quarter Form

11    10-Q was materially false and misleading because it failed to disclose the impact of

12    Bidz's non-arms-length related party transactions, sham transactions, and improper

13    accounting on Bidz's financial statements, and because it represented a false gross

14    profit and earnings trend.

15    65.    On November 27, 2007, the Company issued a press release, entitled

16    "*Bidz.com Has Record Holiday Weekend*," which reaffirmed its previously

17    announced guidance.  This press release, in relevant part, stated:

18    The Company also reaffirmed its guidance provided on November 12,

19    2007 for the 2007 fourth quarter, 2007 and 2008. The Company

20    expects revenues for the 2007 fourth quarter to be in the range of $56

21    $58 million, and expects pre tax income of approximately $5.6 $6.0

22    million. For 2007, the Company expects revenue in the range of $180

23    $182 million and gross margin of approximately 27 28%. The

24    Company expects pre tax income of $18.0 $18.5 million. The

25    Company expects its effective tax rate to be approximately 20.2%,

26    and expects to end the year with approximately 26.4 million fully

27    diluted shares outstanding. For 2008, the Company expects revenues

28

DOCS\490115v1

to be in the range of $225 $230 million, pre tax income of approximately $23.5 $25.5 million and gross margin of approximately 27 28%. The Company expects its effective tax rate to be approximately 40%. The Company expects fully taxed GAAP EPS of $0.47 $0.51, and expects to end the year with approximately 30.0 million fully diluted shares outstanding.

66.    The guidance that was set forth in the November 27, 2007 press release was materially false and misleading because it was predicated upon the fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

67.    Defendants knew or were reckless in not knowing that the November 27, 2007 press release was materially false and misleading because it was predicated upon the fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

68.    On January 15, 2008, the Company filed its Form 8-K with the SEC, signed by defendant Kong, attaching a press release dated January 14, 2008, entitled "*Bidz.com, Inc. Now Expects Better Than Anticipated Fourth Quarter and Year-End 2007 Results,*" which stated, in part, the following:

For Q4 2007, the Company now expects to exceed revenues of $56-$58 million, and pre-tax income of $5.6-$6.0 million. For 2007, the Company expects to exceed its revenue guidance range of $180-$182 million and pre-tax income of $18.0-$18.5 million.

*        *        *

The Company also reaffirmed its guidance for 2008. The Company expects revenues to be in the range of $225-$230 million, pre-tax income of approximately $23.5-$25.5 million and gross margin of

29

approximately 27-28%. The Company expects its effective tax rate to be approximately 40%. The Company expects fully taxed GAAP EPS of $0.47-$0.51, and expects to end the year with approximately 30.0 million fully diluted shares outstanding.

69.    Commenting on the results, defendant Zinberg stated, in relevant part, the following:

*We are excited about our better-than-anticipated results for the fourth quarter and the full year. We have continued to achieve significant sales gains with increased profitability despite a difficult economic environment*.  Based on our strong finish to the year and our key performance indicators, we are confident that our momentum will continue in 2008.

70.    The "better-than-anticipated results" and the other guidance set forth in the January 14, 2008 press release was materially false and misleading because it was predicated upon the future fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

71.    On February 28, 2008, the Company filed its Form 8-K with the SEC, signed by defendant Kong, attaching a press release, entitled "*Bidz.com, Inc. Announces Exceptional Financial Results of $8.2 Million of Pre-Tax Income for the Fourth Quarter and $20.7 million pre-tax income for the Full Year 2007 that Significantly Exceeds Guidance and Raises 2008 Guidance*," announcing raised 2008 guidance and "exceptional financial results" of $8.2 million of pre tax income for the fourth quarter of 2007 and $20.7 million pre tax income for the full 2007 year.

72.    The February 28, 2008 press release also highlighted the fact that reported:

30

a.    fourth quarter gross margins increased to 31.2% from 20.4% year over year;

b.    2007 gross margins increased to 29.1% from 23.7% year over year.

73.    In addition, the February 28, 2008 press release stated, in relevant part:

In the fourth quarter, gross profit increased 158% to $19.8 million from $7.7 million in the fourth quarter of 2006. Gross margins in the fourth quarter of 2007 were 31.2%, compared with 20.4% in the same period of 2006. Gross margins benefited from co op marketing contributions that reduced the Company's cost of sales by $4.0 million or 6.3% of net revenue. The co op marketing contributions are charged against cost of sales over the estimated inventory turnover period.

*    *    *

Business Outlook/Guidance

The Company is introducing new revenue guidance for the first quarter of 2008 of $59 $61 million, pre tax income of approximately $6.5 $7.3 million and, fully taxed GAAP EPS of $0.14 $0.16. This compares to revenue of $44.7 million for the first quarter of 2007 and pre tax income of $3.5 million. For the full year 2008, the Company is raising its pre tax Income guidance to $25 26 million, fully taxed GAAP EPS of $0.49 $0.53 and is reiterating its revenue guidance range of $225 $230 million and gross margins of approximately 27 28%. The Company expects its effective tax rate for the full year of 2008 to be approximately 40%, and expects to end the year with approximately 30.0 million fully diluted shares outstanding.

31

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

74.    The February 28, 2008 press release was materially false and misleading because the reported gross profit and gross margin were inflated through related party guaranteed minimum gross profit transactions, by sham paper round trip marketing cost reimbursement transactions, and by improper accounting.

75.    The guidance that was set forth in the February 28, 2008 press release was materially false and misleading because it was predicated upon the future fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

76.    Defendants knew or were reckless in not knowing that the reported financial results and the guidance that were set forth in the February 28, 2008 press release were materially false and misleading because this information was based upon the fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

77.    On March 12, 2008, the Company filed its 2007 Form 10-K with the SEC.  This document, which was signed by defendants Zinberg and Kong, reported the same financial information as the February 28, 2008 press release.   It, in relevant part, stated:

Related Party Transactions:

LA Jewelers participates in our inventory co op marketing program. For the year ended December 31, 2007 we earned $522,000 from LA Jewelers relating to co op marketing contributions and $379,000 was unamortized as of December 30, 2007.

In May, 2007 we entered into an understanding with LA Jewelers whereby they will guarantee that we will earn a certain minimum gross profit margin on their merchandise. This agreement provides that in the event of a gross profit margin shortfall we will be compensated for the difference between our actual gross profit margin

32

and the guaranteed minimum gross profit margin. For the year ended December 31, 2007, $427,000 was recognized under this agreement and as of December 31, 2007, $129,000 was outstanding and accrued under this gross profit margin guarantee.

78. The foregoing representation was materially false and misleading because it failed to disclose that the transactions with LA Jewelers lacked economic substance and were contrived solely to materially inflate Bidz's gross profit and earnings for 2007 by approximately $949,000 and $830,000, respectively.

79. The 2007 Form 10-K further stated that: "Gross profit margins benefited from the amortized co op marketing contributions that reduced our cost of sales by $4.8 million or 2.6% of net revenue." This statement was materially false and misleading because it was predicated upon the fraudulent recognition of gross profits and income from non-arms length related party transactions, sham transaction, and improper accounting.

80. Defendants knew or were reckless in not knowing that gross profit and net income were materially overstated by approximately $4.8 million and $4.2 million, respectively, because Bidz's gross profit and earnings were fraudulently based upon the fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

81. The 2007 Form 10-K also represented the following regarding Bidz's accounting for co op marketing contributions:

In third quarter 2007, we started to bill and collect from our inventory vendors co op marketing contributions as an incentive for us to market and sell the inventory for sale on the Bidz website. In accordance with EITF 02 16: Accounting by a Customer (including a Reseller) for Certain Consideration Received from a Vendor, the co op marketing

33

contributions that cannot be identified specifically to benefit the vendors are a reduction in cost of sales and will result in an increase in gross profit. ***We cannot specifically identify the benefits to each vendor, consequently, co op marketing contributions are charged against inventory as a reduction of costs and amortized as a reduction of cost of sales over an estimated inventory turnover period of approximately 110 days***. For the years ended December 31, 2006 and 2007, we have earned $0 and $4.8 million of co op marketing contributions, respectively, with $0 and $4.2 million, respectively, remaining unamortized as an offset to inventory at December 31, 2006 and 2007. Receivable from vendors for co op marketing contributions is included in other current assets and amounted to $0 and $2.9 million at December 31, 2006 and 2007, respectively.

82.    The foregoing representation was materially false and misleading because the Company improperly inflated gross profit and gross margin by recording the co-op marketing contribution transactions as a reduction to cost of sales even though the marketing costs were, for the most part, easily identified as specific, incremental, identifiable costs incurred by the Company to sell specific products.

83.    Defendants either knew or recklessly failed to know that the foregoing representation was materially false and misleading because Defendants referred to EITF 02-16 several times in the 2007 Form 10-K, and therefore, there is a strong inference that Defendants read EITF 02-16 and either knew or were reckless in not knowing that the Company was misapplying its provisions in accounting for co-op marketing contributions.

34

84.    The 2007 Form 10-K contained certifications signed by defendants Zinberg and Kong which were substantially identical to the certifications that appeared in the 2007 third quarter Form 10-Q.  These certifications were materially false and misleading because:

(a)    The report contained untrue statements of a material fact (*i.e.*, "gross profit margins benefited from the amortized co op marketing contributions that reduced our cost of sales by $4.8 million"; co op marketing contributions properly served to reduce cost of sales because they could not be identified specifically to benefit the vendors).

(b)    The report omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading (*i.e.*, co op marketing contributions which served to reduce the Company's cost of sales by $4.8 million were sham paper round trip marketing cost reimbursement transactions).

(c)    For the reasons specified in "a" and "b" above and because EITF 02 16 was misapplied, the financial statements, and other financial information included in the report did not fairly present in all material respects the financial condition, results of operations, and cash flows of Bidz during the period presented in the report.

85.    The 2007 Form 10-K contained an MD&A section which was materially false and misleading because it failed to disclose the impact of Bidz's non-arms-length related party transactions, sham transactions, and improper accounting on Bidz's financial statements, and because it represented a false gross profit and earnings trend.

86.    On May 6, 2008, the Company issued a press release, entitled "*Bidz.com, Inc. Announces Financial Results for the First Quarter 2008 and Exceeds Guidance,*" announcing financial results for the first quarter of 2008,

35

which exceeded previous guidance.  The press release also highlighted the fact that reported gross margins increase to 29.1% from 24.9% year-over-year.  The press release stated, in relevant part:

> The Company's pre tax income for the first quarter of 2008 was $7.8 million, significantly exceeding its revised guidance of $6.5 $7.3 million, and compared to $3.5 million in the prior year period in 2007. Net income for the first quarter of 2008 increased to $4.6 million...In the first quarter, gross profit increased 62.1% to $18.0 million from $11.1 million in the first quarter of 2007. Gross margins in the first quarter of 2008 were 29.1%, compared with 24.9% in the same period of 2007.
>
> *     *     *
>
> Business Outlook/Guidance
>
> For the full year 2008, the Company is increasing its fully taxed GAAP EPS to $0.52 $0.55 from $0.49 $0.53, and is reiterating its revenue guidance range of $225 $230 million, pre tax income guidance of $25 26 million and gross margins of approximately 27 28%. The Company expects its effective tax rate for the full year of 2008 to be approximately 40 41%, and expects to end the year with approximately 28.5 million fully diluted shares outstanding.

87.    The reported financial results and the guidance that were set forth in the May 6, 2008 press release were materially false and misleading because they were predicated upon the fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

88.    Defendants knew or were reckless in not knowing that the May 6, 2008 press release was materially false and misleading because it was predicated

36

1    upon the fraudulent recognition of gross profit and income from non-arms-length

2    related party transactions, sham transactions, and improper accounting.

3        89.    On May 6, 2008, the Company filed its 2008 first quarter Form 10-Q

4    with the SEC. This document, which was signed by defendants Zinberg and Kong,

5    reported the same financial information as the May 6, 2008 press release.

6    Accordingly, Defendants knew or were reckless in not knowing that this financial

7    information was materially false and misleading because it was predicated upon

8    the fraudulent recognition of gross profit and income from non-arms-length related

9    party transactions, sham transactions, and improper accounting.

10        90.    The 2008 first quarter Form 10-Q stated the following regarding

11   transactions with LA Jewelers:

12       Related Party Transaction

13       During the three months ended March 31, 2007 and 2008, we

14       purchased approximately 7.0% and 3.2%, respectively, of our

15       merchandise from LA Jewelers, Inc., where one of its managers is a

16       stockholder who beneficially owns 1,228,000 shares of our common

17       stock as of December 31, 2007. For the three months ended March 31,

18       2008 we earned approximately $482,000 from LA Jewelers relating to

19       co op marketing contributions and $127,000 was unamortized as of

20       March 31, 2008.

21       In May, 2007 we entered into an understanding with LA Jewelers

22       whereby they will guarantee that we will earn a certain minimum

23       gross profit margin on their merchandise. This agreement provides

24       that in the event of a gross profit margin shortfall we will be

25       compensated for the difference between our actual gross profit margin

26       and the guaranteed minimum gross profit margin. For the three

27

28
                                    37

1    months ended March 31, 2008, we recognized $141,000 under this

2    agreement, which was outstanding and accrued as of March 31, 2008.

3        91.    The foregoing representation was materially false and misleading

4    because it failed to disclose that the transactions with LA Jewelers lacked

5    economic substance and were concocted solely to inflate Bidz's gross profit and

6    earnings for the first quarter of 2008 by approximately $623,000 and $369,439,

7    respectively.

8        92.    The 2008 first quarter Form 10-Q stated the following regarding co-op

9    marketing transactions:

10       In the third quarter of 2007, we started to bill and collect from our

11       inventory vendors co op marketing contributions as an incentive for us

12       to market and sell their merchandise on the Bidz website. In

13       accordance with EITF 02 16: Accounting by a Customer (including a

14       Reseller) for Certain Consideration Received from a Vendor, the co

15       op marketing contributions that cannot be identified specifically to

16       benefit the vendors are a reduction in cost of sales and will result in an

17       increase in gross profit. We cannot specifically identify the benefits to

18       each vendor, consequently, co op marketing contributions are charged

19       against inventory as a reduction of costs and amortized as a reduction

20       of cost of sales. For the three months ended March 31, 2008, we have

21       recognized $3.6 million of co op marketing contributions.

22       Approximately $3.3 million remain unamortized and is included as an

23       offset to inventory at March 31, 2008.

24       93.    The statement that "[w]e cannot specifically identify the benefits to

25    each vendor" was materially false and misleading because, for the most part,

26    Bidz's marketing costs were easily identified as specific, incremental, identifiable

27    costs incurred by the Company to sell specific products. Defendants knew or were

28

38

1    reckless in not knowing that the statement was materially false and misleading

2    because there is a strong inference that Defendants read EITF 02-16 since they

3    referred to it several times in the 2008 first quarter Form 10-Q.    Therefore,

4    Defendants knew or were reckless in not knowing that the Company misapplied its

5    provisions in accounting for co-op marketing contributions.

6         94.    Defendants knew or were reckless in not knowing that the reported

7    gross profit and net income were materially overstated by approximately $3.6

8    million and $2.1 million, respectively, because these amounts were based upon the

9    fraudulent recognition of gross profit and income from non-arms-length related

10   party transactions, sham transactions, and improper accounting.

11        95.    Because, the co-op marketing fraud resulted in a falsely inflated

12   inventory, beginning with the first quarter of 2008, the Company began to

13   eliminate a substantial portion of its fictitious inventory by describing the de facto

14   write-down as arms length wholesale sales.

15        96.    The 2008 first quarter Form 10-Q contained certifications signed by

16   defendants Zinberg and Kong which were substantially identical to the

17   certifications that appeared in the 2007 third quarter Form 10-Q.    These

18   certifications were materially false and misleading because:

19        (a)    The report contained untrue statements of a material fact (*i.e.*,

20   gross profit margins benefited from the amortized co op marketing contributions

21   that reduced cost of sales by $3.6 million; co op marketing contributions properly

22   served to reduce cost of sales because they could not be identified specifically to

23   benefit the vendors).

24        (b)    The report omitted to state a material fact necessary to make the

25   statements made, in light of the circumstances under which such statements were

26   made, not misleading (*i.e.*, co op marketing contributions which served to reduce

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1   the Company's cost of sales by $3.6 million were sham paper round trip marketing

2   cost reimbursement transactions).

3            (c)    For the reasons specified in "a" and "b" above and because

4   EITF 02 16 was misapplied, the financial statements, and other financial

5   information included in the report did not fairly present in all material respects the

6   financial condition, results of operations, and cash flows of Bidz during the period

7   presented in the report.

8            97.    The 2008 first quarter Form 10-Q contained an MD&A section which

9   was materially false and misleading because it failed to disclose the impact of

10   Bidz's non-arms-length related party transactions, sham transactions, and improper

11   accounting on Bidz's financial statements, and because it represented a false gross

12   profit and earnings trend.

13           98.    The 2008 first quarter Form 10-Q was also materially false and

14   misleading because it incorporated the materially false and misleading 2007 Form

15   10-K by reference: "These financial statements and related notes should be read in

16   conjunction with the Company's audited financial statements for the fiscal year

17   ended December 31, 2007 filed in the Annual Report on Form 10 K by the

18   Company on March 12, 2008 with the Securities and Exchange Commission." *See*

19   2008 first quarter Form 10-Q, page 6.

20           99.    On August 5, 2008, the Company filed its Form 8-K with the SEC,

21   signed by defendant Kong, attaching a press release, entitled "*Bidz.com, Inc.*

22   *Announces Strong Financial Results for the Second Quarter 2008 and Exceeds*

23   *Guidance.*"  The press release stated that the Company "reported strong financial

24   results for the three months ended June 30, 2008, exceeding its previous guidance

25   and continuing a trend of exceeding its forecasts."  It also stated, in relevant part:

26           In the second quarter, gross profit increased 40.9% to $15.3 million

27           from $10.9 million in the second quarter of 2007. Gross margin in the

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

second quarter of 2008 was 27.9%, compared with 27.8% in the same period of 2007.

\*       \*       \*

Gross profit increased 51.6% to $33.4 million from $22.0 million in the six months ended June 30, 2007. Gross margin for the first half of 2008 was 28.5% versus 26.2% in the first half of 2007.

\*       \*       \*

Income from operations in the first six months of 2008 was $14.1 million or 12.0% of sales as compared to $7.4 million or 8.8% of sales in the same period a year ago.

\*       \*       \*

The Company's pre tax income for the six months ended June 30, 2008 was $14.0 million, nearly double the $7.2 million in the prior year period.

\*       \*       \*

Business Outlook/Guidance

The Company is introducing new revenue guidance for the third quarter of 2008 of $55 $58 million, pre tax income of approximately $4.8 $5.2 million and, fully taxed GAAP EPS of $0.10 $0.11.

For the full year 2008, the Company is increasing its revenue and profit guidance. The Company's revenue guidance range is increasing to $240 245 million from $225 $230 million, pre tax income guidance to $26.0 $27.5 from $25.0 $26.0 million, fully taxed GAAP EPS to $0.56 $0.59 from $0.52 $0.55 and expects gross margins to remain at approximately 27 28%. The Company expects its effective tax rate for the full year of 2008 to be approximately 41%, and expects to end the year with approximately 27.5 million fully diluted shares outstanding.

41

1    100.   The reported financial results and the guidance that were set forth in

2  the August 5, 2008 press release were materially false and misleading because they

3  were predicated upon the fraudulent recognition of gross profit and income from

4  non-arms-length related party transactions, sham transactions, and improper

5  accounting.

6    101.   Defendants knew or were reckless in not knowing that the August 5,

7  2008 press release was materially false and misleading because it was predicated

8  upon the fraudulent recognition of gross profit and income from non-arms-length

9  related party transactions, sham transactions, and improper accounting.

10    102.   On August 5, 2008, the Company filed its 2008 first quarter Form 10-

11  Q with the SEC.  This document, which was signed by defendants Zinberg and

12  Kong, reported the same financial information as the August 5, 2008 press release.

13  Accordingly, it was materially false and misleading because it was predicated upon

14  the fraudulent recognition of gross profit and income from non-arms-length related

15  party transactions, sham transactions, and improper accounting.  On August 5,

16  2008, the same information was repeated by defendant Kong during an earnings

17  call also attended by defendant Zinberg.  Defendant Kong also confirmed that

18  ["t]he co-op marketing contribution is all part of the guidance since last year."

19    103.   The 2008 second quarter Form 10-Q stated the following regarding

20  transactions with LA Jewelers:

21    Related Party Transaction

22    During the three months ended June 30, 2007 and 2008, we purchased

23    approximately 22.5% and 4.2%, respectively, of our merchandise

24    from LA Jewelers, Inc., where one of its managers is a stockholder

25    who beneficially owns 1,228,000 shares of our common stock as of

26    June 30, 2008. During the six months ended June 30, 2007 and 2008,

27    we purchased approximately 13.3% and 3.9%, respectively. In the

28
42

three months and six months ended June 30, 2008 we earned approximately $131,000 and $613,000, respectively from LA Jewelers relating to co op marketing contributions and $93,000 was unamortized as of June 30, 2008.

In May, 2007 we entered into an understanding with LA Jewelers whereby they will guarantee that we will earn a certain minimum gross profit margin on their merchandise. This agreement provides that in the event of a gross profit margin shortfall we will be compensated for the difference between our actual gross profit margin and the guaranteed minimum gross profit margin. In the three months and six months ended June 30, 2008, we recognized $81,000 and $222,000, respectively under this agreement and $16,000 was outstanding and accrued at June 30, 2008.

104.    The foregoing representation was materially false and misleading because it failed to disclose that the transactions with LA Jewelers lacked economic substance and were concocted solely to inflate Bidz's gross profit and earnings for the first quarter of 2008 by approximately $212,000 and $127,000, respectively.

105.    The 2008 second quarter Form 10-Q stated the following regarding co-op marketing transactions:

In the third quarter of 2007, we started to bill and collect from our inventory vendors co op marketing contributions as an incentive for us to market and sell their merchandise on the Bidz website. In accordance with EITF 02 16: Accounting by a Customer (including a Reseller) for Certain Consideration Received from a Vendor, the co op marketing contributions that cannot be identified specifically to benefit the vendors are a reduction in cost of sales and will result in an

43

increase in gross profit. We cannot specifically identify the benefits to each vendor, consequently, co op marketing contributions are charged against inventory as a reduction of costs and amortized as a reduction of cost of sales. In the three months and six months ended June 30, 2008, we have recognized $2.8 million and $6.7 million, respectively, of co op marketing contributions. Approximately $3.5 million remain unamortized and is included as an offset to inventory at June 30, 2008. Receivable from vendors for co op marketing contributions, less allowance for doubtful accounts, is included in other current assets and amounted to $1.2 million at June 30, 2008.

106.   The statement that "[w]e cannot specifically identify the benefits to each vendor" was materially false and misleading because, for the most part, Bidz's marketing costs were easily identified as specific, incremental, identifiable costs incurred by the Company to sell specific products.  Defendants knew or were reckless in not knowing that the statement was materially false and misleading because there is a strong inference that Defendants read EITF 02-16 since they referred to it several times in the 2008 second quarter Form 10-Q.  Therefore, Defendants knew or were reckless in not knowing that the Company misapplied its provisions in accounting for co-op marketing contributions.

107.   Defendants knew or were reckless in not knowing that the reported gross profit and net income were materially overstated by approximately $2.8 million and $1.6 million, respectively, because these amounts were based upon the fraudulent recognition of gross profit and income from non-arms-length related party transactions, sham transactions, and improper accounting.

108.   In an effort to conceal the co-op marketing fraud, which resulted in a falsely inflated inventory, as of June 30, 2008, the Company eliminated a

1  substantial portion of its fictitious inventory by describing the de facto write-down

2  as arms length wholesale sales.

3      109.   The 2008 second quarter Form 10-Q contained certifications signed

4  by defendants Zinberg and Kong which were substantially identical to the

5  certifications that appeared in the 2007 third quarter Form 10-Q.    These

6  certifications were materially false and misleading because:

7          (a)    The report contained untrue statements of a material fact (*i.e.*,

8  gross profit margins benefited from the amortized co op marketing contributions

9  that reduced cost of sales by $2.8 million in the three months ended June 30, 2008

10  and $6.7 million in the six months ended June 30, 2008; co op marketing

11  contributions properly served to reduce cost of sales because they could not be

12  identified specifically to benefit the vendors).

13          (b)    The report omitted to state a material fact necessary to make the

14  statements made, in light of the circumstances under which such statements were

15  made, not misleading (*i.e.*, co op marketing contributions which served to reduce

16  the Company's cost of sales by $6.7 and $2.8 million were sham paper round trip

17  marketing cost reimbursement transactions).

18          (c)    For the reasons specified in "a" and "b" above and because

19  EITF 02 16 was misapplied, the financial statements, and other financial

20  information included in the report did not fairly present in all material respects the

21  financial condition, results of operations, and cash flows of Bidz during the period

22  presented in the report.

23      110.   The 2008 second quarter Form 10-Q contained an MD&A section

24  which was materially false and misleading because it failed to disclose the impact

25  of Bidz's non-arms-length related party transactions, sham transactions, and

26  improper accounting on Bidz's financial statements, and because it represented a

27  false gross profit and earnings trend.

28

45

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

111. The 2008 second quarter Form 10-Q was also materially false and misleading because it incorporated the materially false and misleading 2007 Form 10-K by reference: "These financial statements and related notes should be read in conjunction with the Company's audited financial statements for the fiscal year ended December 31, 2007 filed in the Annual Report on Form 10 K by the Company on March 12, 2008 with the Securities and Exchange Commission." See 2008 second quarter Form 10-Q, page 6.

112. Because the Company's improperly bloated inventory had to be deflated, the Company continued to reduce its inventory through purported wholesale sales. On November 10, 2008, after the markets closed, the Company filed its Form 8-K with the SEC, signed by defendant Kong, attaching a press release, entitled "Bidz.com, Inc. Announces Strong Financial Results for the Third Quarter 2008 and Executive Management Appointment," and disseminated a 2008 third quarter Form 10-Q, signed and certified by defendants Zinberg and Kong, which reflected a sharply decreased gross profit percentage due to $17.2 million in wholesale sales. A substantial portion of the $17.2 million constituted a de facto write-off of non-existent inventory.

113. Upon release of this information, the following became apparent:

|  | Reported Gross Profit Percentage |
|---|---|
| Q/E 6/30/07 | 27.8% |
| Q/E 9/30/07 | 31.7% |
| Q/E 12/31/07 | 31.2% |
| Q/E 3/31/08 | 29.1% |
| Q/E 6/30/08 | 27.9% |
| Q/E 9/30/08 | 24.0% |

114. The market reacted violently to the announcement of a decrease in the Company's reported gross profit percentage to a level that was far below the

46

Company's pre-fraud level.  The stock, which closed at a price of $5.82 per share on November 10, 2008 (prior to the announcement), dropped to a closing price of $4.02 on November 11, 2008 on an extremely heavy trading day.

## OTHER FALSE AND MISLEADING STATEMENTS, SCHEMES, AND ARTIFICES TO DEFRAUD DURING THE CLASS PERIOD

115.   During the Class Period, Defendants made other false and misleading statements and engaged in acts, practices and course of business, which operated as a fraud and deceit upon the purchasers of the Company's securities and contributed to their losses for investments during the Class Period.   These schemes and artifices to defraud were designed to artificially increase revenue and earnings during the Class Period through unethical and unsustainable means.   To the extent these fraudulent practices were engaged in by the Defendants, the Company faced the substantial risk, known to Defendants, that if these practices were exposed and the Company was required to cease such practices, the Company would lose revenues and growth potential both from a loss of customers (because of a loss of confidence in the integrity of the auction process at Bidz) and a reduction in prices received from customers who continued to use Bidz even after the practices were exposed and discontinued.  Accordingly, to the extent that Defendants engaged in such practices, those practices fundamentally misstated the business of Bidz, the composition and sources of its revenues and sales, and thereby artificially inflated the value of Bidz securities during the Class Period.

## BIDZ Uses "Shill Bidders" to Artificially Inflate the Sell Price for Its Online Auctions

116.  Bidz's website, www.bidz.com, utilizes an online sales auction platform, similar to eBay Inc. ("eBay"), as well as a fixed price online store at www.buyz.com.  Unlike eBay, however, Bidz sells its own products.  Thus, Bidz is responsible for the legality of all aspects of the conduct of its auctions.  The

47

DOCS\490115v1

1 Company's ability to generate a high volume of traffic to its website is critical to

2 the Company's ability to generate revenues.

3      117.   In SEC filings during the Class Period, including the Form 10-Qs and

4 the Form 10-K, as well as the press releases, Bidz claimed that their auctions were

5 "$1 no reserve" auctions.  A reserve is a minimum sale price that the final bid must

6 reach for a sale to occur.   Further the "Bidz.com site access and purchase

7 agreement," found on the Company's website, states:

8      **Shill Bidding**. You are strictly prohibited from placing bids or

9      causing bids to be placed on any Product for the purpose of artificially

10      increasing or otherwise manipulating the bidding process on Bidz.com

11      or the bid price of any Product listed on the Site, or influencing user

12      behavior on Bidz.com.

13      118.   However, during the Class Period, consumers have posted numerous

14 complaints on websites such as "Ripoff Report" (www.ripoffreport.com) regarding

15 their suspicions that Bidz uses "shill bidders" to drive up prices.  Shill bidders are

16 phony bidders who do not actually want to purchase the auction item.  The only

17 purpose of the shills' phony bids is to drive up an item's selling price.  This results

18 in the legitimate bidders/consumers paying more for an item than they would have

19 if the shill bidder had not participated in the auction.  Shill bidding is illegal in

20 California and most other states.  To the extent shill bidding was used, it created an

21 artificial reserve that would increase customer bids and prevent particular items

22 from selling below cost, including from those auctions where shills participated

23 that were "$1 no reserve."

24      119.   On July 10, 2009, a Bidz customer posted the following complaint on

25 the Ripoff Report website:

26      I have often questioned whether they use shills.  There have been

27      times I will bid on an item that has no bids and I am instantly outbid,

28

DOCS\490115v1

1  and not by a few dollars, but substantially. It has happened often

2  enough for me to susp[ect] that it is beyond coincidence. I have

3  monitored those bids and once the price gets to a reasonable amount,

4  the "bidder" drops out. That might seem normal, but I have seen it

5  over and over again, under the same bidder name. Many items of like

6  kind have the same bidder name, almost as if those items are his to

7  monitor. No one will know if they are using shills unless some

8  disgruntled employee blows the whistle, but I would love to hear a

9  rebuttal from Bidz.[2]

10  120.  Another customer theorized that Bidz uses either (a) an automatic shill

11  bidding system, or (b) manual shill bidders, to drive up prices. The suspected shill

12  bidders often outbid real customers by substantial amounts – for example, by

13  raising the bid from $50 to $1,000 – and tricking bona fide customers who are

14  monitoring their bids into paying inflated prices.[3]

15  121.  At least two lawsuits currently pending against Bidz make allegations

16  of shill bidding. Company insiders also confirm that the consumers' suspicions are

17  true, and that Bidz uses shill bidders to artificially inflate auction prices. CW1, a

18  former Bidz Operations Coordinator from August 2004 through August 2008,

19  stated that the Company had bogus accounts that it used to bump up bids, and that

20  the practice of using such "phantom bids" was common knowledge within the

21  Company. CW1 recalled investigating a bid on a diamond necklace as part of

22  his/her fraud control duties. COO Liu told CW1 to stop that investigation, and said

23  "don't worry about that one, it was one of ours." CW1 recalled that, on other

24

25  [2] See http://www.ripoffreport.com/Internet-Fraud/Bidz-com/bidz-com-questions-about-shill-fzd5c.htm.

26  [3] See http://www.ripoffreport.com/On-Line-Stores/BIDZ-COM/bidz-com-update-shilling-p-35z8a.htm.

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1    occasions, fellow employee Jorge Gonzales – relaying instructions from Bidz's

2    senior management – told CW1 to stop investigations because the suspect bid

3    came from one of the Company's shill bidders.

4        122.   CW2, a former Bidz Senior Jewelry Buyer from March 2000 through

5    July 2003, stated that Bidz used shill bidders because she/he observed that many

6    high priced items were "sold," but that those sales were never completed.  Rather,

7    high-priced items were "won" by shill bidders – including CW2 – and re-auctioned

8    again and again in the hopes of increasing interest in Bidz's website.  CW2 stated:

9    "We kept all of the expensive items on the front page [of the website] constantly,

10   and recycled them.  This was the draw.  It was like a car on special at a sales lot,

11   one at this price, and no salesman on the lot was allowed to sell it."  CW2 was also

12   aware that an employee named "Andre" was one of the Company's shill bidders,

13   and making phony bids was part of his job.  CW2 stated that various Company

14   employees suspected that Marina Zinberg's only job was placing shill bids.

15       123.   CW3, a former Bidz Certified Merchants Accounts Manager from

16   July 2004 through January 2006, stated that Bidz employed shill bidders in Russia

17   who Bidz used to inflate Bidz's online auctions prices.  CW3 stated that, in

18   December 2005, Bidz sent a customer service employee named "Adrian" from the

19   United States to Russia to train these shill bidders.

20       124.   CW3 also investigated a complaint by a merchant bidder who

21   complained that he was losing auctions by one penny.  The bidder told CW3 that

22   he searched the Bidz website and found that the same person was bidding on all of

23   the items that that he wanted, and was winning by just one more penny.  The

24   complaining merchant bidder told CW3 that he suspected this was the result of

25   shill bidding.  CW3 looked at the items and found they had not been paid, even

26   though the bidder was obligated to pay.  CW3 also found that the winning bidder

27   did not show up on the list of people Bidz needed to collect from.  CW3

28

50

1    approached his/her immediate supervisor, Jorge Gonzalez, with this information.

2    Gonzalez told CW3 that the winning bidders were shill bidders, and that the shill

3    bidding was being done from Russia.

4    **Bidz Used Bogus Appraisals to Artificially Inflate the Selling Prices of Auction Items**

5    125.   Bidz customers may obtain an appraisal of purchased items from Bidz

6    for about $33.   Bidz engages American International Gemologists, also known as

7    AIG Labs, to provide the appraisals.   According to a February 19, 2008 news

8    article, entitled "*Criticism Puts Auction Site Bidz.com Under Microscope*," AIG

9    Labs admitted to the Los Angeles Times that it does not physically inspect every

10   item for which they provide an appraisal.   According to the article, this "raised a

11   red flag" for Jeanine Woodling of the International Society of Appraisers, who

12   said: "It's important for them to actually be able to see the piece."

13   126.   CW3 stated that she/he brought AIG Labs and its operator, Norman

14   Monteau, to Bidz for appraisals.   CW3 said she/he knew Monteau was providing

15   Bidz with appraisals that were totally out of line, and that while CW3 was at Bidz,

16   Monteau only appraised high-ticket items.   CW3 explained that if Bidz received,

17   for example, 35 similar pieces, Bidz would solicit one appraisal for all 35 items.

18   CW3 stated that Bidz would also try to give legitimacy to their items by showing

19   them on other websites at inflated prices.

20   127.   CW2 described Bidz's process for selecting photographs for its

21   website.   Accordingly to CW2, if Bidz received, for instance, a lot of 100 rings, a

22   Bidz employee would select the best looking ring from the lot and photograph that

23   one, and use that photograph for the entire lot.

24   **The Truth Regarding Some of the Company's Fraudulent Schemes Emerges**

25   128.   On November 26, 2007, *Citron Research* published an article

26   identifying schemes and other fraudulent conduct used by the Company.   The

27

28

51

DOCS\490115v1

*Citron* article entitled "*Citron Adds Some Color and Clarity to Bidz.com,*" stated, in pertinent part:

> Bidz.com is an online auction provider of off price jewelry and second tier accessories. What makes their model unique is that everything is sold via auction. Yet, the auctions are not third party auctions as facilitated by Ebay, rather they are auctions that are controlled by the company. In this report, Citron will expose what we believe to be many red flags at BIDZ.
>
> *            *            *
>
> ***Instead of generating cash, BIDZ seems to be generating a lot of inventory***. So instead of investors seeing a higher cash balance, they are seeing warehouses filled with "closeout and distress sale" jewelry.
>
> *            *            *
>
> Most investors would prefer to see efficiencies to kick in with rising revenues, but instead, actual reported inventory levels are instead spiraling at least 300% higher than the run rate of revenue.
>
> *            *            *
>
> ***BIDZ largest supplier for years has been LA Jewelry, owned and operated by Saied Aframian, who also happens to be one of BIDZ largest shareholders***. Not surprisingly, LA Jewelry is also BIDZ largest creditor, and a large participant in BIDZ co-op advertising program. These "related party" transactions are all over BIDZ financials including:
>
> - Over $5.3m accounts payables to a related party (nearly 20% of AP)
> - Purchase of 11.6% of its merchandise from a related party
> - Participation in co-op marketing (12%) by related party

52

- • Guarantee agreement with the same party related for "minimum profit" on inventory purchased from the party.

- • The related party owns 1,228,000 shares of BIDZ's stock.

***Saied Aframian is a convicted felon and has served time in the Federal System for fencing stolen goods. Not just petty crime either, but for being the prime fence for a multi-million dollar nationwide ring of stolen watches and jewelry***.

We are not suggesting that Bidz sells stolen goods; rather we are observing the background of some of the individuals behind BIDZ who are most responsible for its reported profits. The question is whether all these related party transactions cast reasonable doubt over BIDZ reported financials as a fair reflection of the health of the business.

Considering the deal to guarantee margins to the company coincided with the public offering of BIDZ, Citron concludes that Mr. Aframian was well aware that there could be a lot more money made from his stock than from selling jewelry. Any time we have seen a company work on guaranteed margins by a large shareholder, the results have been dismal: i.e. Escala and Syntax Brillian, two stocks previously covered by Citron, now trading 90% and 60% lower respectively from date of initial report.

Speaking of the public offering, BIDZ filed a registration and began to trade on a public exchange. ***But Citron notes that in 2006, after paying for the preparations for an IPO, it then cancelled. Their stated reason was because insiders refused to sign lockup agreements***. This alone should be a red flag.

\*  \*  \*

53

*Citron believes that the company is not being forthright with their customers when it comes to "retail value" or "appraised value."* All of the jewelry from BIDZ shows an appraisal from AIG Labs. This appraisal makes consumers feel as if they are getting a good deal on a credible piece of jewelry that might have a decent resale value. Going to the website of AIG we see their name on a big building, which conveys an illusion of credibility.

Citron paid a visit to AIG labs and an illusion it is. There is no name on the building (except in Photoshop...). As a matter of fact, the only signage they have is a white piece of paper on the front door to identify them. It appears to *Citron that AIG is more of tin "appraisal mill," that enables Bidz.com to sell low priced items to an unknowing public*.

*     *     *

*One common complaint that we see on line is "shill bidding." On Wednesday, November 28, Citron will expose what we believe to be is some extremely questionable bids and bidding practices that occur on BIDZ.com*. This part 2 will have much supporting documentation that the investing public should be made aware of. Unlike eBay and other well-known auction sites, you cannot even click to contact or check the track record of bidders. And since the company is selling its own goods, rather than conducting auctions for independent sellers, the company is responsible for the legality of all aspects of the conduct of its auctions.

Conclusion

It is the opinion of Citron Research that Bidz.com's business model is not sustainable. The large related party transactions, and the

54

DOCS\490115v1

background of the individuals involved certainly provide plenty of reason for doubt. It is the opinion of Citron that the recent surge in stock price is completely unwarranted and the company is going to have to start generating real cash under a verifiable and transparent inventory valuation discipline before shareholders can take its earnings seriously.

129.   As a result of this negative news, the Company's stock dropped $3.38 per share from November 23, 2007 to close at $16.56 per share on November 26, 2007, a one day decline of 17 percent on unusually heavy trading volume.

130.   On November 27, 2007, Bidz hosted a conference call to address the allegations raised in the Citron article.   Speaking on behalf of the Company, defendant Zinberg disclosed additional information that further harmed the Company's stock price. An article in Barron's relating to the conference call stated in pertinent part:

Speaking on a conference call with investors this afternoon to respond to a negative report yesterday from Citron Research, Bidz.com (BIDZ) CEO David Zinberg said the company learned only yesterday that Saied Aframian, manager of L.A. Jewelry, a major jewelry supplier to Bidz and a larger shareholder, had been convicted in the 1980s for fencing stolen jewelry.

*     *     *

Zinberg says Citron's report was "untruthful," and that the company is considering legal action against Citron. Zinberg asserted that comparisons between the cash and inventory positions of Bidz.com and Blue Nile (TILE) and Overstock (OST) are not valid since the companies do not have the same business models.

*     *     *

55

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1   On the relationship with Aframian, he says that he has never had any
2   reason to question his integrity, but that the company is not
3   re¬evaluating his relationship with him. He says the company has cut
4   its reliance on L.A. Jewelry to 12% of revenue from 35% a year ago.
5   He also says the company could easily replace the goods they get
6   from L.A. Jewelry from other wholesalers. He added that Aframian is
7   a manager, but not an owner, of L.A. Jewelry. He says that [the]
8   company checks out its suppliers with the Jewelry Board of Trade. He
9   also said that he has known Aframian for 7 years.

10                          *       *       *

11  On possible shill bidding on the site, he says that shill bidding is
12  against company policy.

13                          *       *       *

14  •   Zinberg says about 25% of its jewelry is sold below cost.
15  •   On the company's apparent sale of televisions and other goods at very
16      high prices -- very far above their actual value -- Zinberg says the
17      company gets zero revenue from electronics sales. He says they are sold
18      by certified merchants, who are allowed to sell goods on the site for free.
19      There are about 40 certified merchants. Zinberg had no explanation for
20      why people would bid more than $11,000 for a TV worth less than a
21      tenth of that.
22  •   Zinberg insisted there was nothing strange about the many bids now on
23      the site for a large yellow diamond ring listed on the company's home
24      page with multiple bids worth $500,000. He says the company has no
25      way of knowing if the bidders can actually pay for such a large purchase.

26
27
28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

- Zinberg says about 20% of winning auction bids do not result in transactions; but he says they only book revenue on shipment of goods once cash is received.
- He had no explanation for why one bidder bought 14 televisions at above-market prices.

131.  As a result of the continuing negative news, the Company's stock dropped $4.67 per share to close on November 27, 2007 at 11.89 per share on unusually heavy trading volume.

132.  Then, on November 28, 2007, *Citron* published another article which provided more information. According to the article, entitled, "*Citron Research Comments on Bidz.com*," the Company had engaged in "shill bidding" in order to artificially increase the auction price of the products on the Company's website. The article stated in relevant part:

> Citron Research believes the bidding process at Bidz.com leaves a lot of unanswered questions. While Citron does find the Bidz site entertaining with a unique interface, they have much to prove before it can be anointed with the big earnings multiples associated with proven business models. This report will outline some of the obvious bidding irregularities that we have observed on the Bidz website.
>
> This report will not be a refutation to the conference call and will not address any new issues.
>
> *     *     *
>
> ***One common complaint that Citron observed in customer postings was shill bidding***. This led us to do our own homework. Citron focuses on presenting public domain information. Therefore, when we suggested shill bidding, the investing public ran with the ball and found the same problems on the Bidz website that were found by

57

1    Citron. As evident in yesterday's conference call investors have
2    already seen these auction items: $6,000 flashlight/TV combo . . .
3    $11,000 Television.

4    The problem is still ongoing as we see in the live auction for a
5    television with an MSRP of $1,499 yet the current bid on the
6    television as of publication is $2,776.

7    In an informal study, Citron offers the linked table, which outlines not
8    only the obvious irregular bidding above, but also a pattern in the
9    auction of over 30 TV's over more than 3 months. Most of these TV's
10   are bid on hundreds of times by the same three bidders.

11   What makes this attached spreadsheet so interesting is that all of these
12   televisions were sold by Clear Solution Partners. The owner of Clear
13   Solution Partners is Bidz.com co-founder Matthew Mills. Not only is
14   he the co-founder and vendor of these televisions, he has also been an
15   outspoken proponent of the stock as evident in the Barron's Blog.

16   The hundreds of unique bidders over $500,000 for the big yellow
17   diamond ring on BIDZ homepage has now been the topic of much
18   discussion and there is no need to restate those questions. Citron notes
19   that BIDZ itself stated in the conference call that it does not know
20   whether bidders are bona fide until after an auction closes. Therefore,
21   Citron cannot prove that the bidding on any jewelry is fake either.
22   Jewelry is an item that thwarts direct comparison pricing, especially
23   on the internet.

24   The question that investors are left with is: Are the patterns of bidding
25   on the televisions any indication of patterns of bidding on jewelry? Do
26   the hundreds of repetitive bids on the TV's (often by the same bidder
27   on separate auctions at nearly the same second) represent flying

28   

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1    fingers of a rogue actor, or a feature of the auction software that only

2    company insiders know about?

3    133.   As a result of the news regarding the Company illegal and fraudulent

4    schemes, the Company's stock declined an additional $1.80 per share to close on

5    November 28, 2007 at $10.10 per share on unusually heavy trading volume.

6                            **LOSS CAUSATION**

7    134.   The market for Bidz securities was open, well-developed and efficient

8    at all relevant times.  As a result of Defendants' materially false and misleading

9    statements and failures to disclose alleged herein, Bidz securities traded at

10   artificially inflated prices during the Class Period.   Plaintiff and the Class

11   purchased or otherwise acquired Bidz securities relying upon market information

12   relating to Bidz and the integrity of the market price of Bidz securities, thus

13   causing economic loss and the damages complained of herein when the truth

14   and/or the effects thereof were revealed and the artificial inflation was removed

15   from the price of Bidz's securities.

16   135. Defendants' wrongful conduct, as alleged herein, directly and

17   proximately caused the economic loss suffered by Plaintiff and the Class.

18   136.   But for Defendants' misrepresentation and omissions, which had the

19   effect of overstating gross profit and gross margin, Plaintiff and the other members

20   of the Class would not have purchased Bidz's securities at the artificially inflated

21   prices at which they were purchased.

22   137.  Artificial inflation caused by Defendants' false and misleading

23   statements and omissions is, in part, demonstrated by the following stock chart:

24

25

26

27

28
                                        59



**Bidz.com (BIDZ)**
**July 2007 - March 2009**

On November 26, 2007, a *Citron Research* article exposed the Company's questionable bidding and appraisal practices. The article also revealed that Saied Aframian, one of Bidz's largest shareholders and the owner and/or manager of LA Jewelers had been convicted in the 1980's for fencing stolen jewelry. Two days later, on November 28, 2007, a second *Citron Research* article provided additional details regarding the Company's "shill bidding."

On November 27, 2007, the Company issued a press release which reaffirmed its previously announced guidance.

November 10, 2008, after the markets closed, the Company issued a press release and disseminated a 2008 third quarter Form 10-Q which reflected a sharply decreased gross profit percentage due to $17.2 million in wholesale sales. A substantial portion of the $17.2 million constituted a de facto write-off of non-existent inventory. The market reacted violently to the announcement of a decrease in the Company's reported gross profit percentage to a level that was far below the Company's pre-fraud level. The stock, which closed at a price of 5.82 per share on November 10, 2008 (prior to the announcement), dropped to a closing price of 4.02 on November 11, 2008 in extremely heavy trading.

November 12, 2007, the Company issued a press release announcing "record" third quarter 2007 financial results, "record" gross margin of approximately 31.7%, and raised 2007 guidance.

May 6, 2008, the Company issued a press release announcing financial results for the first quarter of 2008 which exceeded previous guidance. The press release also highlighted the fact that reported gross margins increase to 29.1% from 24.9% year-over-year. 10-Q for Q1 2008 is filed.

February 28, 2008, the Company issued a press release announcing raised 2008 guidance and "exceptional financial results" of $8.2 million of pre tax income for the fourth quarter of 2007 and $20.7 million pre tax income for the full 2007 year.

August 5, 2008, the Company issued a press release announcing financial results for the second quarter of 2008 which exceeded guidance. The press release stated that the Company "reported strong financial results for the three months ended June 30, 2008, exceeding its previous guidance and continuing a trend of exceeding its forecasts." 10-Q for Q2 2008 is filed.

90 Day Look-back Period Mean Closing Price: $3.62

On March 11, 2008, the Company filed its 2007 Form 10-K. This document, which was signed by Defendants Zinberg and Kong, stated that: "Gross profit margins benefited from the amortized co op marketing contributions that reduced our cost of sales by $4.8 million or 2.6% of net revenue."

July 31, 2007, the Company issued a press release announcing strong preliminary second quarter 2007 results and raised guidance.

Class Period
7/31/07 - 11/10/08

60

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1    138.   Because of the news related the Company's illegal and fraudulent

2    schemes during the Class Period, as reported in the *Citron Research* articles, the

3    Company's stock dropped from a closing price of $19.94 per share on Friday,

4    November 23, 2007, to a low of $10.10 per share on Wednesday, November 28,

5    2007, for a loss of nearly 50% on unusually heavy trading volume.

6    139.   Additionally, because of the announcement on November 10, 2008 of

7    a decrease in the Company's gross profit percentage to a level that was far below

8    the Company's pre-fraud level, the Company's shares fell from $5.82 per share on

9    November 10, 2008 to close on November 11, 2008 at $4.02 per share, a 30.92

10   percent decline, on unusually heavy trading volume.    As the chart below

11   demonstrates, Class members suffered economic losses from the disclosure made

12   by Defendants on November 10, 2008 after the market closed:



CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

140.    Since November 10, 2008, Bidz's securities have not traded above the prices at which Class members purchased those securities prior to November 10, 2008 during the Class Period.   As a result, members of the Class who purchased Bidz securities during the Class Period and continue to hold those securities, have sustained economic injury resulting from the decline(s) in the value of Bidz securities resulting from the revelations on November 10, 2008.

141.    Members of the Class who purchased Bidz securities during the Class Period, and sold those securities after the end of the Class Period, have suffered economic injury caused by Defendants' misrepresentations and/or omissions during the Class Period that did not come to light until November 10, 2008.

142.    Thus, the damage suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Bidz securities and the subsequent significant decline in the value of Bidz securities when Defendants finally announced, on November 10, 2008, a decrease in the Company's reported gross profit percentage to a level that was far below the Company's pre-fraud level.

143.    The foregoing allegations describe Plaintiff's general theory of damages, demonstrate that Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to Defendants' omissions alleged herein.

## ADDITIONAL SCIENTER ALLEGATIONS

144.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

62

1  dissemination of such statements or documents as primary violations of the federal

2  securities laws.  As set forth elsewhere herein in detail, the Individual Defendants,

3  by virtue of their receipt of information reflecting the true facts regarding Bidz,

4  their control over, and/or receipt and/or modification of Bidz's allegedly materially

5  misleading misstatements and/or their associations with the Company which made

6  them privy to confidential proprietary information concerning Bidz, participated in

7  the fraudulent scheme alleged herein.

8      145.  Further, CW2 stated that defendant Zinberg did everything in private

9  and "no one makes decisions except David [Zinberg]."  CW4 also stated that

10  defendant Zinberg was either directly involved with the vendors, or had someone

11  managing the relationships for him.  CW6 stated that the environment at Bidz was

12  like a prison: "You have security. If you have to walk outside, then you have to go

13  through scanners.  I could not go and talk with anyone. David [Zinberg] was

14  watching everyone."  CW6 also stated that there were cameras everywhere and

15  defendant Zinberg, she/he was told, listened to every phone call.  Plaintiff was

16  prevented from learning more information from other potential witnesses because

17  they expressed concern over reprisals by defendant Zinberg that might occur

18  should they cooperate and provide information concerning Defendants' conduct

19  and the Individual Defendants' participation in and knowledge of such conduct.

20      146.  According to CW1, who reported directly to Liu, defendant Kong's

21  wife, Kong was directly involved with the bookkeeping and the preparation of

22  financial statements with a staff accountant and the Chief Compliance Officer.

23  This was confirmed by CW4 and CW5, who was the Certified Merchants Account

24  Manager from July 2004 until January 2006 and responsible for supervising over a

25  100 merchant accounts daily.  CW5 stated that the only person in charge of the

26  book balancing was defendant Kong.  CW5 who reported to Liu and worked in

27

28

63

1  customer service in the billing department from June 2002 until August 2004

2  stated that defendant Kong and Liu had access to the general ledger.

3      147.  The Individual Defendants had substantial motivation to participate in

4  the fraudulent practices alleged herein.  The Individual Defendants sold suspicious

5  amounts of stock at suspicious times during the Class Period.  During the Class

6  Period, the Individual Defendants sold over 310,000 shares of Bidz stock that had

7  been held by them during the Class Period, for which they received approximately

8  $3,046,316 in proceeds.  Additionally, defendant Kong's wife and the Chief

9  Operating Officer of Bidz, Liu, sold 175,000 shares during the Class Period for

10 proceeds of approximately $2,135,593.  Marina Zinberg, David Zinberg's sister,

11 also sold 345,000 shares of Bidz stock for proceeds of approximately $3,970,130.

12 Finally,  non-defendant  President  and  Chief  Technology  Officer,  Leonid

13 Kuperman, sold 25,000 shares for proceeds of approximately $281,251 during the

14 Class Period.  These sales during the 469-day Class Period, when compared to the

15 469-day period preceding the Class Period (when the Individual Defendants made

16 no insider sales), were highly unusual and a departure from the Individual

17 Defendants' conduct during the 469-day period preceding the Class Period.  The

18 insider sales during the Class Period were as follows:

19

20

| Filer Name | Number Of Shares | Transaction Type | Price | Market Value | Transaction Date |
|---|---|---|---|---|---|
| KONG LAWRENCE | 64,435.00 | Exercise | 10.31 | $664,325 | 06-Aug-2008 |
| KONG LAWRENCE | 53,801.00 | Exercise | 8.98 | $483,133 | 03-Sep-2008 |
| KONG LAWRENCE | 52,495.00 | Exercise | 10.07 | $528,625 | 22-Sep-2008 |
| KONG LAWRENCE | 24,269.00 | Sale | 10.11 | $245,360 | 23-Sep-2008 |
| **TOTAL** | **195,000.00** | | | **$1,921,442** | |
| KUPERMAN LEONID | 8,000.00 | Sale | 10.52 | $84,160 | 09-May-2008 |
| KUPERMAN LEONID | 420.00 | Sale | 12.13 | $5,095 | 27-May-2008 |
| KUPERMAN LEONID | 16,580.00 | Sale | 11.58 | $191,996 | 28-May-2008 |
| **TOTAL** | **25,000.00** | | | **$281,251** | |

64

| | | | | | |
|---|---|---|---|---|---|
| LIU CLAUDIA Y | 37,500.00 | Sale | 16.79 | $629,625 | 16-Nov-2007 |
| LIU CLAUDIA Y | 17,500.00 | Sale | 17.82 | $311,850 | 19-Nov-2007 |
| LIU CLAUDIA Y | 32,627.00 | Exercise | 9.80 | $319,745 | 18-Sep-2008 |
| LIU CLAUDIA Y | 10,000.00 | Sale | 9.80 | $98,000 | 18-Sep-2008 |
| LIU CLAUDIA Y | 10,000.00 | Sale | 10.30 | $103,000 | 19-Sep-2008 |
| LIU CLAUDIA Y | 17,373.00 | Sale | 9.82 | $170,603 | 22-Sep-2008 |
| LIU CLAUDIA Y | 31,501.00 | Exercise | 10.61 | $334,226 | 25-Sep-2008 |
| LIU CLAUDIA Y | 3,499.00 | Sale | 10.23 | $35,795 | 26-Sep-2008 |
| LIU CLAUDIA Y | 15,000.00 | Sale | 8.85 | $132,750 | 29-Sep-2008 |
| **TOTAL** | **175,000.00** | | | **$2,135,593** | |
| ZINBERG DAVID | 13,899.00 | Sale | 8.18 | $113,694 | 15-Aug-2007 |
| ZINBERG DAVID | 8,600.00 | Sale | 8.04 | $69,144 | 16-Aug-2007 |
| ZINBERG DAVID | 7,501.00 | Sale | 8.04 | $60,308 | 17-Aug-2007 |
| ZINBERG DAVID | 24,600.00 | Sale | 8.93 | $219,678 | 04-Sep-2007 |
| ZINBERG DAVID | 5,400.00 | Sale | 8.60 | $46,440 | 05-Sep-2007 |
| ZINBERG DAVID | 30,000.00 | Sale | 13.07 | $392,100 | 01-Oct-2007 |
| ZINBERG DAVID | 6,000.00 | Sale | 10.07 | $60,420 | 17-Dec-2007 |
| ZINBERG DAVID | 9,000.00 | Sale | 8.06 | $72,540 | 10-Jan-2008 |
| ZINBERG DAVID | 5,000.00 | Sale | 10.61 | $53,050 | 15-Jan-2008 |
| ZINBERG DAVID | 5,000.00 | Sale | 7.50 | $37,500 | 01-Feb-2008 |
| **TOTAL** | **115,000.00** | | | **$1,124,874** | |
| ZINBERG MARINA | 10,000.00 | Sale | 8.18 | $81,800 | 06-Sep-2007 |
| ZINBERG MARINA | 10,000.00 | Sale | 13.07 | $130,700 | 01-Oct-2007 |
| ZINBERG MARINA | 8,000.00 | Sale | 10.07 | $80,560 | 17-Dec-2007 |
| ZINBERG MARINA | 37,000.00 | Sale | 8.06 | $298,220 | 10-Jan-2008 |
| ZINBERG MARINA | 15,000.00 | Sale | 10.60 | $159,000 | 15-Jan-2008 |
| ZINBERG MARINA | 15,000.00 | Sale | 7.49 | $112,350 | 01-Feb-2008 |
| ZINBERG MARINA | 200,000.00 | Gift | 12.55 | $2,510,000 | 22-May-2008 |
| ZINBERG MARINA | 50,000.00 | Other/Sell | 11.95 | $597,500 | 27-May-2008 |
| **TOTAL** | **345,000** | | | **$3,970,130** | |
| | | | | | |
| **GRAND TOTAL** | **855,000** | | | **$9,433,290** | |

148.    In    addition,    according    to    the    Company's    Proxy    Statement, compensation is established as follows:

**Setting Executive Compensation**

Our compensation setting process consists of establishing targeted overall compensation for each executive officer and then allocating that compensation among base salary and incentive compensation. *At the executive level, we design the incentive compensation to reward company-wide performance through tying awards primarily to*

65

*specific operational and financial performance*. The Compensation Committee evaluates both performance and compensation to ensure that we maintain the ability to attract and retain employees in key positions and that compensation provided to key employees remains competitive relative to the compensation paid to similarly situated executives of our peer companies.

\*        \*        \*

### Compensation Program

The primary components of the executive compensation program of our company consist of base salary, annual incentive bonuses, stock option and other equity-based grants, and executive health benefit and perquisite programs.

*Base Salary*

We provide executive officers with a level of base salary that recognizes appropriately each individual officer's scope of responsibility, *role in the organization, experience, and contributions to the success of our company*. The Board of Directors reviews salaries recommended by the Compensation Committee. In formulating these recommendations, the committee *considers the overall performance of our company, industry compensation benchmark data, and conducts an evaluation of individual officer performance*. The committee makes, or recommends that the Board of Directors make, final determinations on any adjustments to the base salary for executive officers.

*Management Bonus Program*

Annual bonuses are intended to provide incentive compensation to key officers and employees who contribute substantially to the

66

DOCS\490115v1

success of our company. ***The granting of such awards is based upon the achievement of our company's performance objectives and pre-defined individual performance objectives***. Company performance objectives are based upon achieving key financial and operational metrics that are established early in each fiscal year. Individual performance objectives are developed for senior level managers and key employees early in each fiscal year. Upon the close of each fiscal year, executive management and the committee conducts an assessment of individual performance achieved versus individual performance objectives. This assessment includes individual responsibility, performance, and compensation level. Simultaneously, the board conducts an assessment of our company's overall performance, which includes the achievement of operating results and other performance criteria. The combination of these factors determines any incentive bonuses to be paid.

*Stock Option and Restricted Stock Grants*

We grant stock options and restricted stock awards periodically to certain of our key employees to provide additional incentive to work to maximize long-term total return to stockholders. Award levels are determined based on market data and vary among participants based on their positions within the company. Under our 2006 Stock Award Plan, or 2006 Plan, the Board of Directors or a committee appointed by the Board is specified to act as the plan administrator. Our Board of Directors has, pursuant to the 2006 Plan, authorized our Compensation Committee to administer the Plan, including the grant of awards and determination of their terms. In general, stock options and awards of restricted stock are granted to employees at the onset of

67

DOCS\490115v1

employment. In establishing award levels, the committee bases the number of stock option and restricted stock awards to be granted on the target percentage of ownership of the recipient, assuming full dilution of outstanding stock option awards. For executive officers, the committee considers the target percentage of ownership of executive officers in our peer group in setting award levels for our executive officers. If, in the opinion of the committee, the outstanding service of an existing employee merits an increase in the number of options and awards held, the committee may elect to issue additional stock options and restricted stock awards to that employee.

149.    The Individual Defendants thus had significant incentives to make misleading statements and omit material facts to ensure that the Company achieved its performance objectives, which was a factor used to determine the Individual Defendants' salaries and bonuses.    Defendant Zinberg was paid $201,244 in compensation in 2007 (consisting of $181,250 in salary and $19,994 in all other compensation) and paid $433,434 in 2008 (consisting of $241,667 in salary, $169,360 in bonuses, and $22,407 in all other compensation).    Defendant Kong was paid $814,205 in compensation in 2007 (consisting of $235,000 in salary, $338,048 in bonuses, $224,330 in option awards, and $16,828 in all other compensation) and $743,663 in 2008 (consisting of $235,000 in salary, $302,930 in bonuses, $182,413 in option awards, and $23,320 in all other compensation). His wife, Liu, was paid $628,614 in 2007 and $524,448 in 2008.

## DEFENDANTS' ASSOCIATIONS AND PROPENSITY TO ENGAGE IN UNLAWFUL CONDUCT CONSISTENT WITH SCIENTER ALLEGATIONS

150.    As alleged in more detail below, the Individual Defendants have demonstrated their propensity to engage in securities fraud and other fraudulent and/or improper business conduct, as well as to associate themselves and the

68

1  Company with persons with criminal or otherwise questionable backgrounds

2  and/or who have engaged in questionable business practices.

3  **Bidz Sold Unlicensed Securities Before it Attempted an IPO**

4      151.  CW2 stated that Bidz's former COO, Matthew Mills, sold Bidz stock

5  for years before Bidz attempted its IPO in March 2006.  CW2 stated that, at least

6  as early as March 2000, a crew of 6 to 10 employees sold Bidz stock to strangers

7  over the phone, in a separate room away from the company, in a "boiler room"

8  type operation.  The crew's only duties were to sell Bidz stock by phone, and

9  report to Mills.

10      152.  In fact, in a June 29, 2006 SEC Form S-1 filing, Bidz admitted that it

11  illegally sold stock from 1999 through at least mid-2003, and "raised over $20.5

12  million" by doing so.  Bidz admitted that the stock sales violated federal and state

13  securities laws because the securities were not registered, and because they were

14  sold by unlicensed brokers – among other reasons.

15  **Bidz Is the Target of Numerous Lawsuits Relating to Its Business Practices**

16      153.  Bidz's SEC Form 10-Q for the period ending June 30, 2009 reveals

17  that Bidz is the target of numerous lawsuits.  The lawsuits allege securities fraud,

18  unfair business practices, and derivative actions alleging that Bidz's management

19  breached their duties to shareholders.

20      154.  Bidz is also the subject of inquiries from the SEC (relating to its

21  inventory reserve policies) and the Federal Trade Commission (relating to its e-

22  mail marketing practices).

23  **Bidz Has Been Connected to Numerous People With Questionable**
    **Backgrounds**
24
25      155.  Bidz's practices are unsurprising in light of the histories of some of

26  Bidz's employees, owners and associates.  For example, according to a Citron

27  Research article on November 26, 2007, Saied Aframian, one of Bidz's largest

28

69

DOCS\490115v1

1   shareholders, and the owner and/or manager of LA Jewelry, one of Bidz's largest

2   suppliers, was convicted of receiving stolen property in 1985 (jewelry stolen

3   during an armed robbery) and served two years in prison.  According to the Citron

4   article, Aframian was the "prime fence for a multi-million dollar nationwide ring

5   of stolen watches and jewelry."  Similarly, a September 1, 2008 article in Barron's,

6   entitled "Putting BIDZ.com Shares on Sale," disclosed that Bidz's co-owner and

7   current director Garry Itkin is alleged to have run an illegal strip club on Sunset

8   Boulevard while serving as Bidz's CFO in 1999.

9       156.   The Barron's article also referenced the criminal histories of others

10  with ties to Bidz and/or defendant Zinberg, including: an individual arrested for

11  sex crimes with a minor; an individual convicted of a felony for receiving stolen

12  property and carrying a concealed weapon; an individual convicted of a felony for

13  engaging in health-care fraud; an individual arrested for "loitering with intent to

14  prostitute, failure to register as a sex offender" and kidnapping; an executive of a

15  health-care company sanctioned by the State of California for fraud; and an

16  individual convicted of a felony relating to buying stolen property and the unlawful

17  sale of a firearm.

18                        **NO SAFE HARBOR**

19      157.   The statutory safe harbor provided for forward-looking statements

20  does not apply to any of the allegedly false statements pleaded in this Complaint.

21  Many of the specific statements pleaded herein were not identified as "forward-

22  looking statements" when made.  To the extent there were any forward-looking

23  statements, there were no meaningful cautionary statements identifying important

24  factors that could cause actual results to differ materially from those in the

25  purportedly forward-looking statements.  Alternatively, to the extent that the

26  statutory safe harbor does apply to any forward-looking statements pleaded herein,

27  Defendants are liable for those false forward-looking statements because at the

28

70

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

1    time each of those forward-looking statements was made, the speaker knew that

2    the forward-looking statement was false, and/or the forward-looking statement was

3    authorized and/or approved by an executive officer of Bidz who knew that the

4    statement was false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against Defendants)**

8    158.   Plaintiff repeats and realleges each and every allegation contained

9    above as if fully set forth herein.

10    159.   During the Class Period, Defendants carried out a plan, scheme and

11    course of conduct which was intended to and, throughout the Class Period, did: (i)

12    deceive the investing public, including Plaintiff and other Class members, as

13    alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase

14    Bidz securities at artificially inflated prices. In furtherance of this unlawful

15    scheme, plan and course of conduct, Defendants, and each of them, took the

16    actions set forth herein.

17    160.   Defendants (i) employed devices, schemes, and artifices to defraud;

18    (ii) made untrue statements of material fact and/or omitted to state material facts

19    necessary to make the statements not misleading; and (iii) engaged in acts,

20    practices, and a course of business which operated as a fraud and deceit upon the

21    purchasers of the Company's securities in an effort to maintain artificially high

22    market prices for Bidz securities in violation of Section 10(b) of the Exchange Act

23    and Rule 10b-5. All of the Defendants are sued either as primary participants in

24    the wrongful and illegal conduct charged herein or as controlling persons as

25    alleged below.

26    161.   Defendants, individually and in concert, directly and indirectly, by the

27    use, means or instrumentalities of interstate commerce and/or of the mails, engaged

28

71

1    and participated in a continuous course of conduct to conceal adverse material

2    information about Bidz's financial well-being and prospects, as specified herein.

3        162.   These Defendants employed devices, schemes and artifices to defraud,

4    while in possession of material adverse non-public information and engaged in

5    acts, practices, and a course of conduct as alleged herein in an effort to assure

6    investors of Bidz's value and performance and continued substantial growth, which

7    included the making of, or the participation in the making of, untrue statements of

8    material facts and/or omitting to state material facts necessary in order to make the

9    statements made about Bidz and its business operations and future prospects in

10   light of the circumstances under which they were made, not misleading, as set forth

11   more particularly herein, and engaged in transactions, practices and a course of

12   business which operated as a fraud and deceit upon the purchasers of Bidz's

13   securities during the Class Period.

14       163.   Each of the Individual Defendants' primary liability, and controlling

15   person liability, arises from the following facts: (i) the Individual Defendants were

16   high-level executives and/or directors at the Company during the Class Period and

17   members of the Company's management team or had control thereof; (ii) each of

18   these Individual Defendants, by virtue of their responsibilities and activities as a

19   senior officer and/or director of the Company, was privy to and participated in the

20   creation, development and reporting of the Company's internal budgets, plans,

21   projections and/or reports; (iii) each of these Individual Defendants enjoyed

22   significant personal contact and familiarity with the other Defendants and was

23   advised of, and had access to, other members of the Company's management team,

24   internal reports and other data and information about the Company's finances,

25   operations, and sales at all relevant times; and (iv) each of these Individual

26   Defendants was aware of the Company's dissemination of information to the

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

1   investing public which they knew or recklessly disregarded was materially false

2   and misleading.

3       164.   Defendants had actual knowledge of the misrepresentations and/or

4   omissions of material facts set forth herein, or acted with reckless disregard for the

5   truth in that they failed to ascertain and to disclose such facts, even though such

6   facts were available to them.  Such the Defendants' material misrepresentations

7   and/or omissions were done knowingly or recklessly and for the purpose and effect

8   of concealing Bidz's financial well-being and prospects from the investing public

9   and supporting the artificially inflated price of its securities.  As demonstrated by

10  Defendants' overstatements and misstatements of the Company's financial well-

11  being and prospects throughout the Class Period, Defendants, if they did not have

12  actual knowledge of the misrepresentations and omissions alleged, were reckless in

13  failing to obtain such knowledge by deliberately refraining from taking those steps

14  necessary to discover whether those statements were false or misleading.

15      165.   As a result of the dissemination of the materially false and misleading

16  information and failure to disclose material facts, as set forth above, the market

17  price of Bidz's securities was artificially inflated during the Class Period.   In

18  ignorance of the fact that market prices of Bidz's securities were artificially

19  inflated, and relying directly or indirectly on the false and misleading statements

20  made by the Defendants, or upon the integrity of the market in which the securities

21  traded, and/or in the absence of material adverse information that was known to or

22  recklessly disregarded by Defendants, but not disclosed in public statements by

23  Defendants during the Class Period, Plaintiff and the other members of the Class

24  acquired Bidz securities during the Class Period at artificially high prices and were

25  damaged thereby.

26      166.   At the time of said misrepresentations and omissions, Plaintiff and

27  other members of the Class were ignorant of their falsity, and believed them to be

28

73

DOCS\490115v1

true.  Had Plaintiff and the other members of the Class and the marketplace known the truth about Bidz, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Bidz securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

167.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

169.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

170.   The Individual Defendants acted as controlling persons of Bidz within the meaning of Section 20(a) of the Exchange Act and are liable thereunder.  As senior officers and/or directors of Bidz, high-level executives of the Company, "hands on" supervisors, decision-makers and participants in Bidz's operations, and owners of Bidz stock, the Individual Defendants had the power and authority to influence and control and did influence and control Bidz to engage in the wrongful conduct complained of herein.

171.   In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

74

1       172.   As set forth above, Bidz and the Individual Defendants each violated

2   Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

3   Complaint.   By virtue of their positions as controlling persons, the Individual

4   Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct

5   and proximate result of the Defendants' wrongful conduct, Plaintiff and other

6   members of the Class suffered damages in connection with their purchases of the

7   Company's securities during the Class Period.

8   **PRAYER FOR RELIEF**

9       WHEREFORE, Plaintiff prays for relief and judgment, as follows:

10       A.   Determining that this action is a proper class action under Rule 23 of

11   the Federal Rules of Civil Procedure;

12       B.   Awarding compensatory damages in favor of Plaintiff and the other

13   Class members against Defendants, jointly and severally, for all damages sustained

14   as a result of Defendants' wrongdoing, in an amount to be proven at trial, including

15   interest thereon;

16       C.   Awarding Plaintiff and the Class their reasonable costs and expenses

17   incurred in this action, including counsel fees and expert fees; and

18       D.   Such other and further relief as the Court may deem just and proper.

19   **JURY TRIAL DEMANDED**

20       Plaintiff hereby demands a trial by jury.

21   Dated:  October 13, 2009          MILBERG LLP
                                        Jeff S. Westerman
22                                     Andrew J. Sokolowski

23

24

25   _JEFF S. WESTERMAN_

26

27

28

75

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071-3172
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
E-mail: jwesterman@milberg.com
asokolowski@milberg.com

Counsel for Lead Plaintiff and Liaison
Counsel for the Class

BROWER PIVEN
A Professional Corporation
David A.P. Brower
Jessica Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300
E-mail: brower@browerpiven.com
sleater@browerpiven.com

BROWER PIVEN
A Professional Corporation
Charles J. Piven
Yelena Trepetin
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile: (410) 685-1300
E-mail: piven@browerpiven.com
trepetin@browerpiven.com

Counsel for Lead Plaintiff
and Lead Counsel for the Class

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

# EXHIBIT A

## PLAINTIFF'S CERTIFICATION

Roland Pomfret ("Plaintiff") declares that:

1.     Plaintiff has reviewed the complaint and authorized its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.     A schedule of Plaintiff's transactions in Bidz.com securities during the Class Period is attached hereto.

5.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court. Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this __6__ day of October 2009.

_____
Roland Pomfret

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: 410-332-0030
Facsimile: 410-685-1300
www.browerpiven.com

77

**ROLAND POMFRET**

**Bidz.com Securities Litigation**

Schedule of Transactions

| Transaction Trade Date | Transaction Type | # of Shares | # of Option Contracts | Option Type (with strike price and expiration date) | Share Price | Contract Price |
|---|---|---|---|---|---|---|
| 8/31/2007 | SELL | 5,000 | | | $8.60 | |
| 10/4/2007 | BUY | 10,000 | | | $14.29 | |
| 10/8/2007 | BUY | 5,000 | | | $14.50 | |
| 10/9/2007 | BUY | 5,000 | | | $14.50 | |
| 10/9/2007 | SELL | 257 | | | $14.75 | |
| 10/10/2007 | BUY | 100 | | | $14.60 | |
| 10/31/2007 | SELL | 718 | | | $14.75 | |
| 11/1/2007 | BUY | 100 | | | $13.99 | |
| 11/1/2007 | BUY | 9,125 | | | $14.99 | |
| 11/2/2007 | BUY | 2,300 | | | $14.25 | |
| 11/5/2007 | BUY | 5,000 | | | $14.05 | |
| 11/12/2007 | SELL | 10,000 | | | $14.91 | |
| 11/15/2007 | BUY | 10,000 | | | $16.25 | |
| 11/16/2007 | SELL | 10,000 | | | $16.91 | |
| 11/21/2007 | BUY | 10,000 | | | $17.58 | |
| 11/23/2007 | SELL | 10,000 | | | $18.47 | |
| 11/26/2007 | BUY | 5,000 | | | $19.99 | |
| 11/26/2007 | BUY | 10,000 | | | $18.51 | |
| 11/27/2007 | BUY | 20,000 | | | $11.73 | |
| 1/7/2008 | SELL | 15,000 | | | $7.82 | |
| 1/31/2008 | SELL | 5,000 | | | $7.61 | |
| 2/27/2008 | SELL | 5,000 | | | $9.98 | |
| 3/18/2008 | SELL | | 20 | Put $7.50 Sept. | | $270.00 |
| 3/20/2008 | SELL | | 10 | Put $10.00 Sept. | | $430.00 |
| 3/28/2008 | SELL | | 20 | Put $7.50 Sept. | | $215.00 |
| 5/5/2008 | SELL | | 10 | Put $10.00 Dec. | | $300.00 |
| 5/6/2008 | SELL | 10,000 | | | $9.99 | |
| 5/19/2008 | SELL | | 50 | Put $10.00 Dec. | | $240.00 |
| 5/19/2008 | SELL | | 200 | Call $17.50 June | | $15.00 |
| 6/19/2008 | SELL | | 200 | Call $15.00 July | | $30.00 |
| 6/30/2008 | BUY | | 200 | Call $15.00 July | | $5.00 |

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:  410-332-0030
Facsimile:  410-685-1300
www.browerpiven.com

**ROLAND POMFRET**

**Bidz.com Securities Litigation**

Schedule of Transactions

| Transaction Trade Date | Transaction Type | # of Shares | # of Option Contracts | Option Type (with strike price and expiration date) | Share Price | Contract Price |
|---|---|---|---|---|---|---|
| 7/10/2008 | SELL | | 200 | Call $12.50 Aug. | | $50.00 |
| 8/1/2008 | SELL | | 20 | Put $7.50 Mar. | | $245.00 |
| 8/19/2008 | SELL | | 200 | Call $12.50 Sept. | | $30.00 |
| 9/17/2008 | BUY | | 10 | Put $10.00 Sept. | | $150.00 |
| 9/17/2008 | SELL | | 10 | Put $7.50 Dec. | | $170.00 |
| 9/17/2008 | SELL | | 200 | Call $12.50 Dec. | | $65.00 |
| 9/23/2008 | SELL | | 10 | Put $10.00 Mar. | | $350.00 |
| 10/16/2008 | BUY | | 10 | Call $12.50 Dec. | | $15.00 |
| 10/16/2008 | BUY | | 10 | Call $12.50 Dec. | | $20.00 |

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:  410-332-0030
Facsimile:   410-685-1300
www.browerpiven.com

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, employed in the County of Los Angeles, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One California Plaza, 300 South Grand Avenue, Suite 3900, Los Angeles, California 90071-3149.

2.    That on October 13, 2009, declarant served the CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at Los Angeles, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of October, 2009, at Los Angeles, California.

ANN MARIE GENOVESE

80

DOCS\490115v1

## SERVICE LIST

*Ramon Gomez v. Bidz.Com, Inc., and David Zinberg, et al.*
Civil Action No. CV09-3216 CBM

| | |
|---|---|
| Jeff S. Westerman (SBN 94559)<br>Andrew J. Sokolowski (SBN 226685)<br>MILBERG LLP<br>One California Plaza<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, California 90071<br>Telephone: (213) 617-1200<br>Facsimile:  (213) 617-1975<br>E-mail: jwesterman@milberg.com<br>asokolowski@milberg.com<br><br>Andrei Rado<br>MILBERG LLP<br>One Pennsylvania Plaza, 49th Floor<br>New York, NY 10119<br>Telephone: (212) 594-5300<br>Facsimile:  (212) 868-1229<br>E-mail: arado@milberg.com | **Counsel for Lead Plaintiff Roland Pomfret and Liaison Counsel for the Class** |
| BROWER PIVEN, A Professional Corporation<br>David A.P. Brower<br>Jessica Sleater<br>488 Madison Avenue, 8th Floor<br>New York, New York 10022<br>Telephone: (212) 501-9000<br>Facsimile:  (212) 501-0300<br>E-mail:  brower@browerpiven.com<br>sleater@browerpiven.com | **Counsel for Lead Plaintiff Roland Pomfret and Lead Counsel for the Class** |
| BROWER PIVEN<br>A Professional Corporation<br>Charles J. Piven<br>Yelena Trepetin<br>World Trade Center-Baltimore<br>401 East Pratt Street, Suite 2525<br>Baltimore, Maryland 21202<br>Telephone: (410) 332-0030<br>Facsimile:  (410) 685-1300<br>E-mail:  piven@browerpiven.com<br>trepetin@browerpiven.com | |

81

DOCS\490115v1

| | |
|---|---|
| Joseph Gentile<br>Ronen Sarraf<br>SARRAF GENTILE LLP<br>116 John Street Suite 2310<br>New York , NY 10038<br>Telephone: 212-868-3610<br>Facsimile:  212-918-7967<br>E-mail: joseph@sarrafgentile.com<br>ronen@sarrafgentile.com | **Counsel for Plaintiff Ramon Gomez** |
| Samuel M Ward<br>Stephen R Basser<br>BARRACK RODOS AND BACINE<br>600 West Broadway Suite 900<br>San Diego , CA 92101<br>Telephone: 619-230-0800<br>Facsimile:  619-230-1874<br>E-mail: sward@barrack.com<br>sbasser@barrack.com | |
| *Mark Walczyk v. Bidz.Com, Inc* | |
| Daniel L Germain<br>ROSMAN AND GERMAIN LLP<br>16311 Ventura Boulevard Suite 1200<br>Encino , CA 91436-2152<br>Telephone: 818-788-0877<br>Facsimile:  818-788-0885<br>E-mail: germain@lalawyer.com | **Counsel for Plaintiff Mark Walczyk** |
| David Promisloff<br>Seamus D. Kaskela<br>Steven D Resnick<br>BARROWAY TOPAZ KESSLER<br>MELTZER & CHECK LLP<br>280 King of Prussia Road<br>Radnor , PA 19087<br>Telephone: 610-667-7706<br>Facsimile:  610-667-7056<br>E-mail: sresnick@btkmc.com | |
| *Mitchell v. Bidz.com, Inc.* | |
| Darren J Robbins<br>Brian Oliver O'Mara<br>David C Walton<br>COUGHLIN STOIA GELLER<br>RUDMAN AND ROBBINS LLP<br>655 West Broadway Suite 1900<br>San Diego , CA 92101-3301<br>Telephone: 619-231-1058<br>Facsimile:  619-231-7423<br>E-mail: e_file_sd@csgrr.com<br>bomara@csgrr.com<br>davew@csgrr.com | **Counsel for Plaintiff James Mitchell** |

82

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1

| | |
|---|---|
| Corey D Holzer<br>Michael Ira Fistel , Jr<br>HOLZER HOLZER AND FISTEL<br>LLC<br>200 Ashford Center North Suite 300<br>Atlanta , GA 30338<br>Telephone: 770-392-0090<br>Facsimile:  770-392-0029<br>E-mail: cholzer@holzerlaw.com<br>mfistel@holzerlaw.com | |
| Jeffrey A Berens<br>DYER AND BERENS LLP<br>682 Grant Street<br>Denver , CO 80203-3507<br>Telephone: 303-861-1764<br>Facsimile:  303-395-0393<br>E-mail: jeff@dyerberens.com | |
| Samuel H Rudman<br>COUGHLIN STOIA GELLER<br>RUDMAN AND ROBBINS LLP<br>58 South Service Road Suite 200<br>Melville , NY 11747<br>Telephone: 631-367-7100<br>Facsimile:  631-367-1173<br>E-mail: srudman@lerachlaw.com | |
| **Counsel for Defendants** | |
| Joel A Feuer<br>GIBSON DUNN AND CRUTCHER<br>LLP<br>2029 Century Park East Suite 4000<br>Los Angeles , CA 90067<br>Telephone: 310-551-8808<br>Facsimile:  310-552-7058<br>E-mail: jfeuer@gibsondunn.com | **Counsel for Defendants Bidz.com, Inc., David Zinberg, Leon Kuperman, Lawrence Y. Kong, and Claudia Y. Liu.** |

83

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

DOCS\490115v1