JEFF S. WESTERMAN (SBN 94559)
jwesterman@milberg.com
DAVID E. AZAR (SBN 218319)
dazar@milberg.com
ANDREW J. SOKOLOWSKI (SBN 226685)
asokolowski@milberg.com
MILBERG LLP
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90071
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975

BROWER PIVEN, A Professional Corporation
DAVID A.P. BROWER (*admitted pro hac vice*)
brower@browerpiven.com
JESSICA SLEATER
sleater@browerpiven.com
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

Counsel for Lead Plaintiff and Liaison Counsel for the Class

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| RAMON GOMEZ, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BIDZ.COM, INC., AND DAVID ZINBERG, <br><br> Defendants. | Lead Case No. CV09-3216 CBM (Ex) <br><br> PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT <br><br> DATE:   March 22, 2010 <br> TIME:   10:00 a.m. <br> CTRM:  2 <br> JUDGE:  Hon. Consuelo B. Marshall |

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT............................................................................................ 4

I.    PLEADING STANDARDS ON A MOTION TO DISMISS ......................... 4

    A.    Standard Applicable to Plaintiff's Falsity Allegations ......................... 4

    B.    Standard Applicable to Plaintiff's Scienter Allegations ...................... 5

II.    DEFENDANTS' MISTATEMENTS OF BIDZ'S RESULTS ...................... 5

    A.    Defendants Artificially Inflated Gross Profit Margins By Recognizing Non-Existent Cooperative Marketing Contributions........................................................................... 5

    B.    Bidz Artificially Inflated the Book Value of Its Purchased Inventory ................................................................................. 7

    C.    Defendants Artificially Inflated Gross Profit Margins By Recognizing Non-Existent Gross Profit Margin Guarantees ............... 8

    D.    Defendants Artificially Inflated Gross Profit Margins By Improperly Booking Marketing Contributions..................................... 8

III.    PLAINTIFF'S FALSITY ALLEGATIONS SATISFY RULE 9(b) ............. 9

    A.    Bidz's July 31, 2007 Press Release Reported An Artificially Inflated Gross Margin Outlook........................................................ 10

    B.    Bidz Artificially Inflated Its Q3 07 Results Relating to Gross Profit Margins and Net Income.................................................. 10

    C.    Bidz Artificially Inflated Its Q4 07, FY 07 and FY 08 Results Relating to Gross Profit Margins and Net Income ............................ 12

    D.    Bidz's Q1 08 Results Artificially Inflated Bidz's Gross Profit Margins and Net Income.................................................. 13

    E.    Bidz's Q2 08 Results Artificially Inflated Gross Profit Margins and Net Income ............................................................... 14

    F.    Bidz's Q3 08 10-Q Revealed That Its Artificially Inflated Gross Margins Were Not Sustainable .......................................... 15

IV.    DEFENDANTS' SHILL BIDDING AND FALSE APPRAISAL PRACTICES MATERIALLY AFFECTED THE COMPANY ................... 16

i

V.    THE ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF
      SCIENTER .................................................................................................. 16

      A.    Individual Defendants' Knowledge and Participation in
            Schemes to Artificially Inflate Financial Results ............................... 16

      B.    Individual Defendants' Knowledge and Participation in Other
            Fraudulent Schemes ............................................................................. 19

      C.    Defendants' Attacks on the CWs are Unfounded ................................ 20

      D.    The Material GAAP Violations Provide Evidence of *Scienter* .......... 21

      E.    Plaintiff Adequately Pleads Motive .................................................... 21

      F.    The Magnitude and Timing of Write-Off Evidences Scienter ........... 24

      G.    The SOX Certifications Provide Evidence of Scienter ....................... 24

CONCLUSION ................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

CASES

5

*Batwin v. Occam Networks, Inc.*,
   No. 07-2750, 2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008)..17, 19, 23

6

7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................4

8

9

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008)................................................................................19

10

11

*Carol Gamble Trust 86 v. E-Rex, Inc.*,
   No. 03-15032, 2004 U.S. App. LEXIS 88 (9th Cir. Jan. 5, 2004).....................25

12

13

*Edwards v. Marin Park, Inc.*,
   356 F.3d 1058 (9th Cir. 2004)................................................................................4

14

15

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995)................................................................................24

16

17

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001)................................................................................24

18

19

*Freedman v. Louisiana-Pacific Corp.*,
   922 F. Supp. 377 (D. Or. 1996)............................................................................21

20

*Glover v. DeLuca*,
   No. 2:03-0288, 2006 U.S. Dist. LEXIS 76093 (W.D. Pa. Sept. 29, 2006)........21

21

22

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002) .................................................................................4

23

24

*In re Anicom Inc. Sec. Litig.*,
   No. 00-4391, 2001 U.S. Dist. LEXIS 6607 (N.D. Ill. May 15, 2001) ..............20

25

26

*In re APAC Teleserv., Inc. Sec. Litig.*,
   No. 97-9145, 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Nov. 19, 1999)...........23

27

28

DOCS\503450v6

*In re Cardinal Health, Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................... 23

*In re Commtouch Software Ltd. Sec. Litig.*,
    No. 01-00719, 2002 U.S. Dist. LEXIS 13742 (N.D. Cal. July 24, 2002) .......... 19

*In re CornerStone Propane Partners., L.P. Sec. Litig.*,
    416 F. Supp. 2d 779 (N.D. Cal. 2005) ............................................................... 20

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................. 20

*In re Daou Sys.*,
    411 F.3d 1006 (9th Cir. 2005) ........................................................................... 21

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) ................................................................. 23

*In re Homestore.com, Inc. Sec. Litig.*,
    252 F. Supp. 2d 1018 (C.D. Cal. 2003) ....................................................... 7, 8, 9

*In re LDK Solar Sec. Litig.*,
    No. 07-05182, 2008 U.S. Dist. LEXIS 80717 (N.D. Cal. Sept. 24, 2008) .......... 5

*In re Northwest Biotherapeutics, Inc. Sec. Litig.*,
    No. 07-1254, 2008 U.S. Dist. LEXIS 54028 (D. Wash. July 2, 2008) ............... 17

*In re Oxford Health Plans, Inc., Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................................... 22

*In re Petco Animal Supplies, Inc. Sec. Litig.*,
    No. 05-0823, 2006 U.S. Dist. LEXIS 97927 (S.D. Cal. July 31, 2006) ............ 17

*In Re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) .......................................................................... 21, 24

*In Re Silicon Graphics Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................................. 22

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3rd Cir. 1996) ............................................................................... 21

iv

DOCS\503450v6

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008) ................................................................. 19

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007)........................................................5, 23, 24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America
    West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ............................................................................. 22

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ........................................................................... 22

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ................................................................................ 24

*SEC v. Delphi Corp.*,
    No. 06-14891, 2008 U.S. Dist. LEXIS 78671 (E.D. Mich. Oct. 8, 2008) ......... 17

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) ................................................................................ 22

*Stoneridge Inv. Partners, LLC v. Scientific Atlanta*,
    552 U.S. 148 (2008) ............................................................................................ 4

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05-1898, 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005)............. 25

*Tellabs v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................4, 5, 21

*Warman v. Overland Data*,
    No. 97-833, 1998 U.S. Dist. LEXIS 2009 (S.D. Cal. Feb. 20, 1998) ............... 25

**STATUTES**

Private Securities Litigation Reform Act of 1995 ("PSLRA") ...........................4, 25

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a) ............................................................................................ 4

Fed. R. Civ. P. 15(a) ......................................................................................... 25

1

Fed. R. Civ. P. 9(b) ........................................................................................ 4, 9

2

Fed. R. Civ. P. 10b-5 ......................................................................................... 4

3

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

## PRELIMINARY STATEMENT

Defendants devised an accounting fraud to manipulate gross profit margins and falsely report earnings. Defendants did so by recording: (a) sham cooperative marketing contributions from merchandise vendors; and (b) bogus payments from a related-party vendor under a purported agreement in which the vendor guaranteed 20% profit margins.[1]

Defendants' co-op marketing contribution scam worked as follows: First, Bidz.com, Inc. ("Bidz" or the "Company") billed suppliers for non-existent "co-op marketing contributions." Second, Bidz's vendors increased the billed cost of merchandise they sold to Bidz in an amount equal to the sham co-op marketing contributions Bidz billed to those vendors. Third, Bidz and the suppliers either swapped checks of equal amounts or offset the amounts in their accounts receivable and accounts payable, meaning the transactions had no actual economic value. Fourth, Bidz recorded the co-op marketing contributions as a reduction of either (a) cost of sales (the reduction of which is equivalent to income) in an amount necessary to achieve a desired net income figure, or (b) cost of purchased inventory. Finally, Defendants recorded an inflated value of purchased inventory in Bidz's financial statements because the inflated value billed by vendors exceeded the reductions taken from co-op marketing contributions. ¶¶30-37.[2] This scheme allowed Bidz to artificially inflate gross margins (by reducing the cost of sales) and net income, and to falsely report those figures in public statements and filings with the United States Securities and Exchange Commission ("SEC").

Defendants also inflated gross margins by recognizing bogus payments under a purported gross profit guarantee with a large supplier and related party,

---

[1]  "Defendants" refers to Defendants Daniel Zinberg, Lawrence Kong and Bidz.com. "Individual Defendants" refers to Defendants Zinberg and Kong.

[2]  Paragraph references ("¶") are to the Consolidated Class Action Complaint for Violation of Federal Securities Laws ("Complaint"), Dkt. No. 34.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

L.A. Jewelers.  ¶¶29, 31.  Bidz received no such payments, but it falsely recorded an increase in gross profits that directly inflated gross profit margins.

Moreover, even to the extent some vendors paid marketing contributions, Defendants improperly accounted for those payments.  All parties here agree that Financial Accounting Standards Board's Emerging Issues Task Force Issue 02-16 ("EITF 02-16") governs proper classification of co-op marketing contributions. Defendants incorrectly booked the contributions as a reduction of cost of sales (which increases gross margins), rather than as a proper reduction in marketing costs (which has no impact on gross margins).  ¶¶50-53.  As a result, Bidz reported materially inflated gross profit margins.  Under EITF 02-16, the latter method is proper because Bidz used contributions to market specific products from specific vendors.  To reduce the impact of their scheme on Bidz's vendors, Defendants allowed the vendors to inflate the price of their goods by the amount of their expected marketing contributions, which also inflated the book value of those vendors goods in Bidz's purchased inventory.  ¶34.

Defendants also employed secret "shill bidders" to place bogus bids on items in order to create the false perception of demand for the items and drive up the bidding and sale prices, effectively establishing auction reserves.   ¶¶116-24. Publicly, however, Bidz stated the shill bidding was strictly forbidden, and that all of its auctions were "$1 no reserve" auctions – meaning that auction bids open at $1 and there is no "reserve" or minimum bid for any item.  *Id*.  Defendants also engaged an "appraisal mill" to provide inflated price appraisals for items, which deceived customers and inflated sales prices by overvaluing the items.  ¶¶125-27. This conduct rendered Bidz's statements regarding its fundamental method of operation and the composition and sources of its revenue and sales false and misleading, and artificially inflated the prices of Bidz's securities throughout the

1  Class Period.   The prices of those securities thus sharp declined when these

2  improper and deceptive practices were finally revealed.   ¶¶128-33.

3       The Complaint's well-pled allegations also make clear that the Individual

4  Defendants, who were well-informed about the accounting rules applicable to

5  Bidz's co-op marketing and were directly involved in the preparation of the

6  financial statements, were active and knowing participants in this fraudulent

7  scheme to artificially inflate gross margins and net income throughout the Class

8  Period.   Indeed, the conclusion that these Defendants intentionally or recklessly

9  issued the alleged material misstatements and omissions during the Class Period is

10  further compelled by the small size of the Company and the Individual

11  Defendants' complete control over all decision-making, as supported and

12  corroborated by reliable confidential witnesses ("CW(s)").   The existence of

13  scienter is further bolstered by the fact that the schemes concerned one of Bidz's

14  largest suppliers, materially affected the Company's gross profit margins, gross

15  profit and net income, and resulted in a $17.2 million *de facto* write-off at the end

16  of the Class Period.

17       Moreover, during the Class Period, the Individual Defendants and other Bidz

18  insiders sold massive amounts of Bidz stock.   ¶147.   The Individual Defendants

19  alone sold over 310,000 shares during that period, and received approximately

20  $3,046,316 in proceeds from the sales.   *Id.*   In all, the Individual Defendants and

21  other Company insiders sold 855,000 shares of Bidz stock during the Class Period,

22  and received approximately $9,433,290 in proceeds.   *Id.*   In addition, Bidz's

23  executive compensation was tied primarily to the Company's operational and

24  financial performance, giving the Individual Defendants additional motives to

25  inflate the Company's financial results achieve those payments.

26       For these reasons, the Court should deny Defendants' motion to dismiss.

27

28

3

DOCS\503450v6

**ARGUMENT**

## I.    PLEADING STANDARDS ON A MOTION TO DISMISS

In considering a Rule 12(b)(6) motion, the Court must construe the complaint liberally, accept all factual allegations as true, and draw all reasonable inferences in plaintiff's favor. *Gompper v. VISX, Inc*., 298 F.3d 893, 895 (9th Cir. 2002). A complaint need only allege "enough factual matter (taken as true)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted).

### A.    Standard Applicable to Plaintiff's Falsity Allegations

Under § 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must plead six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc.*, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008). Defendants only challenge falsity and scienter.

The heightened pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA") applies only to the element of scienter – all other elements of a § 10(b) claim are governed by traditional pleading standards under Fed. R. Civ. P. 8(a) or 9(b). *See Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). Rule 9(b) merely requires that the complaint contain an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (citation omitted). In other words, Plaintiff must plead the who, what, where, when and why of each false statement.

### B.     Standard Applicable to Plaintiff's Scienter Allegations

Plaintiff must also plead that Defendants "acted with scienter – that is, that defendants knew or were deliberately reckless to the falsity of their statements." *In re LDK Solar Sec. Litig.*, No. 07-05182, 2008 U.S. Dist. LEXIS 80717, at *29 (N.D. Cal. Sept. 24, 2008).  The Ninth Circuit defined recklessness as "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it."  *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1179 (C.D. Cal. 2007) (citation and quotations omitted).  When examining a plaintiff's scienter allegations, "courts must . . . accept all factual allegations in the complaint as true [and] consider the complaint in its entirety." *Tellabs*, 551 U.S. at 322-23.

"The inquiry . . . is whether *all of the facts* alleged, *taken collectively*, give rise to a strong inference of scienter, *not whether any individual allegation, scrutinized in isolation, meets that standard.*"  *Id.* at 322-33 (emphasis added). Additionally, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged."  *Id*. at 324, 308.  Thus, if the competing inferences are in "equipoise," Plaintiff satisfies his scienter pleading burden.  *See id.* at 331.

## II.     DEFENDANTS' MISTATEMENTS OF BIDZ'S RESULTS

### A.     Defendants Artificially Inflated Gross Profit Margins By Recognizing Non-Existent Cooperative Marketing Contributions

Starting in the third fiscal quarter ("Q3") of fiscal year 2007 ("FY 07"), Bidz claimed it began to collect "co-op marketing contributions" from its inventory vendors "as an incentive for us to market and sell the inventory for sale on the Bidz website."  *See* Def. RJN, Ex. C at 81.  Bidz then booked those purported marketing

5

contributions as a reduction in the cost of sales, which resulted in higher gross profit margins. *Id.*

In reality, however, Bidz's vendors never paid the marketing contributions, and each of Bidz's Class Period statements regarding the contributions and gross profit margins was false and misleading because they were premised on the reduction of cost of sales from fake contributions. ¶¶30, 33-37. The spurious nature of these contributions is apparent from Bidz's financials. In the Q3 07 Form 10-Q, Bidz reported total "sales and marketing expense" of $2,406,000. *See* Def. RJN, Ex. B at 15. For the same quarter, Bidz reported co-op marketing contributions of $2,333,000. ¶¶46-47. Thus, Bidz claims that its vendors reimbursed the Company for all but $73,000 of "sales and marketing expenses." This claim defies logic and good business sense. For Bidz's vendors to have reimbursed $2,333,000 in sales and marketing expenses in July, August and September 2007, they would have essentially agreed to pay for advertising that enabled Bidz to sell products other than theirs, including the nearly $25 million in inventory Bidz already had in stock as of June 30, 2007.

Other circumstances confirm the bogus nature of the reported marketing contributions. Bidz's SEC filings and press releases falsely reported that Bidz carried outstanding marketing contributions owed by its vendors as accounts receivable, categorized as "other current assets" on the Company's balance sheet. *See, e.g.*, ¶46(c). Yet Bidz's SEC filings do not reflect any incoming payments for marketing contributions. In the Company's Q1 08 Form 10-Q, Bidz – for the first time – made "allowance[s] for doubtful accounts [receivable]" for the co-op marketing contributions. Def. RJN, Ex. D at 131. The Q1 08 results reflect a massive decrease in co-op marketing accounts receivable – from $2.9 million at the end of FY 2007 to $1.5 million at the end of Q1 08. *Compare id.* with Def. RJN, Ex. C at 81. Coupled with Bidz's new allowance for doubtful accounts, this large

6

drop-off reflects a stealth write-off of marketing contributions that Bidz never received (and never expected to receive), but which Defendants nevertheless improperly recorded as a reduction of cost of sales.  The suspect nature of the marketing contributions is further evidenced by Bidz's claim in its FY 08 Form 10-K that it carried $934,000 in co-op marketing accounts receivable as "other current assets."  Def. RJN, Ex. L at 300-01.  However, the reported total balance of "other current assets" in the Form 10-K was only $689,000.  Def. RJN, Ex. L at 312.

Bidz's recognition and booking of co-op marketing contributions is clearly false and unreliable.  If Defendants reported Bidz's financials accurately and eliminated non-existent marketing contributions from the Company's balance sheet, Bidz's cost of sales would have been much higher and its gross profit margins much lower.

### B.   Bidz Artificially Inflated the Book Value of Its Purchased Inventory

The sham co-op marketing contributions were part of an offsetting payment agreement between Bidz and its vendors.  Under the agreement, Bidz artificially inflated gross margins by recognizing fake marketing contributions without requiring its vendors to pay those contributions.  ¶34.  To accomplish this, Bidz allowed vendors to overcharge the Company for goods by an amount equal to each vendor's expected co-op marketing contribution.  ¶¶34-35.  Bidz then booked the inflated purchased inventory value, and recognized the bogus round-trip marketing contributions as a reduction of cost of sales which, in turn, inflated gross margins. *Id.*   This is similar to the improper round-trip transactions in the *Tyco* and *Homestore* cases.  *See* ¶¶36-37; *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d, 1018, 1024-25 (C.D. Cal. 2003).  The transactions took place only on paper.  In Q3 08, Bidz was forced to write off the value of its non-existent purchased inventory (*i.e.*, the amount the vendors billed Bidz above actual value).  ¶112.

DOCS\503450v6

### C. Defendants Artificially Inflated Gross Profit Margins By Recognizing Non-Existent Gross Profit Margin Guarantees

Defendants also falsely inflated Bidz's gross profit margins by recognizing more non-existent payments – purportedly stemming from a profit margin guarantee agreement between Bidz and related-party vendor, L.A. Jewelers. ¶¶29-31. Under the alleged agreement, L.A. Jewelers guaranteed Bidz a 20% gross profit margin on goods Bidz purchased. *Id.* L.A. Jewelers' owner, Saied Aframian, owned about 1.2 million shares (roughly 5%) of Bidz's stock throughout the Class Period. *See, e.g.*, Def. RJN, Ex. B at 22.

The purported agreement is dubious because (a) it involves a related party who owned about 5% of Bidz throughout the Class Period; (b) it was not the result of arms-length negotiations, and (c) the 20% gross profit guarantee makes no economic sense to L.A. Jewelers given Bidz's alleged business model of $1 "no reserve" auctions and the significant risk that model would pose to a vendor who guaranteed 20% gross margins. ¶29.

As with the co-op marketing contributions, Bidz received no actual payment from L.A. Jewelers for the various gross margin shortfalls reported in its SEC filings. ¶¶29-32. The bogus gross profit guarantee thus lacked economic substance, but allowed Bidz and L.A. Jewelers to manipulate gross profit margins – increasing the price of Bidz's (and Mr. Aframian's) stock with no actual cost to L.A. Jewelers. Eliminating the bogus payments from L.A. Jewelers would have reduced gross profits and resulted in lower reported gross profit margins for Bidz during the Class Period.

### D. Defendants Artificially Inflated Gross Profit Margins By Improperly Booking Marketing Contributions

Finally, even where Bidz received some marketing contributions from its vendors, Defendants improperly booked these contributions as a reduction in cost of sales, which falsely increased gross profit margins by effectively reducing the

DOCS\503450v6

cost of Bidz's purchased inventory. ¶¶50-54. Under EITF 02-16, Defendants may not book such contributions as a reduction of cost of sales "if the cash consideration represents a reimbursement of a specific, incremental, identifiable cost incurred by the customer in selling the vendor's products or services." Def. RJN, Ex. A at 7, ¶6. In such cases, the cash considerations are booked as a reduction of "costs incurred by the customer to sell the vendor's products" (*i.e.*, reduced sales and marketing costs). *Id.* The former impacts gross margins, while the latter does not.

For comparison, if a customer (Bidz) pays a vendor (like L.A. Jewelers) $100 for an item, and recognizes a reduction in cost of sales from marketing contributions of $10, that effectively reduces the cost of the item to $90. If the item sells for $120, the customer (Bidz) realizes a gross margin of about 25% ($30). However, if the marketing contribution produces a specific, identifiable benefit to a particular vendor (L.A. Jewelers), the customer (Bidz) must book a reduction of marketing costs elsewhere on his income statement, the cost remains $100, and the gross margin on the $120 sale is only 16.7% ($20).

Defendants knew that Bidz used the vendors' marketing contributions to purchase specific ads, search keywords, etc. designed to increase sales of the vendor's particular products. ¶¶51-52. As such, the marketing contributions represented a specific, incremental, identifiable cost incurred to sell the vendors' particular products, and should have been booked as a reduction of marketing costs, not a reduction of cost of sales. As a result of this improper accounting, Bidz falsely understated its cost of sales and materially overstated its gross profit margins during the Class Period.

## III.   PLAINTIFF'S FALSITY ALLEGATIONS SATISFY RULE 9(b)

The Complaint identifies the "who" (Bidz and/or its representatives), "what" (set forth below), "where" (the medium in which the misstatement was made – *i.e.*,

9

press release, SEC filing, etc.), and "when" of each false statement regarding purported co-op marketing contributions and L.A. Jewelers' gross margin guarantee payments. As set forth in detail above, the Complaint also explains how Defendants' financial manipulations artificially inflated gross margins and net income in Bidz's financial statements (the "why").

### A. Bidz's July 31, 2007 Press Release Reported An Artificially Inflated Gross Margin Outlook

On July 31, 2007, a Bidz press release (which Bidz also filed as an attachment to an August 1, 2007 Form 8-K) falsely reported an increase in the Company's FY 2007 gross profit margin guidance from 24-25% to 25-26%, and increased earnings guidance to $14-15 million income before tax, up from $13-14 million, "primarily due to the increase in gross profit margins." ¶27. Bidz's stock price increased from its previous closing price of $8.15 to $8.40. ¶28.

However, Bidz's false and misleading projected increase in gross profits and income relied on recognizing (a) non-existent co-op marketing contributions and (b) bogus payments from L.A. Jewelers' gross profit guarantee, which artificially inflated gross margins, as explained *supra*. ¶¶33-34. Bidz also misapplied EITF 02-16 by accounting for any sham marketing contributions it received as a reduction in cost of sales – rather than a reduction of marketing costs – which resulted in inflated gross margin projections in its July 31, 2007 press release.

### B. Bidz Artificially Inflated Its Q3 07 Results Relating to Gross Profit Margins and Net Income

In Q3 07, Bidz incorporated the non-existent marketing contributions and gross profit guarantee into its gross margin calculations. In an August 13, 2007 press release, Bidz provided earnings guidance for Q3 07, falsely stating anticipated quarterly revenues of $37-39 million and income before tax of $3.0-3.2 million. ¶38. The release also reaffirmed its FY 07 revenue guidance and gross margin estimate of 25-26%, and expected income before tax of $14-15 million.

10

¶38.  Defendant Kong repeated this guidance on an earnings conference call the same day.  ¶39.

On November 12, 2007, Bidz issued a press release regarding Q3 07 results, and filed its Q3 07 Form 10-Q the following day.  ¶¶41, 45.  The press release and Q3 07 Form 10-Q falsely represented that co-op marketing contributions reduced the Company's cost of sales by $833,000 ($134,000 attributable to L.A. Jewelers), or 2.1% of net revenue.  ¶¶41, 46(a)-(b).  Defendant Kong repeated this information on an earnings call also attended by Defendant Zinberg.  ¶47.  The Q3 07 Form 10-Q also reported a $122,000 increase in gross profits resulting from L.A. Jewelers' bogus gross profit guarantee.  ¶¶45, 54-56; *see also* Def. RJN, Ex. B at 22.

Bidz carried accounts receivable for co-op contributions of $1.2 million as "other current assets" on its balance sheet.  ¶46(c).  Bidz also reported an increase in net income, "due primarily to higher gross profit margins on increased revenues."  ¶41.  Bidz reported gross margins of 31.7% for Q3 07.  Bidz's Q3 07 guidance and results were false and misleading because they artificially inflated gross profit margins and net income.  The Company's improper recognition of sham co-op marketing contributions and profit margin guarantees resulted in a $955,000 overstatement of gross profit ($833,000 marketing contributions plus $122,000 gross profit guarantee), and an approximate $780,000 overstatement of net income.  ¶55.  Even assuming Bidz did receive co-op marketing contributions, the same gross margin overstatement would occur because Bidz improperly recognized those payments as a reduction of cost of sales, rather than as reduced sales and marketing costs as required by EITF 02-16.  Eliminating the sham would result in a 29.6% gross profit margin, not 31.7%.

DOCS\503450v6

### C.   Bidz Artificially Inflated Its Q4 07, FY 07 and FY 08 Results Relating to Gross Profit Margins and Net Income

Bidz continued its misrepresentations for Q4 07.  A November 27, 2007 press release offered Q4 07 guidance, claiming expected pre-tax income of $5.6-6.0 million and gross margins of 27-28%.  ¶65.  A February 28, 2008 press release (attached to a Form 8-K) reported gross profit margins of 31.2% for the quarter and 29.1% gross margins for FY 07.  ¶¶72-73.  Bidz specifically represented that "[g]ross margins benefited from co-op marketing contributions that reduced the Company's cost of sales by $4.0 million or 6.3% of net revenue."  ¶73.  The press release also issued guidance for FY 08, including $25-26 million pre-tax income and gross margins of 27-28%.  ¶73.

Bidz's FY 07 10-K, filed March 12, 2008, reported that co-op marketing contributions reduced cost of sales by $4.8 million for the fiscal year ($522,000 attributable to L.A. Jewelers), or 2.6% of net revenue.  ¶79.  Bidz also reported a $427,000 increase in gross profit for FY 07 resulting from L.A. Jewelers' sham profit margin guarantee.  ¶77.  Bidz's Form 10-K also reported that the Company carried accounts receivable for co-op contributions of $2.9 million as "other current assets" on its balance sheet, and reported gross margins of 29.1% for FY 07.  ¶81; Def. RJN, Ex. C at 84.

Bidz's Q4 07, FY 07 and FY 08 guidance and results were false and misleading because they artificially inflated gross profit margins and net income. The Company's improper recognition of sham co-op marketing contributions and profit margin guarantees resulted in a rough $5.2 million overstatement of gross profit ($4.8 million in marketing contributions plus the $427,000 gross profit guarantee), and a $4.2 million overstatement of net income.  *See* ¶¶77-80.  Even assuming Bidz did receive co-op marketing contributions, the same gross margin overstatement would occur because Bidz improperly recognized those payments as a reduction of cost of sales, rather than as reduced sales and marketing costs as

12

required by EITF 02-16.  Eliminating the sham transactions would result in a 24.3% gross profit margin for Q4 07, not 31.2%.

### D.   Bidz's Q1 08 Results Artificially Inflated Bidz's Gross Profit Margins and Net Income

On May 6, 2008, Bidz issued a press release regarding its Q1 08 financial performance.  ¶86.  Bidz highlighted its 29.1% gross margins for Q1 08, up from 24.9% the prior year, and its $7.8 million pre-tax income.  ¶86.  Bidz filed its Q1 08 Form 10-Q the same day, which reported the same financial information as the press release.  ¶89; Def. RJN, Ex. D at 131.  The Form 10-Q also reported that co-op marketing contributions reduced cost of sales by $3.6 million for the quarter ($482,000 attributable to L.A. Jewelers).  ¶¶90, 92.  Bidz also reported a $141,000 increase in gross profit for Q1 08 resulting from L.A. Jewelers' sham profit margin guarantee.  ¶90.

The Form 10-Q – for the first time – made an "allowance for doubtful accounts [receivable]" related to the co-op marketing contributions.  *See* Def. RJN, Ex. D at 131.  Bidz also reported a massive drop-off in accounts receivable for co-op contributions (booked under "other current assets") – down to $1.5 million from $2.9 million at the end of FY 07.  *See* Def. RJN, Ex. D at 131.  These simultaneous occurrences show that Bidz performed a stealth write-off of the sham marketing contributions.

Bidz's Q1 08 results were false and misleading because they artificially inflated gross profit margins and net income.   The Company's improper recognition of sham co-op marketing contributions and profit margin guarantees resulted in a rough $3.7 million overstatement of gross profit ($3.6 million in marketing contributions plus the $141,000 gross profit guarantee), and a $2.1 million overstatement of net income.  *See* ¶¶90-92, 94.  Even assuming Bidz received co-op marketing contributions, the same gross margin overstatement

13

would occur because Bidz improperly recognized those payments as a reduction of cost of sales, rather than as reduced sales and marketing costs as required by EITF 02-16.  Eliminating the sham transactions would result in a 23.1% gross profit margin for Q1 08, not 29.1%.

### E.   Bidz's Q2 08 Results Artificially Inflated Gross Profit Margins and Net Income

On August 5, 2008, Bidz filed a Form 8-K (with press release attached) discussing the Company's Q2 08 results.  ¶99.  The press release reported 27.9% gross profit margins for Q2 08, and reported that Bidz expected gross margins to remain at 27-28% for FY 08.  ¶99.  Bidz's Q2 08 Form 10-Q, filed the same day, and also reported 27.9% gross margins.  *See Def. RJN, Ex. F at 204.*  The Form 10-Q also reported that co-op marketing contributions reduced cost of sales by $2.8 million for Q2 08 ($131,000 attributable to L.A. Jewelers).  ¶¶103, 105.  Bidz also reported a $81,000 increase in gross profit for Q2 08 resulting from L.A. Jewelers' sham profit margin guarantee.  ¶90.  Bidz reported another drop in accounts receivable relating to co-op marketing contributions, down to $1.2 million from $1.5 million the previous quarter, indicating a further write-down.  ¶105.

Bidz's Q2 08 results were false and misleading because they artificially inflated gross profit margins and net income.  The Company's improper recognition of sham co-op marketing contributions and profit margin guarantees resulted in a rough $2.8 million overstatement of gross profit ($2.8 million in marketing contributions plus the $81,000 gross profit guarantee), and a $1.6 million overstatement of net income.  ¶¶103-07.  Even assuming Bidz received co-op marketing contributions, gross margin were still overstated because Bidz improperly recognized those payments as a reduction of cost of sales, rather than reduced sales and marketing costs as EITF 02-16 requires.  Eliminating the sham transactions would result in a 22.6% gross profit margin for Q2 08, not 27.9%.

14

DOCS\503450v6

1

### F.    Bidz's Q3 08 10-Q Revealed That Its Artificially Inflated Gross Margins Were Not Sustainable

2    On November 10, 2008, after the markets closed, Bidz filed a Form 8-K

3  with an attached press release regarding the Company's Q3 08 results.  ¶112.  The

4  press release reflected a sharp decrease in gross margins – down to 24.0% for the

5  quarter – due to alleged "wholesale" sales totalling $17.2 million.  ¶112.

6    As discussed *supra*, since the inception of the Company's co-op marketing

7  agreements, Bidz allowed vendors to inflate the price of goods beyond actual

8  value.  Bidz then booked the inflated value as an asset ("inventory") and decreased

9  its cost of sales (and artificially increased its gross margins) by recognizing sham

10  co-op marketing contributions.  *See supra* Part II.B.  However, quarter after quarter

11  of this purchased inventory inflation caused Bidz's purchased inventory number to

12  grow – with no actual inventory to show for it.  This became a problem because

13  analysts and investors look at inventory build-up as a bad sign.  Therefore, Bidz

14  elected to sell a portions of the purchased inventory (which was carried at an

15  inflated dollar value) in a bulk sale.  Of course, the sale price of the purchased

16  inventory seemed low compared to its book value, and the sale resulted in a low

17  reported gross margin.  Bidz's $17.2 million "wholesale" sale was actually a de

18  facto write-off (in whole or in part) of the non-existent purchased inventory it built

19  up since it began its co-op marketing contribution scheme.  ¶112.

20    Defendants argue that Bidz accounted for co-op marketing contributions

21  appropriately under EITF 02-16, and "there is no basis for concluding that Bidz

22  was inflating the value of its inventory through the co-op marketing program" and,

23  therefore, "there is no basis for concluding that Bidz's wholesale transaction

24  reported in November 2008 was caused by its need to sell inflated inventory."  *See*

25  Def. Br. at 18.  Defendants' argument is contrary to the Complaint's allegations

26  and is predicated upon whether Bidz properly accounted for co-op marketing

27  transactions in conformity with EITF 02-16, an issue of fact that is not

28

15

appropriately decided on a motion to dismiss.

## IV.   DEFENDANTS' SHILL BIDDING AND FALSE APPRAISAL PRACTICES MATERIALLY AFFECTED THE COMPANY

Bidz also employed secret "shill bidders" to create the false impression of demand for items and to artificially drive up auction prices on items sold on its website.  ¶¶116-24.  Bidz publicly proclaimed that shill bidding was forbidden on its website, and that all auctions were "$1 no reserve" auctions.  ¶117.  However, confidential witnesses confirm that Bidz lied, and actually employed and trained shill bidders in its Los Angeles facility and abroad in Russia.  ¶¶122-24.  Through bogus bids, these shill bidders set a de facto reserve bid well above $1.  ¶¶118, 120  Defendants never disclosed Bidz's employment of shill bidders to investors.  Defendants knew that, if the practice became known, Bidz would lose revenue and growth potential from a loss of customers and reduced bidding prices from remaining customers.  ¶115.  When Citron Research revealed the practice in an independent report on November 27, 2007 (the "Citron Report"), Bidz's stock dropped 17% by the end of the trading day.  ¶¶129, 138.

Bidz also provided an "appraisal mill," AIG Labs, to provide appraisals to customers.  ¶125.  AIG Labs did not follow industry standards, and often issued appraisals for entire lots of items based on its appraisal of a single piece from the lot.  ¶126.  The Citron Report also exposed Bidz's fraudulent appraisal practices, which contributed to the large decline in stock price between Friday, November 23, 2007 and Wednesday, November 28, 2007.  ¶¶128, 138.

## V.   THE ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF SCIENTER

### A.   Individual Defendants' Knowledge and Participation in Schemes to Artificially Inflate Financial Results

Plaintiff has far exceed the scienter pleading standard.  Plaintiff alleges that the Individual Defendants were active participants in the fraud and had full

16

knowledge that the statements made during the Class Period were false and misleading.  Defendant Zinberg was the Company's President, Chief Executive Officer, and Chairman of the Board of Directors, and did everything in private – including making all of the decisions for the Company.  ¶¶9, 145.  Zinberg and his sister, Marina Zinberg, also control over 62% of the Company's shares.   ¶9.  Further, according to CW4, who was the Director of Business Development, PR and Marketing from February 2000 until June 2007, Zinberg was either directly involved with the vendors that enabled Defendants to perpetrate the fraud, or had someone managing the relationships for him.   ¶145.  According to CW1 (and confirmed by other CWs), who reported directly to the Chief Operation Officer (Defendant Kong's wife), Defendant Kong, the Company's Chief Financial Officer, was directly involved with the bookkeeping and the preparation of financial statements, which were materially false and misleading during the Class Period. ¶¶10, 146.[3]   *See Batwin v. Occam Networks, Inc.*, No. 07-2750, 2008 U.S. Dist. LEXIS 52365, at *34-35 (C.D. Cal. July 1, 2008) (scienter allegations persuasive because of "defendants' considerable involvement with the company's generation and reporting of revenues"); *In re Nw. Biotherapeutics, Inc. Sec. Litig.*, No. 07-1254, 2008 U.S. Dist. LEXIS 54028, at *14 (D. Wash. July 2, 2008) (defendants' "position[] . . . strongly suggests that they knew that the releases included false or misleading statements").

The Individual Defendants also knew the accounting rules applicable to Bidz's co-op marketing.  This is evidenced by the fact that they reviewed the Class

---

[3] *See SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S. Dist. LEXIS 78671, at *26 (E.D. Mich. Oct. 8, 2008) (finding scienter because "[s]he is alleged to have been responsible for GAAP accounting . . . yet she participated in a scheme to mischaracterize" a payment); *In re Petco Animal Supplies, Inc. Sec. Litig.*, No. 05-CV-0823-H (RBB), 2006 U.S. Dist. LEXIS 97927, at *45 (S.D. Cal. July 31, 2006) ("Plaintiffs allege that they participated in the scheme to defraud investors by causing or permitting [the Company] to overstate its earnings by recklessly disregarding proper accounting procedures.")

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

Period SEC filings, which contained discussions regarding EITF 02-16, and signed SOX certifications stating that they had reviewed the documents. *See, e.g.*, ¶57. Moreover, Defendant Kong knew that Bidz accounted for co-op marketing contributions as a reduction of cost of sales – as evidenced by his comments during the November 10, 2008 earnings call. *See* Plaintiff's Request for Judicial Notice In Support Of Plaintiff's Opposition to Defendants' Motion To Dismiss The Consolidated Class Action Complaint, Ex. A (in addressing an analyst's question, Kong stated: "It [co-op marketing] shows up as a reduction in cost of sales and market contributions are quite common in the retail environment where we get vendors to contribute towards our marketing efforts.").[4]

Further, Defendant Zinberg knew that Bidz's marketing costs, for the most part, were specific, easily identifiable costs incurred by Bidz to sell specific products, as evidenced by his response to an analyst during an earnings call. *See* ¶51 ("We can sell maybe ten Corum watches a month, and if a vendor wants to sell us 100 Corum watches a month we would take a marketing fee, buy keywords and use those Corum keywords to sell the watches").  He also knew or recklessly disregarded that to comply with EITF 02-16 the marketing contributions had to be booked as reduction of marketing costs, not a reduction of cost of sales.

Several CWs confirmed these facts.  CW4 stated that "there were specific ad words used for every product" that s/he bought.  ¶52.  Specifically, CW4 "would use a combination of words like jewelry, rings, watches, gold jewelry, diamonds, and diamond watches . . . [and] keywords for certain brands of watches sold on the website, like Salavetti and Tonino Lamborghini."  ¶52.  CW6, corroborating CW4, stated that s/he "approved the use of ad words selected for specific products" and

---

[4] Kong is also knowledgeable about accounting as he earned a B.S. in Accounting and a MBA in Finance.  He also passed the Certified Public Accountant examination in 1983 and is a member of the American Institute of Certified Public Accountants.  ¶10.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

that Defendant Zinberg approved invoices for ad words and "sent them to the accounting department for payment."  ¶53.  *See also Katz v. Image Innovations Holdings, Inc*., 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (*scienter* allegations adequate where complaint "alleged that [defendant] . . . supplied the information used to generate invoices for the fictitious sales, and reviewed such invoices").

Further, the inference that the Individual Defendants knew about the schemes is simply common sense.  Because the false statements at issue concerned Bidz's largest supplier, ¶128, and materially affected gross profit margins, gross profit and net income, ¶¶55, 80, 94, 107, there is a strong inference that top management knew of the improper accounting.  *See, e.g., Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) ("The size of the contract and the prominence of the client raise a strong inference that defendants would be aware of this order.").  The scienter allegations are even more compelling here due to the small size of the Company and the Individual Defendants' hands-on management in such a small Company.  *See Batwin*, 2008 U.S. Dist. LEXIS 52365, at *34-35 ("Given Occam's relatively small size and plaintiff's allegations regarding the officer defendants' considerable involvement with the company's generation and reporting of revenues, plaintiff's allegations of scienter are persuasive."); *see also In re Commtouch Software Ltd.*, No. 01-00719, 2002 U.S. Dist. LEXIS 13742, at *27-28 (N.D. Cal. July 24, 2002) (given the modest company size, top management was likely aware of accounting problems).

## B.    Individual Defendants' Knowledge and Participation in Other Fraudulent Schemes

The Individual Defendants' knowledge and active participation in the shill bidding and the sham appraisals are supported by reliable CWs.  *See, e.g.*, ¶¶121-27.  For example, CW1, a Bidz Operations Coordinator from August 2004 through August 2008, stated that following an investigation regarding a diamond necklace

19

as part of her/his fraud control duties, she/he was told by the COO (Defendant Kong's wife), "don't worry about that one, [the bid] was one of ours."  ¶121. Several CWs also corroborate the fact that certain employees' – including Defendant Zinberg's sister – sole job was to place phony bids, or to train shill bidders.  ¶¶122-23.

Thus, the Complaint adequately pleads Defendants' knowledge of and participation in the fraud.  *See In re CornerStone Propane Partners., L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 791 (N.D. Cal. 2005) (*scienter* present where defendant was "implicated as an author of CornerStone financials as well as a primary perpetrator of a fraudulent scheme"); *In re Anicom Inc. Sec. Litig.*, No. 00-4391, 2001 U.S. Dist. LEXIS 6607, at *15-16 (N.D. Ill. May 15, 2001) ("[defendants] knew of the prebilling and fictitious invoices because they were procured at the defendants' direction").

## C.    Defendants' Attacks on the CWs are Unfounded

Unable to withstand the clear, cogent and compelling evidence of their scienter, Defendants resort to attacking Plaintiff's facially reliable sources.[5] However, Plaintiff can rely on information from confidential witnesses because Plaintiff pled the responsibilities and positions each CW occupied – many of whom had first-hand interactions with the Individual Defendants.  *See  In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005).  The fact that this case involves "[c]orroboration from multiple sources also supports an inference of a scienter."  *Id.*  Further, allegations from CWs employed before the Class Period are relevant because they corroborate the continuity of the fraudulent conduct.  *See*

---

[5] Plaintiff was prevented from learning more information from other potential witnesses "because they expressed concern over reprisals by defendant Zinberg that might occur should they cooperate and provide information concerning Defendants' conduct and the Individual Defendants' participation in and knowledge of such conduct,"  ¶145, which further provides evidence of scienter.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

1   *In Re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[p]re-class data

2   is relevant"); *Glover v. DeLuca*, No. 2:03-0288, 2006 U.S. Dist. LEXIS 76093, at

3   *17-19 (W.D. Pa. Sept. 29, 2006); *Freedman v. Louisiana-Pac. Corp.*, 922 F.

4   Supp. 377, 396 (D. Or. 1996) ("Plaintiffs are not barred from presenting relevant,

5   admissible evidence from before the three-year period to prove an element.").

6   **D.    The Material GAAP Violations Provide Evidence of *Scienter***

7        GAAP violations, when coupled with evidence of fraudulent intent, provide

8   evidence of scienter.  *In re Daou Sys.*, 411 F.3d at 1016.[6]   The Individual

9   Defendants were fully aware of how Bidz accounted for the co-op marketing, as

10  their statements on earnings calls and their discussion of EITF 02-16 in various

11  SEC filings make clear.  *See*, *e.g.*, ¶¶49-50, 53. Thus, Defendants knowingly

12  violated GAAP provisions by completely ignoring and misapplying the mandates

13  of EITF 02-16, which enabled them to fraudulently and materially overstate gross

14  profit margins, gross profit, and net income during the Class Period., ¶¶80, 94,

15  107.

16  **E.    Plaintiff Adequately Pleads Motive**

17       Personal pecuniary motive is not required to plead scienter.  *See Tellabs*, 551

18  U.S. at 325; *In re Daou*, 411 F.3d at 1023.   However, here, "[t]he Individual

19  Defendants [ ] had significant incentives to make misleading statements and omit

20  material facts to ensure that the Company achieved its performance objectives,

21  which was a factor used to determine the Individual Defendants' salaries and

22  bonuses."  ¶149.  Defendant Zinberg was paid $201,244 in 2007 ($181,250 in

23  salary and $19,994 in all other compensation) and $433,434 in 2008 ($241,667 in

24  salary, $169,360 in bonuses, and $22,407 in all other compensation).  ¶149.

25  ─────────────
    [6] Although Plaintiff believes that GAAP violations have been properly pled, whether the
26  Company violated GAAP is a factual question, which should not be addressed at the
    motion to dismiss stage. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 709 n.9 (3rd
27  Cir. 1996) (characterizing GAAP proof as a battle of experts).

28
    PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
    CONSOLIDATED CLASS ACTION COMPLAINT
    DOCS\503450v6

Defendant Kong was paid $814,205 in 2007 ($235,000 in salary, $338,048 in bonuses, $224,330 in option awards, and $16,828 in all other compensation) and $743,663 in 2008 ($235,000 in salary, $302,930 in bonuses, $182,413 in option awards, and $23,320 in all other compensation).  Defendant Kong's wife, Liu, was paid $628,614 in 2007 and $524,448 in 2008.  ¶149.  Defendants' desire to protect their positions and compensation is a sufficient motive to engage in fraud.  *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).

Further, "'[s]uspicious' stock sales by corporate insiders are circumstantial evidence of intent to defraud."  *In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 1001 (9th Cir. 1999).  During the Class Period, the Individual Defendants sold over 310,000 shares of Bidz stock, receiving approximately $3,046,316 in proceeds. ¶147.  These sales were highly unusual compared to the 469-day period preceding the Class Period when the Individual Defendants did not sell any shares.  *See, e.g.*, *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) ("Ellison had not sold any of his Oracle stock for five years [prior to the class period].  This makes Ellison's January 2001 trades highly inconsistent with his prior trading history. Taken together, these factors cast suspicion on the stock trades and support a strong inference of scienter").

In all, Bidz insiders sold 855,000 shares of the Company's stock, for total proceeds of $9,433,290.   ¶147.[7]  Far smaller stock sales have sufficed.  *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (sale of 175,000 shares, earning $3.5 million satisfied *scienter*); *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (profits of $1.7 million for one

---

[7]  Liu sold 175,000 shares during the Class Period for proceeds of approximately $2,135,593; Marina Zinberg, Zinberg's sister, also sold 345,000 shares of Bidz stock for proceeds of approximately $3,970,130; and President and Chief Technology Officer, Leonid Kuperman, sold 25,000 shares for proceeds of approximately $281,251.

1    defendant and $621,000 for another are "suspicious" sales).   And, even if a

2    defendant does not sell a significant portion of his holdings, the stock sales can still

3    be suspicious.  *See Middlesex*, 527 F. Supp. 2d at 1186.

4        Defendants' affirmative defenses to the insider trading allegations are

5    baseless and not appropriately considered on a motion to dismiss.[8]  For example,

6    the fact that the Individual Defendants sold below the market peak for the stock,

7    Def. Br. at 23, is not relevant and shows only that they misjudged when price

8    inflation would peak.  What matters is that Defendants accomplished their sales at

9    prices higher than those available after disclosure of Bidz's fraud.  *See Batwin*,

10   2008 U.S. Dist. LEXIS 52365, at *44-45 (finding stock sales suspicious even if sell

11   when stock has begun to decline).

12        Additionally, "[t]he fact that there might be an innocent explanation for the

13   timing of [defendant]'s sale is not enough to defeat the inference of scienter that

14   arises from plaintiffs' well-pleaded allegations – which, as defendants keep

15   forgetting, I must accept as true for purposes of this motion to dismiss."  *In re*

16   *EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).

17   In fact, the timing is extremely suspicious here because although Bidz was trading

18   on NASDAQ since June 6, 2007, *see* Def. Br. at 22, and there were no restrictions

19   on Defendants' trading, Defendants only started to sell shares after the beginning

20   of the Class Period, when the prices were artificially inflated due to the false and

21   misleading statements.[9]

22

23

24

25

26

27

28

---

[8] *See*, *e.g.*, *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) ("[a]s it is typically premature to raise affirmative defenses in a motion to dismiss, this Court will not consider the impact of [the defendant's] purported 10b5-1 trading plan"); *In re APAC Teleservices, Inc. Sec. Litig.*, No. 97-9145, 1999 U.S. Dist. LEXIS 17908, at *22 (S.D.N.Y. Nov. 12, 1999) ("[F]actual issues concerning whether insider trading was done at suspicious times and/or in suspicious amounts" not appropriate on a motion to dismiss.) (citation omitted).

[9] Defendants' argument that "[a]bsent a viable market in which to sell Bidz's securities, it is impossible to find sales during the class period 'suspicious,'" Def. Br. at 22, is simply incorrect.  *See Middlesex*, 527 F. Supp. 2d at 1186-87 (finding stock sales suspicious

DOCS\503450v6

### F.     The Magnitude and Timing of Write-Off Evidences Scienter

Courts have also recognized that the magnitude and the timing of a write-off can support a strong inference of scienter.  *See In re Scholastic.*, 252 F.3d at 77; *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) ("[t]he sheer size of the . . . write-down adds to the inference that the defendants must have been aware the problem was brewing"); *Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of write-offs "renders less credible" defendants' argument that they acted without scienter).  The fact that mere months after the false and misleading Q2 08 Form 10-Q issued on August 5, 2008, which reported an inflated gross margin of 27.9%, the Company disseminated a Q3 08 Form 10-Q, "which reflected a sharply decreased gross profit percentage [24%] due to $17.2 million in wholesale sales," and a "substantial portion of the $17.2 million constituted a de facto write-off of non-existent inventory," provides further evidence of scienter.  ¶112.  *See also* Def. RJN, Ex. G at 239 (gross profit for the quarter was $13.3 million).  *See Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995) ("This shortness of time is circumstantial evidence that the optimistic statements were false when made.").

### G.     The SOX Certifications Provide Evidence of Scienter

The Complaint also alleges false SOX certifications by the Individual Defendants, which report on management's evaluation of internal controls, among other things.  *See*, *e.g.*, ¶¶57, 84.  Those certifications were knowingly or recklessly false, based on the facts then existing, as alleged in the Complaint and discussed *supra*, and provide further evidence of scienter.  *See also Middlesex*, 527 F. Supp. 2d at 1190 (taking into account SOX certifications in the scienter analysis).   High-level corporate officers who sign SEC filings and SOX

---

without demonstration that the sales were inconsistent with defendants' prior trading history due to trade restrictions prior to the class period).

1  certifications, such as the Individual Defendants here, have a duty to familiarize

2  themselves with the operations that would have revealed the improprieties (if

3  unknown).  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*

4  *Inc.*, No. 05-1898, 2005 U.S. Dist. LEXIS 19506, at *63 (S.D.N.Y. Sept. 6,

5  2005).[10]

6       Therefore, when the overwhelming indicia of scienter is considered in

7  totality, as it must be, it is clear that Plaintiff has adequately pled scienter as to all

8  Defendants.[11]

9                              **CONCLUSION**

10      For the foregoing reasons, Defendants' motion to dismiss should be denied.

11  In the alternative, Plaintiff requests that any dismissal be without prejudice and that

12  Plaintiff be given leave to amend under Fed. R. Civ. P. 15(a).  *See Carol Gamble*

13  *Trust 86 v. E-Rex, Inc.*, No. 03-15032, 2004 U.S. App. LEXIS 88, at *9 (9th Cir.

14  Jan. 5, 2004) ("'adherence to [the principle of 'liberal' grants of leave to amend] is

15  *especially* important in the context of the PSLRA'") (citation omitted).

16   Dated:  February 10, 2010              MILBERG LLP
17                                          JEFF S. WESTERMAN
                                            DAVID E. AZAR
18                                          ANDREW J. SOKOLOWSKI

19
20                                          _*/s/ Andrew J. Sokolowski*_
                                            ANDREW J. SOKOLOWSKI

21

22  _____
    [10] The Complaint also demonstrates Defendants' propensity to engage in securities fraud
23  and other fraudulent business conduct, as well as to associate themselves and the
    Company with persons with criminal or unsavory backgrounds.  ¶¶150-56.  For example
24  Defendants raised over $20.5 million by illegally selling unregistered Bidz stock from
    1999 through at least mid-2003, violating federal and state securities laws.  ¶¶ 151-52.

25  [11] Defendants seek dismissal of Plaintiff's Section 20(a) claim, arguing that the
    Complaint does not allege a primary violation.  Def. Br. at 4.  However, because the
26  Section 10(b) is sustainable, the Section 20(a) claim should also be upheld.  *See Warman*
    *v. Overland Data*, No. 97-CV-833 JM (JFS), 1998 U.S. Dist. LEXIS 2009, at *18 (S.D.
27  Cal. Feb. 20, 1998).

28  _____
                              25

DOCS\503450v6

One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071-3172
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975
E-mail:  jwesterman@milberg.com
dazar@milberg.com
asokolowski@milberg.com

Counsel for Lead Plaintiff and Liaison
Counsel for the Class

BROWER PIVEN
A Professional Corporation
David A.P. Brower
Jessica Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300
E-mail:  brower@browerpiven.com
sleater@browerpiven.com

BROWER PIVEN
A Professional Corporation
Charles J. Piven
1925 Old Valley Road
Stevenson, Maryland 21153
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300
E-mail:  piven@browerpiven.com

Counsel for Lead Plaintiff Roland
Pomfret and Lead Counsel for the Class

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

1

## CERTIFICATE OF SERVICE

2

3       I hereby certify that on February 10, 2010, I electronically filed the

4   foregoing with the Clerk of the Court by using the CM/ECF system.

5       Participants in the case who are registered CM/ECF users will be served by

6   the CM/ECF system.

7       I further certify that some of the participants in the case are not registered

8   CM/ECF users.   I have mailed the foregoing document by First-Class Mail,

9   postage prepaid to the non-CM/ECF participants indicated on the attached Manual

10  Notice List.

11      I certify under penalty of perjury that the foregoing is true and correct.

12  Executed on February 10, 2010.

13                                              _Cecille Chaffins_

14                                          _____
                                                 CECILLE CHAFFINS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT

DOCS\503450v6

# Mailing Information for a Case 2:09-cv-03216-CBM-E

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stephen R Basser**
  sbasser@barrack.com

- **Lindsey Elizabeth Blenkhorn**
  lblenkhorn@gibsondunn.com

- **David A P Brower**
  brower@browerpiven.com

- **Andrew John Demko**
  ademko@gibsondunn.com

- **Joel Alan Feuer**
  jfeuer@gibsondunn.com

- **Joseph Gentile**
  joseph@sarrafgentile.com

- **Brian Oliver O'Mara**
  bomara@csgrr.com

- **Charles J Piven**
  piven@browerpiven.com

- **Ronen Sarraf**
  ronen@sarrafgentile.com

- **Andrew Joseph Sokolowski**
  asokolowski@milberg.com,agenovese@milberg.com,cchaffins@milberg.com

- **Samuel M Ward**
  sward@barrack.com,lxlamb@barrack.com

- **Jeff S Westerman**
  jwesterman@milberg.com,mbowman@milberg.com,cchaffins@milberg.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jessica Sleater
Brower Piven  APC
488 Madison Avenue  8th Floor
New York, NY 10022
```