1
2
3
4
5
6
7



NO JS-6

FILED
CLERK, U.S. DISTRICT COURT

MAY 2 5 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11

12   RAMON GOMEZ, on behalf of          )    **Lead Case:**
     himself and all others similarly   )    **No. CV 09-03216 CBM (Ex)**
13   situated,                          )    **Consolidated with: Nos. CV 09-03671**
                                        )    **CBM; CV 09-03967 CBM**
14              Plaintiff,              )
                                        )
15   v.                                 )    **ORDER DISMISSING PLAINTIFF'S**
                                        )    **CONSOLIDATED COMPLAINT**
16   BIDZ.COM, INC. and DAVID           )    **WITHOUT PREJUDICE**
     ZINBERG,                           )
17                                      )
                Defendants.             )
18

19       The matters before this Court are: (1) Defendants Bidz.com, Inc.'s, David

20   Zinberg's, and Lawrence Y. Kong's ("Defendants") Motion to Dismiss the

21   Consolidated Class Action Complaint [Docket No. 36]; and the (2) the parties'

22   Requests for Judicial Notice [Docket Nos. 37 and 44.]  The Court **GRANTS** the

23   Motion without prejudice and **GRANTS** the Requests for Judicial Notice.

24                              **BACKGROUND**

25       This consolidated class action[1] arises out of false and/or misleading

26

27   [1] Between May, 2009, and July, 2009, three different individual plaintiffs filed complaints with class action
     allegations against Defendants for securities fraud. *See Gomez v. Bidz.com*, CV 09-3216; *see also Mitchell v.
     *Bidz.com*, CV 09-03671; *see also Walczyk v. Bidz.com*, CV 09-03967.  Upon stipulation, [Docket No. 29], this
28   Court consolidated the actions, deemed *Gomez v. Bidz.com* the "Lead Case", appointed Roland Pomfret Lead

1  statements and/or omissions Defendants made in violation of the Securities

2  Exchange Act of 1934.

3  **I.      History Relating to the Consolidated Class Action Complaint**

4         Lead Plaintiff Roland Pomfret ("Plaintiff") alleges on his behalf and on

5  behalf of all other purchasers (the "Class") of securities in Bidz.com, Inc.,

6  ("Bidz.com" or "the Company") between July 3, 2007, and November 10, 2008,

7  (the "Class Period"), that: (1) Defendants violated Securities Exchange Act of

8  1934 Section 10(b) and Rule 10b-5 because they "carried out a plan, scheme and

9  course of conduct which was intended to, and through the Class Period, did

10  deceive the investing public . . . and cause[d] Plaintiff and other members of the

11  Class to purchase Bidz.[com] securities at artificially inflated prices" through "the

12  dissemination to the investing public which Defendants knew or recklessly

13  disregarded was materially false and misleading", Compl. at ¶¶ 159, 163; and (2)

14  Defendants Zinberg and Kong violated Securities and Exchange Act of 1934

15  Section 20-A "by virtue of their positions as controlling persons" and their "direct

16  and supervisory involvement in the day-to-day operations." *Id.* at ¶¶ 171, 172.

17         A.      The Defendants

18         Founded in 1998, Bidz.com is an online live-auctioneer of jewelry and other

19  items. *Id.* at ¶ 8.  Unlike Ebay, which auctions third-party merchandise, Bidz.com

20  auctions merchandise it purchases from vendors, including "gold, platinum, and

21  silver jewelry . . . . stones, watches, and accessories." *Id.* at ¶ 116.  Bidz.com is

22  "the second largest online retailer of jewelry", and is traded on NASDAQ. *Id.*

23         David Zinberg was Bidz.com's President, Chief Executive Officer and

24  Chairman of the Board of Directors throughout the Class Period. *Id.* at ¶ 9.

25  Before that, from 1998 to 2001, Zinberg was the Company's Secretary. *Id.*

26  Zinberg and his sister own a 62% interest in the Company's shares. *Id.*

27         Lawrence Kong was the Chief Financial Officer, Secretary, and Treasurer

28  Plaintiff for the putative class, and appointed Brower Piven Lead Counsel. [Docket No. 30.]

1  of Bidz.com throughout the Class Period, and was a Director at all times alleged in

2  the Complaint. *Id.* at ¶ 10. Plaintiff alleges Kong is a certified public accountant,

3  and is married to the Company's Chief Operating Officer, Claudia Liu. *Id.*

4          B.    False and Misleading Statements During the Class Period

5        Plaintiff alleges the Company's SEC filings, earnings forecasts, press

6  releases and earnings calls during the Class Period were false and/or misleading

7  because they were "predicated on fraudulent recognition of gross profit and

8  income from non-arms-length related party transactions, sham transactions, and

9  improper accounting." *Id.* at ¶ 42.

10        Between August 1, 2007, and August 5, 2008, the Company made 20

11  statements in SEC filings, in press releases and earnings statements allegedly

12  announcing, *inter alia*, false: "higher earnings guidance due to increase in gross

13  profit margins", *see id.* at ¶¶ 27-37 (July, 2007, statements), 40-67 (November,

14  2007, statements); pre-tax income exceeding expectations, *see id.* at ¶¶ 38-39

15  (August, 2007, statements); and exceptional and/or better than expected financial

16  results, increased profitability and raised guidance. *See id.* at ¶¶ 68-70 (January,

17  2008, statements), 71-76 (February, 2008, statements); 77-84 (March, 2008,

18  statements), 85-98 (May, 2008, statements), 99-111 (August, 2008, statements).

19        These statements of inflated gross profit margins resulted in a "falsely

20  inflated inventory". *Id.* at ¶ 108. Consequently, Plaintiff alleges, on or about June

21  30, 2008, the "Company [had to] eliminate a substantial portion of its fictitious

22  inventory by describing the de facto write-down as arms length wholesale sales."

23  *Id.* On November 10, 2008, Defendants filed their SEC Form 8-K "which

24  reflected a sharply decreased gross profit percentage due to $17.2 million in

25  wholesale sales. A substantial portion of the $17.2 million constituted a de facto

26  write-off of non-existent inventory." *Id.* at ¶ 112. Plaintiff alleges the November

27  10, 2008, Form 8-K demonstrates the Company's 2007-2008 gross profit

28  projections had been false all along. *See id.* at ¶ 113.

1    Plaintiff further alleges:

2    [t]he market reacted violently to the announcement of a decrease in the
3    Company's reported gross profit percentage to a level that was far below
     Company's pre-fraud level.  The stock, which closed at $5.82 per share on
4    November 10, 2008, dropped to a closing price of $4.02 on November 11,
     2008, on an extremely heavy trading day.

5    *Id.* at ¶ 114.  Plaintiff alleges that he has economic loss because Bidz.com's

6    "securities have not traded above the prices at which the Class member purchased

7    those securities prior to November 10, 2008".  *Id.* at ¶¶ 135, 137-140.

8                           **LEGAL STANDARD**

9    A complaint may be dismissed for failure to state a claim upon which relief

10   can be granted.  *See* FED. R. CIV. P. 12(b)(6).  Only a complaint that facially states

11   a "plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129

12   S. Ct. 1937, 1950 (2009); *see also* Fed. R. Civ. P. 12(b)(6); *Balistreri v. Pacifica*

13   *Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990) (complaint may be dismissed in

14   the absence of sufficient facts alleged under a cognizable legal theory).  A

15   complaint has facial plausibility when the "plaintiff pleads factual content that

16   allows the court to draw the reasonable inference that the defendant is liable for

17   the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  To conform to Federal Rule

18   of Civil Procedure 8, the plaintiff must make more than "an unadorned, the-

19   defendant-harmed me" accusation.  *Id.*  A complaint which offers merely "labels

20   and conclusions" or a "formulaic recitation of the elements" without "further

21   factual enhancement" cannot survive a motion to dismiss.  *Id.*

22   On a Rule 12(b)(6) motion to dismiss, the court construes all plausible

23   factual allegations in the pleading in the light most favorable to the complainant.

24   *Id.*  A court may consider only the allegations in the pleadings, exhibits attached to

25   or referenced in the complaint, and matters properly subject to judicial notice.

26                            **DISCUSSION**

27   Defendants move to dismiss the Complaint because Plaintiff does not

28   adequately allege either falsity or scienter.

                                    4

1

**I.      The Requirements of the PSLRA**

2       The elements of Plaintiff's securities fraud cause of action pursuant to Rule

3   10b-5 are: (1) a material misrepresentation or omission of fact, (2) scienter; (3) a

4   connection with the purchase or sale of a security; (4) transaction and loss

5   causation; and (5) economic loss. *In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th

6   Cir. 2005); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990

7   (9th Cir. 2009).  Of these elements, the parties dispute only whether Plaintiff

8   adequately alleges falsity and scienter.

9       At "the pleading stage, a complainant stating claims under section 10(b) and

10   Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil

11   Procedure 9(b) and the [Private Securities Litigation Reform Act of 1995]." *Id.*

12   These twin dictates impose a burden on the plaintiff to plead both falsity and

13   scienter with particularity. *See Metzler Invest. GMBH v. Corinthian Colleges,*

14   *Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

15       First, Rule 9(b) requires a plaintiff to allege a false statement/omission with

16   particularity.  This requirement "prevents a plaintiff from skirting dismissal by

17   filing a complaint laden with vague allegations of deception unaccompanied by

18   particularized explanation stating *why* the defendant's alleged statements or

19   omissions are deceitful." *Id.* (emphasis in original).

20       Next, the Private Securities Litigation Reform Act of 1995 ("PSLRA") states:

21       (1)   Misleading statements and omissions.   In any private action arising
22             under this title in which the plaintiff alleges that the defendant--

23                  (A)   made an untrue statement of a material fact; or

24                  (B)   omitted to state a material fact necessary in order to
25                        make the statements made, in the light of the
                          circumstances in which they were made, not misleading;

26             the complaint shall specify each statement alleged to have been
               misleading, the reason or reasons why the statement is misleading,
27             and, if an allegation regarding the statement or omission is made on
               information and belief, the complaint *shall state with particularity all*
28             *facts on which that belief is formed.*

5

1

2

  (2)  Required state of mind. In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

3

4

5

15 U.S.C. § 78u-4(b)(1) and (2) (emphasis added). The PSLRA requires the

6

complainant to raise a "'strong inference' of scienter – i.e., a strong inference that

7

the defendant acted with an intent to deceive, manipulate or defraud." *Metzler*,

8

540 F.3d at 1061; *see also Zucco Partners*, 552 F.3d at 990. A plaintiff alleging

9

securities fraud on the basis of misleading statement/omissions must therefore

plead intent to defraud with particularity. *Id.*

10

## II. **Falsity**

11

   To survive a motion to dismiss, a securities fraud complainant must specify

12

each false or misleading statement made by each particular defendant, the reasons

13

why each statement is false or misleading, and where an allegation is made on

14

information and belief, all the facts which inform those beliefs. 15 U.S.C. § 78u-

15

4(b)(1); *see also Metzler*, 540 F.3d at 1061, 1071.

16

   Plaintiff alleges the Company's[2] financial statements were false or

17

misleading because they were predicated on: (1) accounting irregularities; and (2)

18

fraudulent business practices. Here, the Court finds that Plaintiff does not allege

19

why each of these public statements were false and misleading.

20

  A.  Accounting Errors: Irregularities in Revenue Recognition

21

   The Court finds that Plaintiff does not meet its burden of pleading falsity

22

because it fails to allege the Company's accounting decisions were the result of

23

fraud and not "merely the difference between two permissible judgments." *In re*

24

---

25

[2] Plaintiff does not allege that Defendant's Zinberg and Kong made publicly false statements. Although "[g]enerally, only defendants who make a false or misleading statement shall be liable under section 10(b) or Rule 10b-5, *In re Downey Sec. Litig.*, 08-3261, 2009 U.S. Dist. LEXIS 25007, * 12-19 (C.D. Cal. March 18, 2009) (Walter, J.) (collecting cases), the "Ninth Circuit has interpreted this limitation to mean that an individual may become a primary violator through 'substantial participation or intricate involvement in the preparation of fraudulent statements' even if he did not actually make the statements." *Id.* at *12-13 (internal citation omitted). Accordingly, this Court considers whether the Company's statements were false or misleading before considering whether these statements can be imputed to either Defendant Zinberg or Defendant Kong. *See id.*

26

27

28

1  *Oak Tech Sec. Litig.*, 96-20522 SW, 1997 U.S. Dist. LEXIS 18503, * 25 (N.D.
2  Cal. Aug. 1, 1997) (Williams, J.).

3      Courts hold Generally Accepted Accounting Principles, ("GAAP"), are "not
4  a set of rules ensuring identical treatment of identical transactions; rather, it
5  tolerates a range of reasonable treatments, leaving the choice among alternatives to
6  management." *Id.* at 25. Thus, at the motion to dismiss stage the plaintiff has the
7  burden of alleging the accounting decision was the result of fraud. *Id.*

8      General allegations that an accounting practice resulted in inflated earnings
9  do not suffice. *See Daou*, 411 F.3d at 1017. Instead, a plaintiff pleading
10  "irregularities in revenue recognition," must allege facts that enable the court to
11  determine whether the alleged accounting violations were minor or constituted a
12  widespread and significant inflation of revenue, including: "(1) such basic details as
13  the approximate amount by which revenues and earnings were overstated; (2) the
14  products involved in the contingent transaction; (3) the dates of any transactions; or
15  (4) the identifies of any of the customers or company employees involved in the
16  transactions. *Id.* at 1016-17. The plaintiff must therefore plead "how the
17  accounting errors or adjustments affected the company's financial statements." *Id.*

18
        1.    *Belated Disclosure of the Related Party Transaction with L.A.*
19                    *Jewelers*

20      Plaintiff alleges the Company engaged in a related party transaction with one
of its suppliers, L.A. Jewelers in the second quarter of 2007, but failed to publicly
21
disclose this transaction until the third quarter of 2007. Plaintiff further alleges this
22
belated disclosure violated GAAP and rendered its financial statements materially
23
false. Compl. at ¶¶ 29-45. Plaintiff fails to plead falsity with respect to the belated
24
disclosure. Plaintiff does not plead sufficient facts from which this Court may infer
25
that the: (1) failure to disclose the related party transaction rendered statements
26
made in the second quarter of 2007 false/ misleading: and (2) the non-disclosure
27
was *material*.
28

2. *Recognition of Non-Existent Marketing Costs and Sham*
*Payments from L.A. Jewelers*

Next, Plaintiff alleges the Company's financial statements were false or misleading because they falsely reflected/included "sham" co-op marketing contributions.[3] *See* Compl. at ¶¶ 29-37, 54.

Plaintiff alleges Bidz.com recorded false or bogus co-op marketing cost reimbursements, particularly with L.A. Jewelers, whereby it would record a higher-than-market purchase[4] price for the supplier's product and record the consideration as income paid by the supplier. *Id.* at ¶ 37. This alleged practice enabled suppliers to inflate the price of goods by the amount of the marketing costs, resulting in: (1) an increase in the amount the Company recorded as income; (2) the ability to recognize fraudulent income immediately; (3) the amortization of the remainder over subsequent periods; and (4) over-inflated revenue and over-inflated inventory that the Company then had to sell at reduced profit margins in November, 2008. *Id.*

Plaintiff's allegations that these transactions were listed as "marketing cost reimbursements" but were "shams" and "paper round trip transactions which lacked economic substance, and provided no pecuniary benefit" to the Company, *id.* at ¶ 35, are generalizations and conclusions. Plaintiff alleges the marketing cost reimbursements were bogus but neither factually alleges the amount by which Company's gross profit margins were inflated as a result of this fraud, nor when the bogus contributions were made/recorded, nor by whom the payments were made. *See Daou*, 411 F.3d at 1018. Plaintiff's allegations that the marketing contributions were shams do not provide a basis for falsity.

---

[3] Bidz.com used a "co-op marketing contribution" system whereby it received consideration from suppliers to offset the costs of marketing that supplier's goods or brands.

[4] Thus, if the Company would ordinarily charge a $200,000 marketing fee on a $1 million purchase from a supplier, under the alleged sham agreement, the supplier would increase the cost of the goods sold to $1.2 million, to offset the $.2 million for the marketing.

1

### 3.    *Improper Accounting of Marketing Contributions*

2   Next, Plaintiff alleges the co-op marketing contributions the Company did

3   in fact receive were improperly accounted for. *See* Compl. at ¶¶ 46- 58, 79-83,

4   92-93, 105-106.

5   The Financial Accounting Standards Board's Emerging Issue Task Force

6   Issue 02-16 ("EITF 02-16") presumes that "cash consideration received from a

7   vendor is a purchase price concession that should be recognized by the customer

8   as a reduction in the costs of goods sold." Defendants' Request for Judicial

9   Notice at pp. 6-10. Accordingly, companies are presumed to be able to use co-

10  operative marketing costs received from its supplier to reduce the cost of the sale

11  to the company, which in turn increases profits.

12  This presumption is "overcome", if a supplier reimburses its customer for

13  the *specific, incremental and identifiable* costs the customer incurred in selling the

14  supplier's goods. On this point, EITF 02-16 provides:

15
16   cash consideration represents a reimbursement of costs incurred by the
     customer to sell the vendor's products and should be characterized as a
     reduction of that cost when recognized in the customer's income statement
17   if the case consideration represents a reimbursement of a *specific,
     incremental, identifiable, cost incurred by the customer in selling the
     vendor's products or services*. If the amount of cash consideration paid by
18   the vendor exceeds the cost being reimbursed, the excess amount should be
     characterized in the customer's incomes statement as a reduction of cost of
19   sales when recognized in the customer's income statement.

20  Defendants' Request for Judicial Notice at p. 7, ¶ 6. Thus, where a company can

21  link or identify its marketing costs[5] to a specific supplier, the company *may not*

22  use the marketing cost as a reduction in the cost of the sale[6].

23  Plaintiff alleges that Bidz.com was not entitled to the benefit of EITF 02-16

24
     [5] If, for example, the Company took out ad space for its website or placed an ad promoting several different
25   watches in the same ad, then this a cost that benefits all suppliers, or all watch suppliers; pursuant to EITF 02-16,
     these marketing costs could be used to reduce the cost of sales. If, however, Bidz.com took out an ad for a specific
26   type of watch, the ad's cost would be a specific, identifiable cost that should not be booked as a reduction in the
     cost of the sale.
     [6] For example, if a company pays its supplier $100 for an item, and recognizes a $10 reduction in cost of the sale,
27   the good effectively costs the company $90. Thus, if the item sells for $120, the company realizes a gross margin
     of $30. If on the other hand, the marketing contribution can be linked to a specific vendor, the cost of the sale
28   remains $100, and the gross margin remains $120. Opp'n at p. 9:9-16.

1  because Bidz.com incurred specific, incremental, identifiable costs on its suppliers

2  behalf, and that Defendants knowingly violated EITF 02-16 to inflate Bidz.com's

3  revenue. Compl. at ¶¶ 51-52, 58. Plaintiff alleges the co-operative marketing

4  contributions were costs Bidz.com incurred on behalf of specific, identifiable

5  suppliers that should have been used to reduce the cost of marketing (and would

6  not have impacted Bidz.com's gross margin), but which it nonetheless booked as

7  reductions in the cost of the sale. The result, according to Plaintiffs, was a

8  reduction in the cost purchased inventory and inflated gross profit margins.

9      Plaintiff conclusorily alleges, without facts, that the Company incurred

10  specific, identifiable costs that should not have been used to reduce the cost of

11  sales. Plaintiff relies on statements by confidential witness four ("CW4"), a

12  Director of Business Development, who stated the Company bought keywords for

13  brands and products. Compl. at ¶ 52. CW4's alleged statement that he/she "would

14  use a combination of words like jewelry, rings, watches . . . [and] used keywords

15  for certain brands of watches sold on the website, like Salavetti" is inconclusive

16  unless accompanied by allegations Bidz.com used keywords to promote only one

17  brand at a time.

18      Moreover, allegations that Bidz.com publicly acknowledged that it logged its

19  marketing contributions as reductions in the cost of sale tends to undermine

20  Plaintiff's other allegations that Bidz.com's public statements misled the public. In

21  its 2007 SEC Form 10-K, Bidz.com put its investors, on notice that it used co-op

22  marketing contributions to reduce the cost of sales:

23          In third quarter 2007, we started to bill and collect from our inventory
            vendors co-op marketing contributions as an incentive for us to market and
24          sell the inventory for sale on the Bidz website. In accordance with EITF 02
            16 . . . the co-op marketing contributions that cannot be identified specifically
25          to benefit the vendors are a reduction in cost of sales and will result in an
            increase in gross profit. *We cannot specifically identify the benefits to each*
26          *vendor, consequently, co-op marketing contributions are charged against*
            *inventory as a reduction of costs and amortized as a reduction of cost of sales*
27          *over an estimated inventory turnover period of approximately 110 days.* For
            the years ended December 31, 2006 and 2007, we have earned $0 and $4.8
28          million of co-op marketing contributions, respectively, with $0 and $4.2

million, respectively, remaining unamortized as an offset to inventory at December 31, 2006 and 2007. Receivable from vendors for co-op marketing contributions is included in other current assets and amounted to $0 and $2.9 million at December 31, 2006 and 2007, respectively.

Compl. at ¶ 81. That quarter, and every quarter thereafter, Bidz.com reported the amount by which co-op marketing reduced its cost of sales, *see e.g. id.* at ¶ 84(a); investors were therefore on notice of both this accounting practice and the amount by which the revenue might be "inflated", and could not have been misled. Accordingly, Plaintiff fails to allege the mis-accounting of the marketing contributions was the result of fraud. *See In re Oak Tech Sec. Litig.*, 1997 U.S. Dist. LEXIS 18503 at * 25.

B.   Fraudulent Practices Affecting Financial Statements

Plaintiff also alleges the Company's use of "shill bidders"[7] and "appraisal mills" rendered its public disclosures false and misleading. The Court finds these allegations also fail to provide a basis for alleging falsity.

1.   *Shill Bidders*

Plaintiff further alleges the Company's public disclosures were false because it used "shill bidders" to drive up the costs of goods being auctioned. *Id.* at ¶¶ 116-124. Although Plaintiff concedes the Company had an express, published policy[8] against shill bidding, it alleges the Company nonetheless used shill bidders to inflate the price of its goods on auction. *Id.* at ¶ 117.

Plaintiff's allegations with respect to shill bidders are inadequate. First, these allegations of shill bidding are predicated on unreliable statements made by confidential witnesses. *See below*, discussion. Courts may disregard statements by confidential witnesses that are based on hearsay, rumor, or speculation. *See Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 25007 at * 37.

---

[7] Shill bidders are people who place bids on goods to artificially increasing or otherwise manipulating the bidding process, or to influence other purchasers' bidding decisions. *See* Compl. at ¶ 117.
[8] The policy states: "You are strictly prohibited from placing bids or causing bids to be placed on any Product for the purpose of artificially increasing or otherwise manipulating the bidding process on Bidz.com or the bid price of any Product listed on the Site, or influencing user behavior on Bidz.com." Compl. at ¶ 117.

1    Next, Plaintiff fails to factually allege the effect shill bidders had on the

2    Company's financial statements.  Plaintiff alleges: "The only purpose of the shills'

3    phony bids is to drive up an item's selling price.  This results in the legitimate

4    bidders/consumers paying more for an item than they would have if the shill bidder

5    had not participated in the auction."  Compl. at ¶ 118.  Plaintiff fails to allege how

6    the use of shill bidders rendered either the financial statements and/or the

7    Company's gross profits incorrect, or otherwise resulted in inflated earnings.  *See*

8    *Daou*, 411 F.2d 1017.  These allegations of "shill bidders" thus do not provide a

9    basis for falsity.

10          2.    *Appraisal Mills*

11    Last, Plaintiff alleges Bidz.com's public disclosures were false because

12    Bidz.com used an "appraisal mills" to provide inflated prices for its "high-ticket

13    items".  *Id.* at ¶¶ 125-127.  This allegation does not suffice to plead falsity.  *See*

14    *Metzler*, 540 F.3d at 1070.  First, Plaintiff does not allege how the use of appraisal

15    mills rendered the financial statements incorrect or otherwise affected Bidz.com's

16    gross profit margin.  *See Daou*, 411 F.2d at 1017.  Next, Plaintiff fails to allege

17    how the fact that the Company had only some of its goods appraised affected the

18    veracity/reliability of its public statements, especially in light of the Company's

19    concession in its Class Period SEC filings that: "we provide appraisal summaries

20    from third-party gemological laboratories for *some* of our jewelry items."

21    Defendants' Request for Judicial notice at p. 40.  Plaintiff's allegations regarding

22    appraisal mills fail with respect to falsity.

23          B.    Conclusion on Falsity

24          The Court finds that Plaintiff fails to factually allege the "who, what, where,

25    when *and why*" the alleged public statements were false.  *See id.* at *18-19.

26    **III.   Scienter**

27          Next, the Court finds that Plaintiff fails to raise a strong, cogent and

28

1   compelling inference of Defendants'[9] scienter.

2       A.   Definition of Scienter

3       Section 10(b) of the Securities Exchange Act is "intended to proscribe

4   knowing or intentional misconduct", including reckless conduct "to the extent it

5   reflects some degree of intentional or conscious misconduct." *See In re Silicon*

6   *Graphics*, 183 F.3d 970, 976-77 (9th Cir. 1993). Scienter is thus "a mental state

7   embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*,

8   425 U.S. 185, 193-94 (1976).

9       B.   Pleading Scienter

10      The PSLRA requires the complainant allege "facts giving rise to a strong

11  inference" of scienter. 15 U.S.C. § 78u-4(b)(2).

12      The Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights,*

13  *Ltd.*, 551 U.S. 308 (2007), governs what "level of pleading" creates a "strong

14  inference" of scienter. Noting the "exacting pleading standards are among the

15  control measures Congress[10] included in the PSLRA", the court held that a "court

16  governed by [the PSLRA] must engage in a comparative analysis" because:

17         It does not suffice that a reasonable factfinder plausibly could infer from the
    complaint's allegations the requisite state of mind . . . An inference of
18         fraudulent intent may be plausible, yet less cogent than the other,
    nonculpable explanations for the defendant's conduct. *To qualify as*
19         *"strong" . . . . an inference of scienter must be more than merely plausible*
    *or reasonable – it must be cogent and at least as compelling as any*
20         *opposing inference of nonfraudulent intent.*

21  *Id.* (emphasis added). The court further held that "a complaint will survive . . .

22  only if a reasonable person would deem the inference of scienter cogent and at

23  least as compelling as any opposing inference one could draw from the facts

24  alleged." *Id.* at 324.

25      Thus, at the motion to dismiss stage, the court must find a *strong, cogent*

---

[9] It should be noted that "corporate scienter relies heavily on the awareness of the directors and officers." *Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008). Accordingly, the analysis into Bidz.com's scienter turns in large part on its individual corporate officers' knowledge and participation in the alleged fraud. *See id.*
[10] The *Tellabs* court observed that the PSLRA's "twin goals [are] to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." 552 U.S. at 322.

1    *and compelling* inference of fraudulent intent. *Id.* at 315, 322, 328. The inference

2    need not be "irrefutable, i.e., of a 'smoking gun genre', or even the *most* plausible

3    of competing inferences", but it "must be more than merely 'reasonable' or

4    'permissible' . . . in light of other explanations." *Id.* at 324, 322 ("must plead facts

5    rendering an inference of scienter *at least as likely as* any plausible opposing

6    inference.") (emphasis in original)).

7          Consequently, to "adequately demonstrate that the 'defendant acted with the

8    required state of mind', a complaint must allege that the defendants made false or

9    misleading statements either intentionally or with deliberate recklessness." *Zucco*

10   *Partners*, 552 F.3d at 991 (internal citations omitted). Mere facts showing

11   recklessness or a motive to commit fraud and an opportunity to do so are

12   insufficient to establish a strong inference of deliberate recklessness. *Silicon*

13   *Graphics*, 183 F.3d at 974. Instead, the complainant must allege a:

14         highly unreasonable omission, involving not merely simple or even
           inexcusable negligence, but an extreme departure from the standards of
15         ordinary care, and which presents a danger of misleading . . . that is either
           known to [each] defendant or is so obvious [he] must have been aware of it
16
     *id.* at 976 (internal citations omitted), which can be done by alleging "specific
17
     contemporaneous statements or conditions" tending to show the intentionally or
18
     recklessly false/misleading nature of the statements. *Metzler*, 540 F.32d at 1066
19
     citing *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).
20
           The determination of "[t]he strength of an inference cannot be decided in a
21
     vacuum." *Tellabs* 551 U.S. at 323. Court must take a "holistic" approach to
22
     scienter, *id.* at 326, and consider whether "*all* of the facts, taken collectively, give
23
     rise to a strong inference of scienter, not whether any individual allegations,
24
     scrutinized in isolation, meets that standard." *Id.* at 323, 325.
25
           This Circuit interprets *Tellabs* as requiring a dual analysis whereby courts
26
     first "determine[s] whether any of the plaintiff's allegations, standing alone, are
27
     sufficient to create a strong inference of scienter", and then, if the individual
28

14

1   allegations fail to create a strong inference, conducts a holistic review. *Zucco*

2   *Partners*, 552 F.2d at 991-92.

3           C.      Confidential Witnesses

4           Plaintiff relies on statements from six confidential witnesses, ("CW1" thru

5   "CW6"), to allege scienter. *See* Compl. at ¶¶ 52, 121-127, 145-146, 151. The

6   Court finds that the majority of the confidential witness statements are: (1) not

7   probative of scienter; and (2) too unreliable to be considered.

8                   1.      *Two-Step Test For Confidential Witnesses*

9           The Ninth Circuit utilizes a two-step test to determine whether a plaintiff

10  may rely on statements from confidential witnesses to satisfy the PSLRA's

11  pleading requirements. *Zuccos Partners*, 552 F.2d at 994 citing *Daou*, 411 F.3d at

12  1015-16. First, the confidential witness:

13          must be described with sufficient particularity to establish their reliability
            and personal knowledge . . . [including] sufficient factual detail about a
14          confidential witness'[s] position within the defendant company to provide a
            basis for attributing the facts reported by that witness to [his] personal
15          knowledge

16  such as the confidential witness's job title, employment information, and how and

17  why he/she was in a position within the company to obtain the knowledge he/she

18  claims. *See id.* at 996, 1105-16. Next, "statements which are reported by

19  confidential witnesses with sufficient particularity and personal knowledge must

20  themselves be indicative of scienter." *Id.* at 994, 996-97.

21                  2.      *Allegations Regarding Plaintiff's Confidential Witnesses*

22          CW1, a "former Bidz[.com] Operations Coordinator from August 2004

23  through August 2008", Compl. at ¶ 121, whose duty it was to investigate fraudulent

24  bids, and reported directly to Liu [Defendant Kong's wife, allegedly stated that]

25  Kong was directly involved with the bookkeeping and the preparation of financial

26  statements with a staff accountant and the Chief Compliance Officer." *Id.* at ¶ 146.

27  The Court does not consider CW1's because: (1) Plaintiff fails to allege facts from

28  which this Court can conclude that CW1 was in a position within the Company to

1   obtain the information he/she alleges; and (2) these allegations are not probative of

2   either Defendant Zinberg's or Defendant Kong's scienter. *See Zucco Partners*, 552

3   F.2d at 994, 996. The Complaint does not contain an allegation that CW1 saw or

4   personally knew that any of the individual Defendants prepared or otherwise

5   assisted with the preparation of the books. *See id.*

6       Next, the Court finds that it cannot consider the alleged statements made by

7   CW2, a "former Bidz[.com] Senior Jewelry Buyer from March, 2000, through July,

8   2003", that Bidz.com used shill bidders and that other corporate officers, not named

9   in this action, ran the Company in a "boiler room type operation", Compl. at ¶¶

10  122, 145, 151, because: (1) Plaintiff fails to explain or describe CW2's job duties,

11  *see Zucco Partners*, 552 F.2d at 994, or how CW2 is/was in a position to know

12  these facts; (2) CW2's statement are not probative of either Defendant Zinberg's or

13  Defendant Kong's scienter because CW2's statements do "not relate to any of the

14  [i]ndivdual [d]efendants", but instead to other employees, *Downey*, 2009 U.S. Dist.

15  LEXIS 25007 at *38; *Glazer*, 549 F.3d at 745 (plaintiff must allege scienter as to

16  each individual defendant); and (3) CW2 worked for the Company *before*[11] the

17  Class Period. CW2 is not a reliable witness with respect to what the Company and

18  the individual Defendants knew/did during the Class Period.

19      Nor can the Court consider CW3's statements. CW3, a "former Bidz[.com]

20  Certified Merchants Accounts Manager from July 2004 through January 2006",

21  allegedly stated that the Bidz.Com used both shill bidders and an appraisal mill.

22  Compl. at ¶¶ 123, 124, 126. CW 3's statements are unreliable and are not

23  probative of scienter because: (1) Plaintiff fails to allege CW3 was in a position to

24

25  [11] Plaintiff argues this Court should consider statements either made by confidential witnesses employed before the Class Period or relating to events that took place before the Class Period. *See* Opp'n at p. 20:15 to p. 21:5.

26  Although Plaintiff relies on *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) and *Glover v. DeLuca*, No 2:03-0288, 2006 U.S. Dist. LEXIS 76093, *17-19 (W.D.Pa. Sept. 29, 2006), for the proposition that pre-Class

27  Period data is relevant, the Court has not found authority which permits it to consider statements from confidential witnesses who did not work for the company before the class period. Indeed, the court in *Glover*, 2006 U.S. Dist.

28  LEXIS at *84, n.40, did not consider allegations of events "that occurred well after the [c]lass [p]eriod [because] [the plaintiff] has made no allegations which tie those events to [the defendants'] knowledge at an earlier time."

16

1   obtain personal knowledge that the Company used shill bidders and an appraisal

2   mill; and (2) CW3 worked for the Company *before* the Class Period. *See Zucco*

3   *Partners*, 552 F.2d at 994. Accordingly, CW3 is not competent a reliable source

4   to provide information about the individual Defendants' mental state.

5       Next, the Court find that CW4's statements may be considered for limited

6   purposes. Plaintiff alleges CW4, the Company's "Director of Business

7   Development, PR and Marketing from February 2000 until June 2007", was "in

8   charge of the marketing department and [his/her] job was to advertise for

9   Bidz.[com] [and bought] ad space, ad words, banners on websites and advertising

10  on search engines." Compl. at ¶ 52. CW4 allegedly stated Bidz.com "used

11  specific ad words for every product . . . [CW4] used keywords for certain brands

12  of watches sold on the website." *Id.* CW4 further states that: "[D]efendant

13  Zinberg was either directly involved with the [suppliers], or had someone

14  managing the relationships for him." *Id.* at ¶ 145. CW4 also states that Defendant

15  Kong "was directly involved with the bookkeeping and the preparation of

16  financial statements with a staff accountant and the Chief Compliance Officer."

17  *Id.* at ¶ 146.

18      Although CW4 was not employed with the Company during the Class

19  Period (CW4 left/stopped that position in June, 2007, and the Class Period

20  commenced on July 3, 2007), Plaintiff sufficiently alleges CW4's duties and role

21  within the Company such that he/she may reliably discuss the Company's

22  marketing tactics in the period leading up to the Class Period. *See Zucco*

23  *Partners*, 552 F.2d at 994. CW4's statements are probative of scienter, only to the

24  extent that Defendants had "access" to the books and financial statements. CW4's

25  statements are not probative of Defendants Zinberg's and/or Kong's knowledge of

26  whether the marketing costs incurred were attributable to specific suppliers/

27  products. *See id.* at 552 F.3d at 996; *see also Downey*, 2009 U.S. Dist. LEXIS

28  25007 at *38 (statement not probative of individual's scienter because it was not

1 based on witness's own interactions with individual defendant).

2     CW5, a "Certified Merchants Account Manager from July 2004 until

3 January 2006", who was responsible for supervising over a 100 merchant accounts

4 daily", Compl. at ¶ 146, and allegedly stated that "the only person in charge of the

5 book balancing was [D]efendant Kong" is not a reliable witness because he/she

6 worked for the Company before the Class Period. Moreover, CW5's statements

7 are not probative of scienter because "access" to a general ledger is not a proxy for

8 intent to defraud. *See Zucco Partners*, 552 F.2d at 996 (statements by confidential

9 witnesses relating to scienter must not be conclusory).

10     Last, the Court does not consider statements made by CW6, a "Marketing

11 Executive and an Online Media Buyer [for the Company] from May, 2003, until

12 April, 2005", that he/she "saw and approved the use of the ad words selected for

13 specific products" and that "the invoices for these ad words were approved by

14 [D]efendant Zinberg, who then sent them to the accounting department for

15 payment", Compl. at ¶ 52, because CW6 was not the Marketing Executive during

16 the Class Period and does not have knowledge of the Company's marketing

17 tactics/use of ad words during the Class Period. Moreover, CW6's statements that

18 "the environment at Bidz[.com] was like a prison: 'You have security. If you have

19 to walk outside, then you have to go through scanners. I could not go and talk with

20 anyone. [Zinberg] was watching everyone'", and that he/she "was told, listened to

21 every phone call" *Id.* at ¶ 145, are not probative of scienter because they do not

22 establish that Defendant Zinberg disseminated false and material information.

23     D.   Analysis of Plaintiff's Individual Allegations of Scienter

24     Having concluded that CW1's, CW2's, CW3, CW5's and CW6's

25 statements cannot be used to allege scienter, the Court next considers whether

26 Plaintiff's remaining allegations suffice to allege scienter against either Defendant

27 Zinberg and/or Defendant Kong. *See Zucco Partners*, 552 F.2d at 991.

28

1

2

    1. *Defendant Zinberg's and Defendant Kong's Control of the*
      *Company and Access to Information*

3

  Plaintiff contends that its allegations that Defendants Zinberg and Kong

4

must have participated in, known about, or directed the fraud suffice to allege a

5

strong inference of scienter because: (1) because Bidz.com is a small company;

6

and (2) because Defendants Zinberg and Kong had a "hands on management

7

style". Opp'n at p. 19:13-15. Specifically, Plaintiff argues that "because [at least

8

some of] the false statements at issue concerned Bidz[.com's] largest supplier,

9

[L.A. Jewelers] and materially affected gross profit margins, gross profit and net

10

income, there is a strong inference that top management knew of the improper

accounting." *Id.* at p. 19:8-10.

11

  Although a company's "corporate management's general awareness of the

12

day-to-day workings of the company's business does not establish scienter",

13

*Metzler*, 540 F.3d at 1068; *see also In re Read-Rite Corp. Sec. Litig.*, 335 F.3d

14

843, 848 (9th Cir. 2003), this Circuit acknowledges two exceptions.

15

    Under the first exception:

16

17

    falsity may itself be indicative of scienter where it is combined with
    allegations regarding a management's role in the company that are
    particular and suggest that the defendant had actual access to the disputed

18

    information, and where the nature of the relevant fact is of such prominence
    that it would be "absurd" to suggest that management was without

19

    knowledge of the matter.

20

*Zucco Partners*, 552 F.3d at 1001; *see also South Ferry LP, #2 v. Killinger*, 542

21

F.3d 776, 785 (2008) (allegations of management's role must be combined with

22

"detailed and specific allegations about [management's] exposure to factual

23

information within the company."). This first exception permits courts to consider

24

"general allegations" about management's role in a company and the relative

25

importance to the company of the allegedly false/misleading information *so long*

26

as such allegations are "buttressed with specific allegations about management's

27

exposure to factual information within the company." *Zucco Partners*, 552 F.3d

28

at 1001. Consequently, allegations that a defendant had access to a company's

1  financial data are not dispositive of scienter, unless they are accompanied by

2  allegations the defendants also "had access to the underlying information from

3  which the accounting numbers were derived." *Id.*

4        Second, a strong inference of scienter arises from allegations that "the

5  information misrepresented is" so "patently obvious[ly]" false, "that it would be

6  'absurd to suggest' that top management was unaware of them." *Id.* citing *Berson*

7  *v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008). In such

8  situations, "awareness of the falsity can be assumed." *Id.*

9        Both exceptions thus turn on "absurdity." If it would be absurd that the

10  defendants did not know or participate in the fraud, then the plaintiff sufficiently

11  alleges a strong inference of scienter. *See South Ferry*, 542 F.3d at 785.

12        Here, Plaintiff's allegations that Defendants Zinberg and Kong had access to

13  the purportedly false information and that they occupied positions of authority in,

14  and exercised tight control over, the Company fail to plead a strong inference of

15  scienter. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1089 (9th Cir. 2002)

16  ("Without corroborating facts, it is impossible to conclude that such allegations rest

17  on more than hind-sight speculation.").

18        With respect to the first exception which focuses on the nature of a

19  defendant's management style, the Complaint does not contain factual allegations

20  regarding either Defendant Zinberg's or Defendant Kong's involvement with,

21  access to, or exposure to the Company's underlying financial information. *See*

22  *Zucco Partners*, 552 F.2d at 1001; *see also South Ferry*, 542 F.3d at 785. First,

23  allegations that: (1) Defendant Zinberg and his sister control over 62% of the

24  Company's stock; or that (2) Defendant Zinberg was "directly involved with"

25  suppliers do not create an inference that he had access to Bidz.com's underlying

26  data. *Id.* at ¶¶ 9, 145, 146. Next, although Plaintiff alleges Defendant Kong had

27  some role in preparing the books, this lone allegation – without more - is not in of

28  itself pernicious because, as the Company's as CFO, Secretary and Treasurer, the

1   Court would expect Defendant Kong to have had a role in overseeing the accounts
2   or finalizing the financial statements. *See Downey*, 2009 U.S. Dist. LEXIS 25007
3   at *2. Thus, as alleged, it would not be *absurd* to conclude that neither Defendant
4   Zinberg nor Defendant Kong knew the statements were false. *See id.* at *27.

5        Plaintiff's allegations also fail under the second exception because, as this
6   Court found *above*, none of the allegedly false statements were so "patently" and
7   "obviously" false, that it would be "absurd" to believe that either Defendant
8   Zinberg or Defendant Kong did not know the statements were false/misleading
9   *See Zucco Partners*, 552 F.3d at 1001; *see also Berson*, 527 F.3d at 988.     •

10       Accordingly, Plaintiff's allegation fails to create a strong inference of
11  scienter on the basis of Defendants Zinberg's and Kong's management style
12  and/or knowledge of the Company's affairs. *See Metzler*, 540 F.3d at 1068
13  (plaintiff does not plead scienter without "at least some additional allegation of
14  specific information conveyed to management and related to fraud.").

            2.    *Defendant Zinberg's and Defendant Kong's Stock Sales &*
                  *Executive Compensation*

     Plaintiff next argues its allegations that Defendants Zinberg and Kong
financially benefitted during the Class Period suffice to allege scienter. *See* Opp'n
at p. 21:17-24. The gravitas of this argument is that money motivated Defendants
Zinberg and Kong to act fraudulently.

     In this Circuit, "generalized assertions of motive, without more, are
inadequate to meet the heightened pleading requirements" because "[i]f simple
allegations of pecuniary motive were enough to establish scienter, 'virtually ever
company in the United States that experiences a downturn in stock price would be
forced to defend securities fraud actions." *Zucco Partners*, 552 F.3d at 1005
(internal citations omitted). That said, important exceptions to this rule exist.

            i.    Executive Compensation

     First, "a strong correlation between financial results and stock options or cash

1   bonuses for individual defendants may occasionally be compelling enough to

2   support an inference of scienter." *Id.* at 1004.  To "be compelling enough to support

3   a strong inference of scienter," the allegations of executive compensation must be

4   "particularized" and must describe "how intimately the bonuses [or compensation]

5   were tied to the company's financials." *Id.*  Bare assertions that "executive-level

6   bonuses were based in part on [the company's] performance" are insufficient. *Id.*

7        Allegations Defendants Zinberg and Kong had "significant incentives" to

8   make false/misleading statements "to ensure the Company achieved its

9   performance objectives" because performance was "a factor used to determine"

10   their salaries and bonuses fail to describe *how* their compensation was tied to the

11   Company's performance.  Compl. at ¶¶ 9, 10, 149.  A general statement that the

12   Company's financial performance was "a factor" used to determine their salaries

13   and bonuses does not pass muster. *See Zucco Partners*, 552 F.3d at 1004.

14                     ii.     Stock Sales

15        Second, "suspicious stock sales by corporate insiders [may be] circumstantial

16   evidence of intent to defraud" if the sales are "dramatically out of line with prior

17   trading practices at times calculated to maximize the personal benefit from

18   undisclosed inside information." *Silicon Graphics*, 183 F.3d at 1001.

19        Plaintiff argues its allegations that Defendants Zinberg and Kong sold

20   310,000 shares of Bidz.com stock in the Class Period (for a total of $3,046,316)

21   when they had not sold a single share in the 469 days period immediately

22   preceding the Class Period suffices to allege scienter.  Compl. at ¶ 47.  Plaintiff

23   relies on *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226,

24   1232 (9th Cir. 2004), in which a corporate officer's trading of company stock

25   during the class period that was "highly inconsistent" with his failure to sell a

26   single share of company stock during the five years preceding gave rise to a strong

27   inference of scienter, to argue that Defendants Zinberg's and Defendant Kong's

28   failure to sell shares before the Class Period is probative of their scienter.

1    Allegations of insider trading do not raise a strong inference of scienter if

2  there is no history of pre-class period trading. *See Silicon Graphics*, 183 F.3d at

3  986. Plaintiff's allegations that neither Defendant Zinberg nor Defendant Kong

4  sold Bidz.com stock in the 469 days before the Class Period – the period between

5  Bidz.com's initial public offering in March, 2006, and the start of the Class Period

6  in July, 2007 – concedes the non-existence of a relevant pre-class trading history.

7  Compl. at ¶ 151. The fact that no one could publicly buy/sell Bidz.com stock

8  before the Company's listing on NASDAQ in June, 2007, could be a "plausible"

9  "opposing non-culpable explanation" for Defendant Zinberg's and Kong's sales

10  during the Class Period: a plausible inference may be that they sold their shares in

11  the Class Period because they could not do so before, not that they were trying to

12  benefit from their fraud. *Tellabs*, 551 U.S. at 324; *see Silicon Graphics*, 183 F.3d

13  at 986 (no inference of fraud where defendant had been precluded from selling his

14  shares before the class period and then sold over 75.3 percent of his stock after

15  restrictions were lifted).

16         3.    *Defendant Zinberg's and Defendant Kong's Propensity To*
              *Engage in Fraud*

17  Plaintiff further argues its allegations that "mere months after the false and

18  misleading Q2 08 Form 10-Q issued on August 4, 2008, which reported an

19  inflated gross margin of 27.9%, the Company disseminated a Q3 08 Form 10-Q

20  which reflected a sharply decreased gross profit percentage" constituting a "de-

21  facto write-off of non-existent inventory" raises a strong inference of scienter.

22  Opp'n at p. 24:10-14. Allegations of what the "Company" or other officers[12] did

23  or knew is irrelevant because this Circuit requires individualized allegations of

24  scienter. *See Glazer*, 549 F.3d at 745. These allegations are not probative of

---

[12] Similarly, Plaintiff's allegations that: (1) *other* Bidz.com officers sold unlicensed securities before the initial public offering (and before the Class Period), *see* Compl. at ¶¶ 151-152; (2) that Bidz.com is the "target of numerous lawsuits relating to its business practice", *see id.* at ¶¶ 153-154, and; (3) the owner of L.A. Jewelry, one of the Company's biggest suppliers, has a criminal history and that Defendant Zinberg has "ties" to individuals with "criminal histories", *id.* at ¶¶ 155-156, are irrelevant with respect to either Defendant Zinberg's or Defenant Kong's state of mind. *See Glazer*, 549 F.3d at 745.

1    either individual Defendant's scienter because Plaintiff does not allege the

2    individual Defendants were involved in or participated in this alleged write-off.

3         4.   *Defendant Zinberg's and Defendant Kong's Knowledge of GAAP*

4

5    Plaintiff argues Defendants Zinberg's and Kong's knowledge of the GAAP

6    violations, "coupled with evidence of fraudulent intent, provide evidence of

     scienter." Opp'n at p. 21:7-9. Although Plaintiff alleges Defendants Zinberg and
7
     Kong knew about the GAAP and EITF 02-16, these allegations fail to create a
8
     strong inference of fraudulent intent, because, under *Tellabs*, it is equally plausible
9
     that the individual defendants did not believe the Company was violating GAAP.
10
         "Scienter cannot be established by publishing inaccurate accounting figures,
11
     even when in violation of GAAP", *Daou*, 411 F.3d at 1022, because GAAP
12
     tolerates a range of reasonable approaches. *See Ezra Charitable Trust v. Tyco*
13
     *Int'l Ltd.*, 466 F.3d 1, 12 (1st Cir. 2006). "Merely stating in a conclusory fashion
14
     that a company's books are out of compliance with GAAP would not itself
15
     demonstrate liability under section 10(b) or Rule 10(b)(5)", *id.*, without factual
16
     allegations that the defendant knew the "challenged statements were false when
17
     made." *Id.* at 9; *see also Daou*, 411 F.3d at 1022 ("significant violations of GAAP
18
     standards can provide evidence of scienter so long as they are pled with
19
     particularity"); *see also Metzler*, 540 F.3d at 1068. Similarly, allegations the
20
     defendant failed to discover or should have known about the GAAP violations are
21
     also insufficient. *See id.*; *see also Ezra*, 466 F.3d at 13, n.10. Allegations,
22
     however, that the individual defendants "personally directed" the company's
23
     recognition of revenue, in violation of GAAP, coupled with factual allegations
24
     that the defendant's "manually adjust[ed]" figures, also in violation of GAAP, do
25
     suffice to plead scienter. *Daou*, 411 F.3d at 1023.
26
         The issue here is not whether Bidz.com logged marketing contributions as
27
     reductions in the cost of sales because it is undisputed that it did so, but whether
28

24

1  Defendants *knew* Bidz.com incurred marketing costs on behalf of specific,

2  identifiable suppliers and knowingly employed an improper accounting method

3  that was designed to misrepresent the Company's profitability.

4      Plaintiff argues the Court should infer that Defendants Zinberg and Kong

5  knew the Company's co-operative marketing contributions should not have been

6  used to reduce the cost of the sale because: (1) Defendants Zinberg and Kong

7  knew about EITF 02-16 and understood its implications, *see id. e.g.* at ¶ 57; and

8  (2) Defendants Zinberg made a public statement suggesting the Company incurred

9  specific, identifiable marketing costs.  These allegations fail to factually allege

10  that either Defendant Zinberg or Defendant Kong knew about or participated in

11  the fraud.

12      First, Plaintiff's general allegations that:

13      . . . the Company improperly inflated gross profit and gross margin by
recording the co-op marketing contribution transactions as a reduction to
14  cost of sales even though the marketing costs were, for the most part, easily
identified as specific, incremental, identifiable costs incurred by the
15  Company to sell specific products.

16  Defendants either knew or recklessly failed to know that the foregoing
representation was materially false and misleading because Defendants
17  referred to EITF 02-16 several times in the 2007 Form 10-K, and therefore,
there is a strong inference that Defendants read EITF 02-16 and either knew
18  or were reckless in not knowing that the Company was misapplying its
provisions in accounting for co-op marketing contributions
19

20  Compl. at ¶¶ 82-83, do not suffice because they are conclusions, not facts.

21      Next, the Court cannot infer scienter on account of Defendants Zinberg's

22  and Kong's control and access in the company.  Plaintiff argues Bidz.com's

23  GAAP violations were so significant that it is "hard to believe" Defendants

24  Zinberg and Kong did not know about them.  *Benson*, 527 F.3d at 988.  Both *Ezra*,

25  466 F.3d at 12, and *Daou*, 411 F.3d at 1022, refute this conclusion.  An inference

26  of scienter does not arise without specific individualized factual allegations that

27  either man: (1) read, knew, and understood EITF 02-16; and (2) also knew that the

28  Company had specific, marketing costs that could be associated to specific

1   suppliers: and (3) chose to record those costs improperly.

2          Nor do the allegations that Defendant Zinberg knew the Company could trace/

3   track individual supplier's marketing costs suffice.  Plaintiff alleges Defendant

4   Zinberg made the following statement an earning call:

5          Ryan Randall Randall Capital: ". . . can you just clarify your comment you
       made about how your merchants have to pay in more into the marketing
6       fund if they want to sell you more inventory than you're willing to take?"

7          David Zinberg: "I will give you an example. We can sell maybe ten Corum
       watches a month, and if a vendor wants to sell us 100 Corum watches a
8       month we would take a marketing fee, buy keywords and use those Corum
       keywords to sell the watches."
9
   Compl. at ¶ 51.  Plaintiff contends this is an acknowledgement that Bidz.com
10
   incurred specific marketing costs on behalf of particular suppliers.
11
          The Court disagrees and finds that Defendant Zinberg's comment about
12
   Corum watches is not probative of scienter because it is taken out of context, and
13
   presents a hypothetical.  *Metzler*, 540 F.3d at 1069 ("plaintiff cannot avoid
14
   dismissal by reliance on isolated statements that stand in contrast to a host of other
15
   insufficient allegations.").  Opining that an isolated statement was "not so
16
   indicative of fraudulent intent that it carries the weight of the entire 181-page
17
   complaint for purposes of establishing a 'strong inference' of scienter," the court
18
   in *Metzler* cautioned against reading fraudulent intent into a statement that could
19
   also be read in a non-fraudulent manner.  *See id.*  Plaintiff's interpretation lumps
20
   inference upon inference.  A "plausible" "opposing inference" is that Defendant
21
   Zinberg used the Corum watch example to explain what happens when inventory
22
   exceeds demand.  *See Tellabs*, 551 U.S. at 324.
23
          The Court finds that Plaintiffs' allegations do not create a strong inference
24
   that Defendants Zinberg and Kong knew the Company was violating GAAP and
25
   mis-recording the marketing contributions.  As alleged, the more plausible
26
   explanation for Defendant Zinberg's and Kong's conduct may be that they
27
   reasonably and genuinely believed the co-operative marketing costs could not be
28

1   connected to individual suppliers, and should be recorded as reductions in the cost

2   of sales per EITF 02-16. *See Galzer*, 549 F.3d at 747 (as between malicious and

3   innocuous explanations for conduct, innocuous explanation was more plausible

4   absent additional facts).

5           5.      *Defendant Zinberg's and Defendant Kong's Sarbanes*
                    *Oxley Certifications*
6

7       Next, Plaintiff contends its allegations that Defendants Zinberg and Kong

8   reviewed the SEC Filings and signed the Sarbanes Oxley certifications contained

9   therein, *see id. e.g.* at ¶ 57, allege scienter because: (1) the certifications were

10  knowingly or recklessly made; and (2) corporate officers who sign these

11  certifications have a duty to familiarize themselves with operations that would

12  reveal known improprieties. Opp'n at p. 24:19-25 to p. 25:1-8. Ninth Circuit

13  precedent rejects such a proposition:

14          Boilerplate language in a corporation's 10-K form, or required certifications
            under Sarbanes-Oxley . . . add nothing to the scienter calculus . . . allowing
15          Sarbanes-Oxley certifications to create an inference of scienter in "every
            case where that was an accounting error or auditing mistake made by a
16          publicly traded company" would "eviscerate the pleading requirements for
17          scienter set forth in the PSLRA."

18  552 F.2d at 1003-1004. An inference of wrongdoing does not arise unless the

19  individual defendants knew they were signing documents/certifications containing

20  false statements. *See Downey Sec.*, 2009 U.S. Dist. LEXIS at * 29.

21      Plaintiff generally alleges only that Defendants Zinberg and Kong signed

22  and certified the public filings. Signatures are not proxies for scienter. *See id.*

23          6.      *Defendant Zinberg's and Defendant Kong's Knowledge of*
                    *the "Shill Bidders" and "Appraisal Mills"*
24

25      Last, Plaintiff contends that Defendants Zinberg's and Kong's "knowledge

26  and active participation in the shill bidding and the sham appraisals" suffice to

27  allege scienter. Opp'n at p. 19:23-24. Plaintiff fails to make any allegations

28  linking *either* Defendant Zinberg or Defendant Kong to either shill bidders or

1    appraisal mills. *See* Compl. at ¶¶ 115-127. Thus, Plaintiff's allegations of "other

2    fraudulent schemes", Opp'n at p. 19:22, do not plead scienter.

3          E.     Totality of the Allegations

4       Having concluded that no single allegation suffices to allege a strong,

5    compelling and cogent inference of scienter, the Court next considers whether the

6    totality of the allegations suffice to do so. *See Tellabs*, 551 U.S. at 325.

7       The totality of Plaintiff's allegations does not outweigh the inference of

8    non-fraudulent intent. *See Zucco Partners*, 552 F.2d at 1006. Considering

9    "plausible" "opposing inferences" that weigh against a finding of scienter, the

10    Court finds that the facts alleged do not point to a conclusion that these

11    omissions/errors were done maliciously. *Tellabs*, 552 U.S. at 324; *see Zucco*

12    *Partners*, 552 F.2d at 1006. To the contrary, the facts alleged and the reasonable

13    inferences drawn from them suggest a fundamental misunderstanding and

14    misapplication of GAAP. *See In re Ceridian*, 542 F.3d 240, 246 (8th Cir. 2008)

15    ("the opposing inference of non-fraudulent intent – that these were mistakes by

16    accounting personnel undetected – is more compelling").

17          F.     Conclusion: Plaintiff Does Not Allege A Strong, Cogent and
18                Compelling Inference of Scienter

19       The Court finds that Plaintiff does not allege a strong, "cogent and

   compelling" inference of scienter to survive under the PSLRA.
20
                       **JUDICIAL NOTICE**
21
      Federal Rule of Evidence 201 enables a court to take judicial notice of
22
   adjudicative facts. Adjudicative facts are "not subject to reasonable dispute in that
23
   it is either: (1) generally known within the territorial jurisdiction of the trial court;
24
   or (2) capable of accurate and ready determination by resort to sources whose
25
   accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).
26
      Plaintiff requests the Court take judicial notice, [Docket No. 44], of: Exhibit
27
   A: Bidz.com, Inc., November 10, 2008 Earnings Call Transcript.
28

1    Defendants request this Court take judicial notice, [Docket No. 37], of:

2    Exhibit A:    EITF 02-16: Accounting by a Customer (Including a Reseller)
                   for Certain Consideration Received from a Vendor EITF 02-16
3    Exhibit B:    Form 10-Q Filed 11/13/07 for the Period Ending 09/30/07
     Exhibit C:    Form 10-K Filed 03/12/08 for the Period Ending 12/31/07
4    Exhibit D:    Form 10-Q Filed 05/06/08 for the Period Ending 03/31/08
     Exhibit E:    Form14A Filed 06/09/08 for the
5                  Period Ending 06/25/08
     Exhibit F:    Form 10-Q  Filed 08/05/08 for the Period Ending 06/30/08
6    Exhibit G:    Form 10-Q Filed 11/10/08 for the Period Ending 09/30/08
     Exhibit H:    Form 4 Filed 12/01/08 for the Period Ending 11/26/08
7    Exhibit I:    Form 4 Filed 12/03/08 for the Period Ending 12/01/08
     Exhibit J:    Form 4  Filed 12/01/08 for the Period Ending 11/26/08
8    Exhibit K:    Form 4 Filed 01/06/09 for the Period Ending 01/02/09
     Exhibit L:    Form 10-K Filed 02/25/09 for the Period Ending 12/31/08
9    Exhibit M:    Form 10-Q Filed 05/05/09 for the Period Ending 03/31/09
     Exhibit N:    Form 10-Q Filed 08110/09 for the Period Ending 06/30/09
10   Exhibit O:    U.S. Securities and Exchange Commission Litigation Release
                   No. 19657, April 17, 2006, Accounting and Auditing
11                 Enforcement Release No. 2414/ April 17, 2006 - *SEC v. Tyco*
                   *International Ltd.*, 06 CV 2942 (S.D.N.Y. filed April 17,2006)
12                 SEC Brings Settled Charges Against Tyco International Ltd.
                   Alleging Billion Dollar Accounting Fraud
13
     The Court grants the parties' requests for judicial notice.  The Court finds that
14
     Defendants' Exhibits A and O can be judicially noticed because Plaintiff
15
     repeatedly refers to both these documents in its Complaint, and alleges Defendants
16
     misapplied EITF 02-16.  *Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d
17
     1185, 1189 (N.D. Cal. 2008).  Defendants' remaining exhibits, the SEC filings,
18
     are judicially noticeable.  *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th
19
     Cir. 2006).  Lastly, the Court takes judicial notice of the existence of Plaintiffs'
20
     Exhibit A, the earnings call transcript, but not the truth of the facts contained
21
     therein.  *See San Luis v. Badgley*, 136 F.Supp.2d 1136, 1146 (E.D. Cal. 2000).
22

23   //

24   //

25   //

26   //

27   //

28

**CONCLUSION**

The Court **GRANTS** Defendants' Motion to Dismiss without prejudice and **GRANTS** the parties' Requests for Judicial Notice.  Plaintiff is hereby granted fourteen (14) days leave to amend its Complaint to factually allege with particularity falsity and a strong, cogent and compelling inference of individualized scienter.

IT IS SO ORDERED.

DATED:   May 25, 2010

By_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE