1  JEFF S. WESTERMAN (SBN 94559)
   jwesterman@milberg.com
2  DAVID E. AZAR (SBN 218319)
   dazar@milberg.com
3  ANDREW J. SOKOLOWSKI (SBN 226685)
   asokolowski@milberg.com
4  **MILBERG LLP**
   300 South Grand Avenue, Suite 3900
5  Los Angeles, California 90071
   Telephone: (213) 617-1200
6  Facsimile:  (213) 617-1975

7  DAVID A.P. BROWER
   brower@browerpiven.com
8  **BROWER PIVEN**
    A Professional Corporation
9  488 Madison Avenue, 8th Floor
   New York, New York 10022
10 Telephone: (212) 501-9000
   Facsimile:  (212) 501-0300

11
   Counsel for Lead Plaintiff and Liaison Counsel for the Class
12
   [Additional Counsel Appear on Signature Page]
13

14            UNITED STATES DISTRICT COURT

15      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

16 RAMON GOMEZ, On Behalf of            ) Lead Case No. CV09-03216 CBM-
   Himself and All Others Similarly     ) Ex
17 Situated,                            )
                                        ) (Consolidated with Nos. CV09-
18              Plaintiff,              ) 03671 CBM; CV09-03967 CBM)
       vs.                              )
19                                      ) CONSOLIDATED AMENDED
   BIDZ.COM, INC., and DAVID            ) CLASS ACTION COMPLAINT
20 ZINBERG,                             ) FOR VIOLATIONS OF THE
                                        ) FEDERAL SECURITIES LAWS
21              Defendants.             )
                                        ) JURY TRIAL DEMANDED
22 ROLAND POMFRET, On Behalf of         )
   Himself and All Others Similarly     )
23 Situated,                            )
                                        )
24              Lead Plaintiff,         )
                                        )
25     vs.                              )
                                        )
   BIDZ.COM, INC., DAVID ZINBERG,       )
26 and LAWRENCE Y. KONG,                )
                                        )
27              Defendants.             )
                                        )
28

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
DOCS\519413v1

# <u>TABLE OF CONTENTS</u>

**Page**

JURISDICTION AND VENUE .............................................................................. 1

PARTIES .............................................................................................................. 2

CLASS ACTION ALLEGATIONS ...................................................................... 6

SUBSTANTIVE ALLEGATIONS ..................................................................... 10

    Bidz Uses "Shill Bidders" to Artificially Inflate the Selling Price for
        Its Online Auctions ............................................................................ 11

    Bidz Uses Bogus Appraisals to Artificially Inflate the Selling Prices
        of Auction Items ................................................................................ 19

    Materially False and Misleading Statements Issued During the Class
        Period ................................................................................................ 20

    The Truth Regarding the Company's Fraudulent Schemes Emerges ........... 43

LOSS CAUSATION ........................................................................................... 49

ADDITIONAL SCIENTER ALLEGATIONS .................................................... 51

DEFENDANTS' ASSOCIATIONS AND PROPENSITY TO ENGAGE IN
    UNLAWFUL CONDUCT CONSISTENT WITH SCIENTER
    ALLEGATIONS .......................................................................................... 57

    Bidz Sold Unlicensed Securities Before it Attempted an IPO ..................... 57

    Bidz Is the Target of Numerous Lawsuits Relating to Its Business
        Practices ............................................................................................ 58

    Bidz Has Been Connected to Numerous People With Questionable
        Backgrounds ...................................................................................... 58

NO SAFE HARBOR ........................................................................................... 59

COUNT I Violation of Section 10(b) of the Exchange Act  and Rule 10b-5
    Promulgated Thereunder  (Against Defendants) ......................................... 60

COUNT II Violation of Section 20(a) of the Exchange Act  (Against the
    Individual Defendants) ................................................................................ 63

PRAYER FOR RELIEF ...................................................................................... 64

JURY TRIAL DEMANDED ................................................................................ 64

i

1.     Lead Plaintiff, Roland Pomfret, brings this Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") individually and on behalf of all other purchasers of the securities of Bidz.com, Inc. ("Bidz" or "Company") between August 13, 2007 and November 28, 2007, inclusive (the "Class Period").  Such purchasers, along with Plaintiff, are collectively referred to herein as the "Class."  This Complaint is brought against Bidz, the Company's President, Chief Executive Officer, and Chairman of the Board of Directors, David Zinberg, and the Chief Financial Officer and director Lawrence Y. Kong (collectively, with the Company, "Defendants").

2.     This Complaint is alleged upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, based upon Plaintiff's counsel's investigation, including review of Bidz's public filings with the United States Securities and Exchange Commission ("SEC"); conference calls; wire and press releases published by and regarding Bidz; securities analysts' reports and advisories; information available in the media and on the Internet; and interviews with at least twenty-three knowledgeable persons ("CW(s)"), including former Bidz employees, who held positions that provided them with personal access to the information which they reported.  Additional facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth in this Complaint that will be revealed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

3.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

1

4.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, Bidz's principal executive offices are located within this District.

6.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.      Plaintiff Roland Pomfret ("Plaintiff") purchased Bidz securities, in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Bidz securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Bidz that was misrepresented and omitted during the Class Period was revealed.  The Plaintiff's Certification of Roland Pomfret containing a detailed list of his transactions in Bidz securities during the Class Period was previously submitted with the Consolidated Class Action Complaint for Violations of the Federal Securities Laws.

8.      Defendant Bidz is a Delaware corporation with its principal executive offices located at 3562 Eastham Drive, Culver City, California 90232.   Bidz characterizes itself as a "leading online retailer of jewelry, featuring a live auction

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
DOCS\519413v1

format." Bidz offers its products through a continuous live format, featuring purportedly a $1 minimum opening bid, and a unique 15-second auction extension period that allows the auctions to continue until all bids are received. The majority of the auctions are short-term, often lasting less than one hour. The product inventory includes gold, platinum, and silver jewelry set with diamonds, rubies, emeralds, sapphires, and other precious and semi-precious stones, watches, and accessories. According to Bidz, it is the "second largest online retailer of jewelry." Bidz's stock is quoted on the NASDAQ Stock Market LLC under the symbol "BIDZ." NASDAQ is a well-developed, efficient market for securities.

9.     Defendant David Zinberg ("Zinberg") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors since the Company was founded in 1998. Defendant Zinberg served as the Secretary from inception until March 2001. Defendant Zinberg is the brother of Marina Zinberg, Vice President of the Company (and formerly the corporate secretary and treasurer). Defendant Zinberg and Marina Zinberg left the Eastern European country of Moldova and moved to Los Angeles, California when defendant Zinberg was a teenager. Prior to founding Bidz, defendant Zinberg, starting in 1988, began acquiring pawn shops, eventually owning 17 pawn shops across Los Angeles, as well as a "bail bond outfit, a dental lab and a deli." *See* Alpert, Bill, "Putting BIDZ.com Shares on Sale," BARRON'S, Sept. 1, 2008.[1] Subsequently, defendant Zinberg founded Bidz in 1998. Defendant Zinberg and his sister, Marina Zinberg, control over 62% of the Company's shares. As a result, defendant Zinberg dominates and controls the Company. Defendant Zinberg is a Class I director whose term expires at the 2010 annual meeting of stockholders. Defendant Zinberg was paid $201,244 in compensation in 2007 (consisting of

---

[1] *See* http://online.barrons.com/article/SB122006128601185513.html#articleTabs_panel_article%3D1.

$181,250 in salary and $19,994 in all other compensation).   During the Class Period, defendant Zinberg signed and certified false and misleading SEC filings and knowingly issued numerous false and/or misleading statements about Bidz's business and the composition and sources of its revenues and sales.   Defendant Zinberg sold 90,000 shares of Bidz stock during the Class Period, for proceeds of $901,364.

10.     Defendant Lawrence Y. Kong ("Kong") is, and at all relevant times was, Chief Financial Officer ("CFO") and a director of Bidz.   Defendant Kong has served as the CFO since January 2001, as Secretary and Treasurer since March 2006, and as a director since July 2003.   Defendant Kong earned a Bachelor of Science in Accounting from the University of South Alabama in June 1982 and a Master of Business Administration in Finance from the University of Chicago in June 1984.   Defendant Kong passed the Certified Public Accountant examination (State of Illinois) in 1983 and is a member of the American Institute of Certified Public Accountants.   Defendant Kong has over 20 years of experience in accounting, financial management and consultancy.   Defendant Kong is the husband of Claudia Y. Liu ("Liu"), the Chief Operating Officer ("COO").   Defendant Kong is a Class II director whose term expires at the 2011 annual meeting of stockholders.   Defendant Kong was paid $814,205 in compensation in 2007 (consisting of $235,000 in salary, $338,048 in bonuses, $224,330 in option awards, and $16,828 in all other compensation).   His wife, Liu, was paid $628,614 in 2007.   During the Class Period, defendant Kong signed and certified false and misleading SEC filings and knowingly issued numerous false and/or misleading statements about Bidz's business and the composition and sources of its revenues and sales.

4

11.    Defendants Zinberg and Kong are collectively referred to herein as the "Individual Defendants."   Bidz and the Individual Defendants are collectively referred to herein as "Defendants."

12.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Bidz, were privy to confidential and proprietary non-public information concerning Bidz's operations, finances, financial condition, products, markets and present and future business prospects, via: their direct "hands on" involvement in Bidz's business; access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees; attendance at management and/or board of directors meetings and committees thereof; and reports and other information provided to them.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein were misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

13.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Bidz's business.

14.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of Bidz's reports, press releases and presentations to securities analysts and the investing public.  The Individual Defendants were provided with copies of Bidz's

misleading reports and press releases prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

15.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, governed by the federal securities laws and registered with the SEC pursuant to the Exchange Act, and was, during the Class period, traded on the NASDAQ, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Bidz's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Bidz's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these obligations.

16.     The Individual Defendants are liable as participants in the fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of Bidz securities by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme deceived the investing public regarding Bidz's business, operations and management and the intrinsic value of Bidz's securities and caused Plaintiff and other members of the Class to purchase Bidz's securities at artificially inflated prices, and to suffer significant economic losses when the truth was revealed.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Bidz securities during the Class Period and who

were damaged thereby (*i.e.*, the "Class").  Excluded from the Class are Defendants, the predecessors, successors, parents and subsidiaries of defendant Bidz, the current or former officers, directors, partners, and other employees of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

18.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Bidz's common shares were actively traded on the NASDAQ under the symbol "BIDZ."  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Bidz or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including Internet and publication notice and notice to brokerage firms who held securities and/or traded Bidz securities on behalf of their customers during the Class Period.

19.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is a member of the Class and will rigorously represent the interests of Class members in the same manner as he will represent his own interests.  Plaintiff knows of no conflicts or antagonisms between his individual interests and those of other class members, and Plaintiff has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted to disclose material information that, under the circumstances, would render the statements made not false and misleading about the business, operations, and financial condition of the Company;

(c)     whether Defendants acted knowingly or recklessly in making materially false and misleading statements or omitting to disclose material information that, under the circumstances, would render the statements made not false and misleading during the Class Period;

(d)     whether Defendants engaged in schemes, artifices to defraud and/or manipulative conduct during the Class Period;

(e)     whether the market prices of Bidz securities were artificially inflated or distorted during the Class Period because of Defendants' conduct complained of herein; and

(f)     whether members of the Class have sustained damages and the proper measure of damages.

22.     Plaintiff intends to rely, in part, upon the presumptions of reliance created by the United States Supreme Court in connection with the reliance element of his claims and the claims of the other Class members under Sections 10(b) and 20(a) of the Exchange Act and, therefore, individual questions regarding reliance do not predominate.  In particular, with respect to Defendants' material omissions alleged herein, reliance by Plaintiff and the other members of the Class

is presumed. With respect to Defendants' affirmative misrepresentations alleged herein, reliance by Plaintiff and the other members of the Class is presumed under the fraud-on-the-market doctrine, because, at all relevant times, the market for Bidz securities was efficient for the following reasons, among others:

(a) Bidz's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, which is a highly-efficient, open, developed, and automated market, free of manipulation;

(b) As a regulated issuer, Bidz filed periodic public reports with the SEC and the National Association of Securities Dealers (NASD);

(c) Bidz regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Bidz was followed by numerous securities analysts and investment market professionals.

23. As a result of the foregoing, the market for Bidz securities rapidly absorbed all publicly material information regarding Bidz and that information was reflected in the price of Bidz's securities.

24. Plaintiff and other members of the Class purchased Bidz securities between the time that Defendants made the material misrepresentations and omissions alleged herein and when the truth was finally and fully revealed to the public.

25. Plaintiff is thus entitled to a presumption that all purchasers of Bidz securities during the Class Period suffered similar injury because they paid inflated prices for their Bidz securities in reliance on Defendants' material misrepresentations and/or omissions and/or in reliance on the integrity of the prices

1   for Bidz securities, and suffered economic losses when the price of Bidz's stock

2   declined in value in direct, proximate and consequential response to the Citron

3   Research articles.

4       26.    A class action is superior to all other available methods for the fair

5   and efficient adjudication of this controversy since joinder of all members is

6   impracticable.  Furthermore, as the damages suffered by individual Class members

7   may be relatively small, the expense and burden of individual litigation make it

8   impossible for members of the Class to individually redress the wrongs done to

9   them.  There will be no difficulty in the management of this action as a class

10  action.

11                          **SUBSTANTIVE ALLEGATIONS**

12      27.    During the Class Period, Defendants made false and misleading

13  statements and engaged in acts, practices and course of business, which operated as

14  a fraud and deceit upon the purchasers of the Company's securities and contributed

15  to their losses for investments during the Class Period.  These schemes and

16  artifices to defraud were designed to artificially create the appearance of a greater

17  volume of sales at higher prices, and thereby, create an artificial demand at inflated

18  prices for Bidz's products.  In turn, the artificially created increased prices

19  increased revenues and earnings and misled the investing public as to the success

20  of Bidz during the Class Period.  Indeed, rather than organically growing through

21  its misstated business practices, Bidz's operations were pursued through illegal,

22  unethical, and unsustainable conduct, including shill bidding and the offering of

23  false appraisals on merchandise it sold.  Due to the fraudulent practices that were

24  engaged in by Defendants, the Company faced the substantial risk, known to

25  Defendants, that if these practices were exposed and the Company was required to

26  cease such practices, the Company would lose revenues and growth potential both

27  from a loss of customers (because of a loss of confidence in the integrity of the

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
DOCS\519413v1

auction process at Bidz), a reduction in prices received from customers who continued to use Bidz even after the practices were exposed and discontinued, and a significant adverse impact on Bidz's publicly traded securities.  Accordingly, those fraudulent practices fundamentally misstated the business of Bidz, the composition and sources of its revenues and sales, and thereby artificially inflated the value of Bidz's securities during the Class Period.

**Bidz Uses "Shill Bidders" to Artificially Inflate the Selling Price for Its Online Auctions**

28.    Bidz's website, www.bidz.com, utilizes an online sales auction platform, similar to eBay Inc. ("eBay"), as well as a fixed price online store at www.buyz.com.  Unlike eBay, however, Bidz sells its own products.  Thus, Bidz is responsible for the legality of all aspects of the conduct of its auctions.  The Company's ability to generate a high volume of traffic to its website is critical to the Company's ability to generate revenues.

29.    In SEC filings during the Class Period, Bidz claimed that their auctions were "$1 no reserve" auctions.  A reserve is a minimum sale price that the final bid must reach for a sale to occur.  Further, the "Bidz.com site access and purchase agreement," found on the Company's website, states:

> **Shill Bidding**. You are strictly prohibited from placing bids or causing bids to be placed on any Product for the purpose of artificially increasing or otherwise manipulating the bidding process on Bidz.com or the bid price of any Product listed on the Site, or influencing user behavior on Bidz.com.

30.    However, before the Class Period, during the Class Period, and after the Class Period, Bidz engaged in the illegal practice of "shill bidding."  Shill bidders are phony bidders who do not actually want to purchase the auction item. The only purpose of the shills' phony bids is to drive up an item's selling price.

11

This results in the legitimate bidders/consumers paying more for an item than they would have if the shill bidder had not participated in the auction.  Shill bidding is illegal in California and most other states.

31.   Shill bidding benefits Bidz's bottom line in at least three ways: (i) it substantially reduces the number of items that are sold for below cost; (ii) it increases the ultimate price that customers pay; and (iii) it increases internet traffic by creating the appearance of substantial interest in the Company's website and its products.

32.   Thus, the shill bidding created an artificial reserve that would increase customer bids and prevent particular items from selling below cost, including from those auctions where shills participated that were "$1 no reserve."  This was done because Bidz would lose money if items were frequently sold for just $1.  The combination of no reserve auctions plus a starting price of $1 created a substantial risk for the Company.  To mitigate this risk, Bidz used shill bidders to create a artificial reserve price, which substantially reduced the number of items that were sold below cost.

33.   Indeed, analysts have discussed the risk created by the $1 auctions. For example, analyst Merriman Curhan Ford, in a report dated May 22, 2008, stated that "[s]ince Bidz.com starts every auction at $1.00, it obviously runs the risk of every item selling for only $1.00—which would significantly impact the company's revenues and gross margins."  Further, another analyst, Stanford Group Company, in a report dated October 8, 2008, stated that "[a]uctions opening bidding at $1 and without reserve prices have the potential to result in sales below Bidz' purchase price. . . ."

34.   Further, Bidz used shill bidding to increase interest in its website by placing high-priced items on its homepage, which were bid on and won by shill

bidders.  These items were then re-listed and re-auctioned several times to create the appearance of substantial interest in the Company's website.

35.     Consumers have posted numerous complaints on websites such as "Ripoff Report" (www.ripoffreport.com) regarding their suspicions that Bidz uses "shill bidders" to drive up prices.

36.     On July 10, 2009, a Bidz customer posted the following complaint on the Ripoff Report website:

> I have often questioned whether they use shills.  There have been times I will bid on an item that has no bids and I am instantly outbid, and not by a few dollars, but substantially.  It has happened often enough for me to susp[ect] that it is beyond coincidence.  I have monitored those bids and once the price gets to a reasonable amount, the "bidder" drops out.  That might seem normal, but I have seen it over and over again, under the same bidder name.  Many items of like kind have the same bidder name, almost as if those items are his to monitor.  No one will know if they are using shills unless some disgruntled employee blows the whistle, but I would love to hear a rebuttal from Bidz.[2]

37.     Another customer noted that Bidz uses either (a) an automatic shill bidding system, or (b) manual shill bidders, to drive up prices.  The suspected shill bidders often outbid real customers by substantial amounts – for example, by raising the bid from $50 to $1,000 – and tricking bona fide customers who are monitoring their bids into paying inflated prices.[3]

---

[2] *See* http://www.ripoffreport.com/Internet-Fraud/Bidz-com/bidz-com-questions-about-shill-fzd5c.htm.

[3] *See* http://www.ripoffreport.com/On-Line-Stores/BIDZ-COM/bidz-com-update-shilling-p-35z8a.htm.

38.     As a result of the hundreds of consumer complaints launched against Bidz, the Better Business Bureau ("BBB") has given Bidz an "F" rating.  On the BBB website, the reason for the F rating is stated as follows:

> We strongly question the company's reliability for reasons such as that they have failed to respond to complaints, their advertising is grossly misleading, they are not in compliance with the law's licensing or registration requirements, their complaints contain especially serious allegations, or ***the company's industry is known for its fraudulent business practices***.[4]

*See* http://www.la.bbb.org/Business-Report/Bidzcom-13099007.

39.     The Company has admitted in SEC filings during the Class Period that:

> Customer complaints or negative publicity about our customer service could severely diminish consumer confidence in and the use of our website. . . . If we do not handle customer inquiries and complaints effectively, we may lose customer confidence. As a result, our revenue could suffer and our operating margin may decrease.

40.     Moreover, at least two lawsuits against Bidz made allegations of shill bidding.  One lawsuit, *Tidenberg v. Bidz.com, Inc., et al.*, No. 08-05553 (C.D. Cal.) ("Consumer Case"), was settled by Bidz paying the plaintiff $20,000, and requiring the plaintiff to sign a comprehensive and highly restrictive confidentiality agreement.  However, before the settlement, Bidz lost its motion for judgment on the pleadings because the court found that the allegations "support a reasonable inference that Defendant is engaged in shill bidding. . . ."  The other lawsuit is still pending.

---

[4] All emphasis added unless otherwise noted.

14

41.     Further, Liu, Bidz's COO, admitted in the Declaration of Claudia Liu in Support of Bidz.com's Motion for Rule 11 Sanctions in the Consumer Case that "[d]uring the years 2004 through 2008, Bidz.com conducted 25,730,845 on line auctions, which resulted in the sale of 14,402,007 items at an average sale price of $45.80.  The difference between the total number of auctions conducted and the number of items sold represents the number of winning bidders who ultimately elected not to make payment to Bidz.com for items won at auctions."

42.     Importantly, the investigation into the allegations here has revealed that Bidz specifically hired people to act as bidders.  For example, on LinkedIn, Tomas Balsys's position from January 2009-present is listed as "Bidder at Bidz.com," and provides the location as Lithuania. *See* http://It.linkedin.com/pub/tomas-balsys/12/461/536.

43.     Company insiders also confirm that Bidz uses shill bidders to artificially inflate auction prices.  CW1, a former Bidz Operations Coordinator from August 2004 through August 2008, stated that the Company had bogus accounts that it used to bump up bids, and that the practice of using such "phantom bids" was common knowledge within the Company.  CW1 recalled investigating a bid on a diamond necklace as part of his/her fraud control duties.  COO Liu told CW1 to stop that investigation, and said "don't worry about that one, it was one of ours."  CW1 recalled that, on other occasions, fellow employee Jorge Gonzales ("Gonzales") – relaying instructions from Bidz's senior management – told CW1 to stop the investigations because the suspect bid came from one of the Company's shill bidders.  CW1 stated that Gonzales reported directly to COO Liu, worked directly with defendant Zinberg, and had regular conversations with defendant Zinberg.  CW1 also stated that Gonzales was sent to Lithuania to set up "customer support."

15

44.    CW2 was a senior jewelry buyer from March 2000 to July 2003. CW2 was hired by and reported to defendant Zinberg through his/her employment. CW2 was initially hired as a jewelry appraiser and worked in the pricing and description department.  During this time, CW2 introduced Zinberg to Norman Monteau ("Monteau"), the owner of American International Gemologists ("AIG"), a small private jewelry appraisal company.  Later, CW2 became a senior jewelry buyer and was in charge of buying lots and unique pieces of jewelry, as well as paying jewelry vendors.  CW2 had constant contact with defendant Zinberg. Defendant Zinberg felt that CW2 was so important to the Company that defendant Zinberg provided CW2 with a car and a personal driver.  CW2 stated that she/he personally became aware of shill bidding when she/he observed that unique and expensive items that she/he had purchased were supposedly sold at auction, but the same item repeatedly came up for auction again.  CW2 acknowledged that the only way this could be explained was by shill bidding.  CW2 stated: "We kept all of the expensive items on the front page [of the website] constantly, and recycled them. This was the draw.  It was like a car on special at a sales lot, one at this price, and no salesman on the lot was allowed to sell it."  In addition, CW2 was also aware that an employee named "Andre" was one of the Company's shill bidders, and making phony bids was part of his job.  CW2 stated that various Company employees suspected that Marina Zinberg's only job was placing shill bids.

45.    CW3, a former Bidz Certified Merchants Accounts Manager from July 2004 through January 2006, stated that Bidz employed shill bidders in Russia who Bidz used to inflate Bidz's online auctions prices.  CW3 stated that, in December 2005, Bidz sent a customer service employee named "Adrian" from the United States to Russia to train these shill bidders.

46.    CW3 also investigated a complaint by a merchant bidder who complained that he was losing auctions by one penny.  The bidder told CW3 that

16

he searched the Bidz website and found that the same person was bidding on all of the items that he wanted, and was winning by just one more penny.   The complaining merchant bidder told CW3 that he suspected this was the result of shill bidding.   CW3 looked at the items and found they had not been paid, even though the bidder was obligated to pay.   CW3 also found that the winning bidder did not show up on the list of people Bidz needed to collect from.   CW3 approached his/her immediate supervisor, Gonzalez, with this information. Gonzalez told CW3 that the winning bidders were shill bidders, and that the shill bidding was being done from Russia.

47.   CW4, a Marketing and Creative Coordinator from August 2006 through June 2007, who reported to COO Liu and defendant Kong, stated that his/her role included producing a report of the new users and new buyers for the Company.   CW4 stated that he/she viewed incoming information on the Company's portal each day, which included who bought what, their name, and their username.   CW4 also confirmed that each day when she/he viewed the incoming information, about 25% of all bidders' names consisted of the word "bidder" plus a number.   CW4 stated that the users whose usernames appeared as "bidder" followed by numbers would never pay for their items.   CW4 also stated that she/he could tell the country of origin of these bidders, and that approximately 20-25% of all bids were coming out of Eastern Europe.   CW4 stated that the bids generally came from Lithuania, with the second largest group coming from Moldova and Russia.   In fact, CW4 stated that he/she jokingly asked a number of people within the Company if these bidders were being generated by a computer robot.   These employees laughed and said "it is what it is."

48.   CW4 also stated that he/she produced a report showing only the new users and the new buyers at the end of each month, and her/his job was to remove users who had not paid for the items.   CW4 stated that he/she was taught to make

17

these reports by the media buyers who reported to COO Liu until the Chief Technology Officer, Leonid Kuperman ("Kuperman"), was hired to take over marketing.  The report would be placed on a shared hard drive, and a notification of its availability was sent to all the media buyers, Liu, and defendants Kong and Zinberg.

49.   CW5, a Customer Service Representative from November 2007 through April 2008 (when she/he voluntary left the Company), who reported directly to the Customer Service Manager, Gonzalez, stated that when she/he returned to work in mid-March 2008 following some time off, he/she walked into a 10 foot by 12 foot office room near the back of the building where the IT staff worked.  At the time she/he walked into the room, she/he observed the following people at their desks: System Administrator, Patrick Aksan ("Aksan"), who reported to Gonzales, System Administrator, Maurizio Somma, Network Administrator, Duane Inouye, Web Master, Lorien Lippen, and Web Designer, Lisa Schmidt.  With the exception of Aksan, the other people in the room reported to Kuperman.   CW5 stated that the office had no partitions and that each monitor was clearly visible on each person's desk.  She/he said that she/he was surprised when she/he looked at some of the monitors and saw that these employees were bidding up the prices of products on the Company's website.  CW5 said that she/he was shocked when she/he overheard Aksan make a remark to the group regarding outside bidders, "Look at these people [other bidders], they don't know what we are doing.  They are stupid."  CW5 said that Aksan made other remarks bragging that the other bidders were not really committing to buying the products and that he would force them to either put in a decent bid or that he would "win" the bid and take them out of the auction.  CW5 stated that she/he immediately went to defendant Kong regarding what she/he had seen.  Defendant Kong physically

18

moved in closely to CW5 in an intimate way, putting his arm around his/her shoulder, and told him/her, "you cannot discuss this."

50.    CW6, a Billing Clerk from June 2007 through March 2009, who worked for the Company in a number of roles, including customer service, merchant support, billing, and collection of payments and credit charges, stated that part of her/his job was to make reports showing refunds.  CW6 stated that she/he had to cancel some bids when the winner would not pay.  CW6 also stated that she/he saw cases where the same customers had established multiple accounts for bidding, and some of them were located in Lithuania.

**Bidz Uses Bogus Appraisals to Artificially Inflate the Selling Prices of Auction Items**

51.    Bidz customers are offered an appraisal of purchased items from Bidz for about $33.  Bidz engages AIG, also known as AIG Labs, to provide the appraisals.  According to a February 19, 2008 news article, entitled "Criticism Puts Auction Site Bidz.com Under Microscope," AIG Labs admitted to The Los Angeles Times that it does not physically inspect every item for which it provides an appraisal.  According to the article, this "raised a red flag" for Jeanine Woodling of the International Society of Appraisers, who said: "It's important for them to actually be able to see the piece."

52.    Bidz used these improper appraisals to artificially increase the prices it realized in its auctions by misleading purchasers of its products into believing that those items were worth more than they actually were.

53.    CWs confirm the use of the improper appraisals.  CW2 stated that she/he brought AIG Labs and its operator, Monteau, to Bidz for appraisals.  CW2 said she/he knew Monteau was providing Bidz with appraisals that were totally out of line, and that while CW2 was at Bidz, Monteau only appraised high-ticket items.  CW2 explained that if Bidz received, for example, 35 similar pieces, Bidz

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
DOCS\519413v1

1  would solicit one appraisal for all 35 items.  CW2 stated that Bidz would also try to

2  give legitimacy to their items by showing them on other websites at inflated prices.

3       54.    CW3 described Bidz's process for selecting photographs for its

4  website.  Accordingly to CW3, if Bidz received, for instance, a lot of 100 rings, a

5  Bidz employee would select the best looking ring from the lot and photograph that

6  one, and use that photograph for the entire lot.

7       55.    Additionally, CW6 stated that as part of her/his job duties, she/he

8  dealt with AIG and the appraisals.  CW6 stated that when a customer wanted an

9  appraisal certificate, CW6 would be the one to order the certificate from AIG.

10  CW6 stated that a long time employee of the Company named "Valentina" would

11  pick up a sample item out of the Company's lot and send only that sample to AIG.

12  The single certificate was used for each item in the entire lot and the same

13  certificate would be sent to each customer that has requested it.  CW6 also stated

14  that she/he handled a lot of complaints that the item sent to customers was not the

15  same item described in the appraisal.

16  **Materially False and Misleading Statements Issued During the Class Period**

17       56.    On August 13, 2007, Bidz filed its Form 10-Q for the quarterly period

18  ended June 30, 2007 (the "2Q 2007 10-Q") with the SEC, which was signed and

19  certified by defendants Zinberg and Kong.  Under Management's Discussion and

20  Analysis of Financial Condition and Results of Operations ("MD&A"), the 2Q

21  2007 10-Q stated, in relevant part, the following:

22       ***We offer our products through a continuous live format, featuring***

23       ***"no reserve" auctions, a $1 minimum opening bid and a unique 15-***

24       ***second auction extension period*** that allows our auctions to continue

25       until all bids are received.

26                         *        *        *

27

28

20

In assessing our business, we consider operational and non-financial performance metrics, such as average order value, average orders per day, average items sold per day, acquisition cost per new buyer, and number of new buyers. ***We averaged daily sales of approximately 8,678 items or 2,678 orders with an average sales transaction amount per order of $171 in the three month period ended June 30, 2007***.

\*       \*       \*

***We sell to consumers and resellers looking for reliable bargains on jewelry.*** Because we purchase and retain all of our jewelry inventory onsite, we can provide our customers with timely service and delivery of their purchases. In addition, each item is inspected by one of our trained product specialists prior to its placement on our website, ***which assures our customers of the quality of our products.*** We operate in a highly competitive market with low barriers to entry. By selling our own merchandise, ***we provide a buying environment in which we minimize fraudulent activity and questionable product quality frequently associated with purchase transactions from third-party sellers.***

57.    In the 2Q 2007 10-Q, in regard to internal controls, the Company stated, in relevant part, the following:

Under the supervision and with the participation of our management, including our Chief Executive Officer [*i.e.*, defendant Zinberg] and Chief Financial Officer [*i.e.*, defendant Kong], we evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period

21

covered by this report. Disclosure controls and procedures are the controls and other procedures that we designed to ensure that we record, process, summarize and report in a timely manner the information we must disclose in reports that we file with or submit to the Securities and Exchange Commission. ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of the date of their evaluation, our disclosure controls and procedures were effective.*** There were no significant changes made in our internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation.

58.   In the 2Q 2007 10-Q, in the risk factors, the Company stated, in relevant part, the following:

***Our net revenue depends to a significant extent on the number of customers who visit our website to purchase merchandise and the dollar amount of their purchases***.  Generating increased traffic to our website and converting that traffic into buyers requires us to achieve effective results from our marketing campaigns; offer a wide variety of products that our customers can purchase at favorable prices; maintain a user-friendly shopping experience; ensure the satisfactory availability, performance, and reliability of our website, network infrastructure, and transaction processing systems; and provide high-quality customer service.  Our business will be harmed if we are unable to increase our customer base and the dollar volume of the orders customers place with us.

*      *      *

We currently attract new customers by driving traffic to our website using a marketing and advertising strategy that includes targeted keyword searches, online banner advertising, targeted e-mail advertising, and participation in affiliate programs.

\*     \*     \*

Customer complaints or negative publicity about our customer service could severely diminish consumer confidence in and the use of our website. Effective customer service requires significant personnel expense, and this expense, if not managed properly, could significantly impact our profitability . . . If we do not handle customer inquiries and complaints effectively, we may lose customer confidence. As a result, our revenue could suffer and our operating margin may decrease.

59.     In the 2Q 2007 10-Q, in regard to appraisals, the Company stated, in relevant part, the following:

In an effort to provide **accurate** descriptions of jewelry posted on our website, we provide appraisal summaries from third-party gemological laboratories for some of our jewelry items. All other jewelry and watch descriptions are provided by our full-time Gemological Institute of America, or GIA, trained gemologists and several experienced product specialists. . . . In addition, mistakes or omissions of important information in our descriptions may occur. Even if our descriptions are accurate, buying a product online may lead to disappointment resulting in returned merchandise. For example, a customer may determine that a piece does not have the expected look, feel, and overall appearance of the merchandise that the buyer envisioned from the website photograph.

60.     Defendants Kong and Zinberg also signed certifications,[5] which stated, in relevant part, the following:

1. I have reviewed this Quarterly Report on Form 10-Q of Bidz.com, Inc.;

2. Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, **the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows** of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others**, particularly during the period in which this report is being prepared;

b) **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our**

---

[5] All certifications referred to in this Complaint contain substantially identical text.

24

*conclusions about the effectiveness of the disclosure controls and procedures*, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. *The registrant's other certifying officer and I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

61.     On August 13, 2007, the Company also filed its Form 8-K with the SEC, signed by defendant Kong, attaching a press release, entitled "Bidz.com, Inc. Announces Second Quarter 2007 Financial Results," which stated, in part, the following:

Net revenue for the second quarter of 2007 was $39.1 million, a 20.6% increase compared with $32.4 million reported for the second quarter of 2006. *This increase was due primarily to the growth in*

25

*demand for the Company's jewelry products and the increase in the average order value, which grew by 28.6% year-over-year to $171. During the second quarter, the Company had an average of nearly 2,700 orders per day as compared to an average of 2,800 orders per day in the prior year's quarter, and the acquisition cost per new buyer declined to $38 versus $49 in the second quarter of 2006.*

\*        \*        \*

The Company's pre-tax income for the second quarter of 2007 was $3.7 million, above the Company's original guidance of $2.8-$3.3 million, and compared to $151,000 in the prior period in 2006. Net income for the second quarter of 2007 increased to $2.9 million, or $0.12 per fully diluted share on 24.1 million weighted average shares outstanding, compared to net income of $147,000, or $0.01 per fully diluted share on 23.8 million weighted average shares outstanding in the same period of 2006. *The increase in net income was due primarily to the increase in net revenue, higher gross profit margins and non-recurring costs related to the Company's withdrawn initial public offering of $1.2 million in the 2006 second quarter.*

In the second quarter, gross profit increased 41.4% to $10.9 million from $7.7 million in the second quarter of 2006.  Gross margin in the second quarter of 2007 was 27.8%, compared with 23.7% in the same period of 2006. *The gross margin improvement versus a year ago is attributable to the higher prices from auction sales* and not continuing the Company's free shipping promotion which ended at the end of January 2007.

\*        \*        \*

**Business Outlook**

26

The Company expects revenues for the third quarter of 2007 to be in the range of $37-39 million, and expects income before income tax of approximately $3.0-3.2 million. For the full year of 2007, the Company confirms its revenue guidance of $170-$180 million, and anticipates gross margin of approximately 25-26%. The Company expects income before income tax for 2007 of $14-$15 million. The Company expects its effective tax rate for the full year of 2007 to be approximately 11%, and expects to end the year with approximately 24.5 million shares outstanding.

62.     Defendant Zinberg, commenting on the results, stated, in relevant part, the following:

***Traffic to our site continues to grow driving an increasing number of items sold and importantly, the average order value in the second quarter increased approximately 29% year-over-year***.

We are very pleased with the momentum we are seeing and particularly the leverage and scalability of our model which resulted in a significant increase in our bottom-line. We are keenly focused on continuing to achieve strong growth and profitability and further leveraging our model to deliver earnings, cash flow and shareholder returns.

63.     Additionally, on August 13, 2007, Defendants held a conference call, discussing the second quarter 2007 results. Besides reiterating the financial results in the Form 8-K and the 2Q 2007 10-Q, defendant Zinberg stated, in relevant part, the following:

Our net sales increased approximately 21% to $39 million, ***primarily driven by increased demand, stronger traffic and greater awareness to our site***. On a comparable basis, expenses grew 12% evidencing

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
DOCS\519413v1

both our financial discipline and operating leverage of our financial model. As a result of improved metrics and congenial positive leverage, net income was $2.9 million or $0.12 per diluted share compared to just $0.01 per diluted share the same period last year.

*The primary factors driving those results were: An average order value increase of 29% from $133 to $171 as well as increases in average items sold per day and average price per item*. These strong results in a somewhat recently weak quarter represent the beginning of what we expect to be continuous acceleration in our business.

\*        \*        \*

*Additionally, our auctions are like live-auctions. They do not end at any specific time. They end when the bidding stops.  We find that competition creates added excitement for consumers while allowing us to maximize profitability from each transaction. We expect our revenue growth to continue and are keenly focused on improving our core metrics to increase margins and profitability*.

We have four primary initiatives that as an organization we are focusing on. First, we will continue to expand our consumer base. *During the second quarter, we had 54,000 new buyers who are spending nearly 30% more on our site per order than just a year ago.* We will continue to spend on online advertising, primarily search advertising and affiliate marketing to drive additional traffic to the site. We also conduct email campaigns to existing customers which drives significant repeat business and as discussed we will continue to focus on monetizing this process.

\*        \*        \*

In summary, Bidz.com is a results driven company that is focused on profitable growth, while continuing to innovate and deliver compelling consumer value and increasing market share. We look forward to delivering strong results and drive shareholder value over the coming quarters and years.

64.     Further, defendant Kong, stated, in relevant part, the following:

In the second quarter of 2007, we reduced our marketing expenditure and focused on attracting buyers that were willing to spend more. As a result, our acquisition costs per new buyer dropped to $38 from $49 in the prior year. This is a dramatic improvement and a key metric we will continue to focus on.  ***Our average order value in the second quarter increased 28.6% year-over-year to $171 from $133 a year ago, and the number of items sold per day increased 12.3% to 8,678. The increase in average order value is due to the increase in the number of items per order to 3.2 compared to 2.7 in the prior year.*** This increase is due to continued improvements in our site: Increased traffic, which creates more demand for our items, our compelling auction format, and a significantly increased selection of products.

\*     \*     \*

In summary, we are very pleased with our second quarter results and the overall performance for the first half of the year. The last several months have been particularly exciting for the company. Bidz.com is quickly becoming a recognizable brand and a leading online jewelry site, and we are very optimistic about our growth prospects for the remainder of 2007 and beyond.

65.     Also, in response to analyst questions, the following exchanges took place:

29

Mark Argento - Craig-Hallum Capital:  That was my next question. Is that what you are seeing in terms of new customer additions? Are you seeing the purchasing per customer up over that 3.2 items per purchase?

Lawrence Kong - Chief Financial Officer:  Right, we are seeing a continuation of those trends in the third quarter continuing from the second quarter and the average order size also reflects what you see in the second quarter.

                                    *        *        *

Mark Argento - Craig-Hallum Capital:  I'm sure you have some of this data, but if you look at the quality of the new customers you're bringing on, is the quality similar to that of previous quarters? Are you able to attract a decent customer who's going to be a long term profitable customer at that sub-$40 level? Can you anecdotally talk to the quality of the new customer that you're bringing on versus the aggregate pool of customers?

Lawrence Kong - Chief Financial Officer:  Yes, I think definitely the quality is better. If you compare the fact that in the second quarter of 2006 we spend $49 to acquire each customer and they only spend on average $133, ***right now we are spending less to acquire the buyer, $38 per buyer, and they are actually spending more. They are spending about $170 per order. So, that really speaks for the quality of the customers and also they are buying more units per order.*** It was 3.2 units per order in the second quarter of this year compared to 2.7 last year. So they're buying at slightly higher prices and more units per order.

66.    The statements in the 2Q 2007 10-Q, including the certifications, the August 13, 2007 press release, and the August 13, 2007 conference call were materially false and misleading when made because Defendants misrepresented and failed to disclose the following material facts:

(a)    that the Company's auctions were not "$1 no reserve" auctions because the Company's shill bidders were creating an artificial reserve to prevent particular items from selling below cost;

(b)    that the Company was relying upon unethical and fraudulent business practices to generate operating margins, revenues, and profits;

(c)    that the Company's revenue and earnings during the Class Period were artificially increased due to the rampant shill bidding and fake appraisals;

(d)    that the Company was not providing customers with the actual retail value and/or appraised value of its products and selling products markedly inferior to the quality standards to which Defendants claimed to adhere;

(e)    that the traffic to its website was generated not by increased demand, but because of the Company's shill bidders;

(f)    that the average order value and average items sold per day were increased not by demand, but by the Company's shill bidders;

(g)    that the Company faced a significant risk that if their practices were exposed and the Company would be required to cease such practices, the Company would lose revenues and growth potential from a loss of customers and a reduction in prices received from customers who continued to use Bidz after the practices were exposed and discontinued;

(h)    that the Company's business model was unsustainable due to shill bidding and the fake appraisals; and

31

(i)     that Bidz suffered from a serious lack of legitimate controls over financial reporting which rendered the Company's financial reporting inherently corrupt, subject to manipulation and unreliable, further making each of the Company's statements materially false and misleading.

67.     On November 13, 2007, Bidz filed its Form 10-Q for the quarterly period ended September 30, 2007 (the "3Q 2007 10-Q") with the SEC, which was signed and certified by defendants Zinberg and Kong.  The 3Q 2007 10-Q included Bidz's financial statements and stated, in relevant part, the following:

> For the three and nine month periods ended September 30, 2007, we reported net income of $3.6 million and $9.9 million, respectively and for the nine month period ended September 30, 2007 we reported net cash provided from operating activities of $2.8 million. As of September 30, 2007, we had current assets of $51.5 million and current liabilities of $32.8 million or working capital of $18.7 million.

68.     Under MD&A of Financial Condition and Results of Operations, the 3Q 2007 10-Q stated, in relevant part, the following:

> **We offer our products through a continuous live format, featuring "no reserve" auctions, a $1 minimum opening bid and a unique 15-second auction extension period** that allows our auctions to continue until all bids are received.
>
> *         *         *
>
> In assessing our business, we consider operational and non-financial performance metrics, such as average order value, average orders per day, average items sold per day, acquisition cost per new buyer, and number of new buyers. **We averaged daily sales of approximately 8,814 items or 2,699 orders, with an average order value of $173 in the three month period ended September 30, 2007**.

\*    \*    \*

*We sell to consumers and resellers looking for reliable bargains on jewelry.* Because we purchase and retain all of our jewelry inventory onsite, we can provide our customers with timely service and delivery of their purchases. In addition, each item is inspected by one of our trained product specialists prior to its placement on our website, *which assures our customers of the quality of our products*. We operate in a highly competitive market with low barriers to entry. By selling our own merchandise, *we provide a buying environment in which we minimize fraudulent activity and questionable product quality* frequently associated with purchase transactions from third-party sellers.

\*    \*    \*

We have provided financial guidance in our press releases. Our most recent press release provided for expected net revenue of $170 million to $180 million and income before income tax of $14 million to $15 million for the 2007 fiscal year. Over the next 3-5 years, we expect net revenue to grow annually by 25-30% and pre-tax income margins to reach 10-12%.

69.    In the 3Q 2007 10-Q, in regard to internal controls, the Company stated, in relevant part, the following:

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report.  Disclosure controls and procedures

33

are the controls and other procedures that we designed to ensure that we record, process, summarize and report in a timely manner the information we must disclose in reports that we file with or submit to the Securities and Exchange Commission. ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of the date of their evaluation, our disclosure controls and procedures were effective.*** There were no significant changes made in our internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation.

70.     In the 3Q 2007 10-Q, in the risk factors, the Company stated, in relevant part, the following:

***Our net revenue depends to a significant extent on the number of customers who visit our website to purchase merchandise and the dollar amount of their purchases***. Generating increased traffic to our website and converting that traffic into buyers requires us to achieve effective results from our marketing campaigns; offer a wide variety of products that our customers can purchase at favorable prices; maintain a user-friendly shopping experience; ensure the satisfactory availability, performance, and reliability of our website, network infrastructure, and transaction processing systems; and provide high-quality customer service. Our business will be harmed if we are unable to increase our customer base and the dollar volume of the orders customers place with us.

*     *     *

The acquisition of new customers is a key factor in increasing demand for our jewelry products and increasing our revenue. ***We currently***

34

> *attract new customers by driving traffic to our website using a marketing and advertising strategy that includes targeted keyword searches, online banner advertising, targeted e-mail advertising, and participation in affiliate programs.*
>
> \*      \*      \*
>
> Customer complaints or negative publicity about our customer service could severely diminish consumer confidence in and the use of our website. . . . If we do not handle customer inquiries and complaints effectively, we may lose customer confidence. As a result, our revenue could suffer and our operating margin may decrease.

71.   In the 3Q 2007 10-Q, in regard to appraisals, the Company stated, in relevant part, the following:

> In an effort to provide ***accurate*** descriptions of jewelry posted on our website, we provide appraisal summaries from third-party gemological laboratories for some of our jewelry items. All other jewelry and watch descriptions are provided by our full-time Gemological Institute of America, or GIA, trained gemologists and several experienced product specialists. . . . In addition, mistakes or omissions of important information in our descriptions may occur. Even if our descriptions are accurate, buying a product online may lead to disappointment resulting in returned merchandise. For example, a customer may determine that a piece does not have the expected look, feel, and overall appearance of the merchandise that the buyer envisioned from the website photograph.

72.   On August 13, 2007, the Company also filed its Form 8-K with the SEC, signed by defendant Kong, attaching a press release, entitled "Bidz.com, Inc.

Announces Third Quarter 2007 Financial Results," which stated, in part, the following:

> Net revenue for the third quarter of 2007 was $40.1 million, a 48% increase compared with $27.1 million reported for the third quarter of 2006. ***This increase was mainly due to the growth in demand for its jewelry products and the increase in average sales amount per order. During the third quarter, the Company lowered its acquisition cost per new buyer and increased the number of new buyers, orders per day, and significantly increased its average order value.***
>
> \*      \*      \*
>
> The Company's pre-tax income for the third quarter of 2007 was $5.2 million, above the Company's original guidance of $3.0-$3.2 million, and compared to $1.0 million in the prior period in 2006. Net income for the third quarter of 2007 increased to $3.6 million, or $0.14 per fully diluted share on 26.3 million weighted average shares outstanding, compared to net income of $997,000, or $0.04 per fully diluted share on 23.8 million weighted average shares outstanding in the same period of 2006. ***The increase in net income was due primarily to higher gross profit margins on increased revenues.***
>
> \*      \*      \*
>
> In the third quarter, gross profit increased 90.6% to $12.7 million from $6.7 million in the third quarter of 2006. Gross margin in the third quarter of 2007 was 31.7%, compared with 24.6% in the same period of 2006. Gross margin benefited from the amortized co-op marketing contributions that reduced our cost of sales by $833,000 or 2.1% of net revenue. The co-op marketing contributions are amortized as a reduction to cost of sales over the estimated inventory turnover

36

period. We expect gross margins for the fourth quarter to continue to improve over the corresponding prior year period as a result of continued receipt of co-op marketing dollars and continued elimination of any major shipping promotions.

*     *     *

## Business Outlook

The Company expects revenues for the fourth quarter of 2007 to be in the range of $56-$58 million, and expects pre-tax income of approximately $5.6-$6.0 million.  For the full year of 2007, the Company has increased its revenue guidance to $180-$182 million and has increased its expected gross margin guidance to approximately 27-28%. The Company now expects pre-tax income for 2007 of $18.0-$18.5 million. The Company expects its effective tax rate for the full year of 2007 to be approximately 20.2%, and expects to end the year with approximately 26.4 million fully diluted shares outstanding.

The Company is introducing new guidance for 2008 and expects revenues to be in the range of $225-$230 million, pre-tax income of approximately $23.5-$25.5 million and gross margin of approximately 27-28%. The Company expects its effective tax rate for the full year of 2008 to be approximately 40%, and expects to end the year with approximately 30.0 million fully diluted shares outstanding. The Company expects fully taxed 2008 GAAP EPS of $0.47-$0.51.

73.    Defendant Zinberg, commenting on the results, stated, in relevant part, the following:

We are very pleased to announce such strong results for the third quarter.   Our unique value proposition and continued focus on

37

executing our business and achieving results has driven this performance. ***Our new initiatives have significantly increased sales and resulted in record gross margins for the quarter.***

Looking forward, ***we continue to innovate to further drive sales growth and profitability.*** We are optimistic about the upcoming holiday period and as a result have increased our guidance for the year. We look forward to continuing to diligently execute our strategic plan in 2008 and beyond.

74.     Additionally, on November 13, 2007, Defendants held a conference call, discussing the third quarter 2007 results.  Besides reiterating the results in the Form 8-K and the 3Q 2007 10-Q, defendant Zinberg stated, in relevant part, the following:

Our third quarter revenues were $40.1 million, exceeding our previous guidance of $37 million to $39 million, and represents a year-over-year growth of 48%. Pre-tax income was $5.2 million versus our guidance of $3 million to $3.2 million and represent year-over-year growth of 409%. We are very pleased with this strong performance and as a result, we are raising our previous 2007 guidance substantially.

From an execution standpoint, we continue to make significant progress in terms of key transaction metrics such as value, visitor traffic, customer acquisition costs and market share. ***Specifically, we are averaging over 8,800 paid items per day, $173 average order size, 2,700 average orders per day, 3.3 items purchased per transaction.*** As per Compete.com, our traffic has increased 169% year over year.

*We believe the reason for our success is our continued focus on being simply the best online auctioneer of jewelry*. We provide a unique value proposition for both our buyers and suppliers. *Our prices are determined by customers, with auctions starting at $1*. We have short auction time and provide immediate gratification.

\*     \*     \*

*Our customers include individuals who purchase for themselves, those who intend to resell the product and those who intend to give it as a gift*.  We are not particularly focused on any one of these, as we know from experience that if we continue to deliver excellent value and broad assortment, we will continue to grow profitably.

\*     \*     \*

*Our customers' sales and actions are reviewed hourly through real-time proprietary [data flow] report. It is important to note that BIDZ.com's inventory is a good thing as a part of our value proposition in the constant supply of quality jewelry at a great price*. The experience we have in controlling the flow of product available for sale allows us to control gross margins to a large degree.

\*     \*     \*

We understand the importance of under-promising and over-delivering and we intend to continue to communicate actively and deliver strong results.

75.     Further, defendant Kong, stated, in relevant part, the following: Thank you, David. As David said, we had a very strong third quarter. Net revenues were $40.1 million, a 48% increase compared to the same period of 2006. *The increase in revenue was due mainly to the growth in demand for our jewelry products and the increase in*

39

*average order value.* We have also implemented three initiatives that David discussed earlier which drove customer demand.

\*   \*   \*

Now turning to guidance. ***For the fourth quarter of 2007, we expect revenue to be in the range of $56 million to $58 million, a 52% year-over- year revenue growth at the midpoint, and expect pre-tax income of $5.6 million to $6 million and GAAP earnings per share of $0.15 to $0.16 on approximately 29.3 million shares outstanding***.

\*   \*   \*

Additionally, we are introducing our 2008 guidance. For 2008, we expect revenue to be in the range of the $225 million to $230 million, or approximately a 25% to 30% increase, and anticipate gross margin of approximately 27% to 28%. We expect income before tax of $23.5 million to $25.5 million, representing a year-over-year increase of approximately 27% to 42%. We expect our effective tax rate for the full year to be 40% and to end the year with an average of approximately 30 million fully diluted shares outstanding. Fully taxed, we expect GAAP earnings per share to be in the range of $0.47 to $0.51.

76.    The statements in the 3Q 2007 10-Q, including the certifications, the November 13, 2007 press release, and the November 13, 2007 conference call were materially false and misleading when made because Defendants misrepresented and failed to disclose the following material facts:

(a)    that the Company's auctions were not "$1 no reserve" auctions and the prices were not determined by customers because the Company's shill bidders were creating an artificial reserve to prevent particular items from selling below cost;

40

(b)     that the Company was relying upon unethical and fraudulent business practices to generate operating margins, revenues, and profits;

(c)     that the Company's revenue and earnings during the Class Period were artificially increased due to the rampant shill bidding and fake appraisals;

(d)     that the Company was not providing customers with the actual retail value and/or appraised value of its products and selling products markedly inferior to the quality standards to which Defendants claimed to adhere;

(e)     that the traffic to its website was generated not by increased by demand, but due to the Company's shill bidders;

(f)     that the average order value and average items sold per day were increased not by demand, but by the Company's shill bidders;

(g)     that the Company faced a significant risk that if their practices were exposed and the Company would be required to cease such practices, the Company would lose revenues and growth potential a loss of customers and a reduction in prices received from customers who continued to use Bidz after the practices were exposed and discontinued;

(h)     that the Company's business model was unsustainable due to shill bidding and the fake appraisals; and

(i)     that Bidz suffered from a serious lack of legitimate controls over financial reporting which rendered the Company's financial reporting inherently corrupt, subject to manipulation and unreliable, further making each of the Company's statements materially false and misleading.

77.     On May 18, 1989, the SEC issued an interpretive release (Securities Act Release No. 6835) which stated, in relevant part:

The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling

investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

As the Commission has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

78.   SEC Staff Accounting Bulletin No. 104, drawing from Regulation S-K, Article 303, and Financial Reporting Release No. 36, also reiterated the importance of MD&A in financial statements:

> Management's Discussion & Analysis requires a discussion of liquidity, capital resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations.   This includes unusual or

1  infrequent transactions, known trends, or uncertainties that have had,

2  or might reasonably be expected to have, a favorable or unfavorable

3  material effect on revenue, operating income or net income and the

4  relationship between revenue and the costs of the revenue.  Changes

5  in revenue should not be evaluated solely in terms of volume and

6  price changes, but should also include an analysis of the reasons and

7  factors contributing to the increase or decrease.  The Commission

8  stated in Financial Reporting Release No. 36 that MD&A should

9  "give investors an opportunity to look at the registrant through the

10  eyes of management by providing a historical and prospective

11  analysis of the registrant's financial condition and results of

12  operations, with a particular emphasis on the registrant's prospects for

13  the future."

14      79.    Thus, the management of a public corporation must disclose in its

15  periodic reports filed with the SEC, "known trends or any known demands,

16  commitments, events or uncertainties" that are reasonably likely to have a material

17  impact on a company's sales revenues, income or liquidity, or cause previously

18  reported financial information not to be indicative of future operating results.  17

19  C.F.R. § 29.303(a)(l)-(3) and Instruction 3.

20      80.    The MD&As which were contained in the 2Q 2007 10-Q and 3Q 2007

21  10-Q were materially false and misleading because they failed to disclose the

22  material impact of the rampant shill bidding and fake appraisals on the Company's

23  financial results and that the Company's business model was not sustainable due to

24  the illegal and unethical practices.

25  **The Truth Regarding the Company's Fraudulent Schemes Emerges**

26      81.    On November 26, 2007, Citron Research published an article

27  identifying schemes and other fraudulent conduct used by the Company.  The

28

43

Citron Research article entitled "Citron Adds Some Color and Clarity to Bidz.com," stated, in pertinent part:

> Bidz.com is an online auction provider of off price jewelry and second tier accessories. What makes their model unique is that everything is sold via auction. Yet, the auctions are not third party auctions as facilitated by Ebay, rather they are auctions that are controlled by the company. ***In this report, Citron will expose what we believe to be many red flags at BIDZ.***
>
> *    *    *
>
> Instead of generating cash, BIDZ seems to be generating a lot of inventory. So instead of investors seeing a higher cash balance, they are seeing warehouses filled with "closeout and distress sale" jewelry.
>
> *    *    *
>
> Most investors would prefer to see efficiencies to kick in with rising revenues, but instead, actual reported inventory levels are instead spiraling at least 300% higher than the run rate of revenue.
>
> *    *    *
>
> ***Citron believes that the company is not being forthright with their customers when it comes to "retail value" or "appraised value."*** All of the jewelry from BIDZ shows an appraisal from AIG Labs. ***This appraisal makes consumers feel as if they are getting a good deal on a credible piece of jewelry that might have a decent resale value.*** Going to the website of AIG we see their name on a big building, which conveys an illusion of credibility.
>
> Citron paid a visit to AIG labs and an illusion it is. There is no name on the building (except in Photoshop...). As a matter of fact, the only signage they have is a white piece of paper on the front door to

44

identify them. It appears to **Citron that AIG is more of tin "appraisal mill," that enables Bidz.com to sell low priced items to an unknowing public**.

\*     \*     \*

One common complaint that we see on line is "shill bidding." On Wednesday, November 28, Citron will expose what we believe to be is some extremely questionable bids and bidding practices that occur on BIDZ.com. This part 2 will have much supporting documentation that the investing public should be made aware of. Unlike eBay and other well-known auction sites, you cannot even click to contact or check the track record of bidders. And since the company is selling its own goods, rather than conducting auctions for independent sellers, the company is responsible for the legality of all aspects of the conduct of its auctions.

Conclusion

**It is the opinion of Citron Research that Bidz.com's business model is not sustainable.** The large related party transactions, and the background of the individuals involved certainly provide plenty of reason for doubt. It is the opinion of Citron that the recent surge in stock price is completely unwarranted and the company is going to have to start generating real cash under a verifiable and transparent inventory valuation discipline before shareholders can take its earnings seriously.

82.    As a result of this negative news, the Company's stock dropped $3.38 per share from November 23, 2007 to close at $16.56 per share on November 26, 2007, a one day decline of 17 percent on unusually heavy trading volume.

83.    On November 27, 2007, Bidz hosted a conference call to address the allegations raised in the Citron Research article.   Speaking on behalf of the Company, defendant Zinberg disclosed additional information that further harmed the Company's stock price.   Importantly, defendant Zinberg was unable to refute the specific examples of shill bidding.   An article in Barron's relating to the conference call stated in pertinent part:

> Speaking on a conference call with investors this afternoon to respond to a negative report yesterday from Citron Research, Bidz.com (BIDZ) CEO David Zinberg said the company learned only yesterday that Saied Aframian, manager of L.A. Jewelry, a major jewelry supplier to Bidz and a larger shareholder, had been convicted in the 1980s for fencing stolen jewelry.
>
> *            *            *
>
> Zinberg says Citron's report was "untruthful," and that the company is considering legal action against Citron. Zinberg asserted that comparisons between the cash and inventory positions of Bidz.com and Blue Nile (TILE) and Overstock (OST) are not valid since the companies do not have the same business models.
>
> *            *            *
>
> **On possible shill bidding on the site, he says that shill bidding is against company policy.**
>
> *            *            *
>
> • Zinberg says about 25% of its jewelry is sold below cost.
>
> • On the company's apparent sale of televisions and other goods at very high prices – very far above their actual value – Zinberg says the company gets zero revenue from electronics sales.  He says they are sold by certified merchants, who are allowed to sell goods on the site

46

for free.  There are about 40 certified merchants.  ***Zinberg had no explanation for why people would bid more than $11,000 for a TV worth less than a tenth of that.***

• ***Zinberg insisted there was nothing strange about the many bids now on the site for a large yellow diamond ring listed on the company's home page with multiple bids worth $500,000. He says the company has no way of knowing if the bidders can actually pay for such a large purchase***.

• ***Zinberg says about 20% of winning auction bids do not result in transactions; but he says they only book revenue on shipment of goods once cash is received***.

• ***He had no explanation for why one bidder bought 14 televisions at above-market prices***.

84.     As a result of the continuing negative news, the Company's stock dropped $4.67 per share to close on November 27, 2007 at 11.89 per share on unusually heavy trading volume.

85.     Then, on November 28, 2007, Citron Research published another article which provided more information.   According to the article, entitled, "Citron Research Comments on Bidz.com," the Company had engaged in "shill bidding" in order to artificially increase the auction price of the products on the Company's website. The article stated in relevant part:

> Citron Research believes the bidding process at Bidz.com leaves a lot of unanswered questions. While Citron does find the Bidz site entertaining with a unique interface, they have much to prove before it can be anointed with the big earnings multiples associated with

47

proven business models. This report will outline some of the obvious bidding irregularities that we have observed on the Bidz website.

This report will not be a refutation to the conference call and will not address any new issues.

*     *     *

**One common complaint that Citron observed in customer postings was shill bidding**. This led us to do our own homework. Citron focuses on presenting public domain information. Therefore, when we suggested shill bidding, **the investing public ran with the ball and found the same problems on the Bidz website that were found by Citron.** As evident in yesterday's conference call investors have already seen these auction items: $6,000 flashlight/TV combo . . . $11,000 Television.

**The problem is still ongoing as we see in the live auction for a television with an MSRP of $1,499 yet the current bid on the television as of publication is $2,776.**

In an informal study, Citron offers the linked table, which outlines not only the obvious irregular bidding above, but also a pattern in the auction of over 30 TV's over more than 3 months. Most of these TV's are bid on hundreds of times by the same three bidders.

What makes this attached spreadsheet so interesting is that all of these televisions were sold by Clear Solution Partners. The owner of Clear Solution Partners is Bidz.com co-founder Matthew Mills. Not only is he the co-founder and vendor of these televisions, he has also been an outspoken proponent of the stock as evident in the Barron's Blog.

The hundreds of unique bidders over $500,000 for the big yellow diamond ring on BIDZ homepage has now been the topic of much

48

discussion and there is no need to restate those questions. **_Citron notes_** **_that BIDZ itself stated in the conference call that it does not know_** **_whether bidders are bona fide until after an auction closes._** Therefore, Citron cannot prove that the bidding on any jewelry is fake either. Jewelry is an item that thwarts direct comparison pricing, especially on the internet.

The question that investors are left with is: Are the patterns of bidding on the televisions any indication of patterns of bidding on jewelry? Do the hundreds of repetitive bids on the TV's (often by the same bidder on separate auctions at nearly the same second) represent flying fingers of a rogue actor, or a feature of the auction software that only company insiders know about?

86.    As a result of the news regarding the Company illegal and fraudulent schemes, the Company's stock declined an additional $1.80 per share to close on November 28, 2007 at $10.10 per share on unusually heavy trading volume.

## LOSS CAUSATION

87.    The market for Bidz securities was open, well-developed and efficient at all relevant times.  As a result of Defendants' materially false and misleading statements and failures to disclose alleged herein, Bidz securities traded at artificially inflated prices during the Class Period.  Plaintiff and the Class purchased or otherwise acquired Bidz securities relying upon market information relating to Bidz and the integrity of the market price of Bidz securities, thus causing economic loss and the damages complained of herein when the truth and/or the effects thereof were revealed and the artificial inflation was removed from the price of Bidz's securities.

88.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

89.   But for Defendants' misrepresentation and omissions, Plaintiff and the other members of the Class would not have purchased Bidz's securities at the artificially inflated prices at which they were purchased.

90.   Artificial inflation caused by Defendants' false and misleading statements and omissions is, in part, demonstrated by the following stock chart:



**Bidz.com (BIDZ)**
**Daily Common Stock Price Chart**
**August 2007 - November 2007**

November 12, 2007, the Company issued a press release announcing "record" third quarter 2007 financial results, "record" gross margin of approximately 31.7%, and raised 2007 guidance.

On November 26, 2007, a Citron Research article exposed the Company's questionable bidding and appraisal practices. Two days later, on November 28, 2007, a second Citron Research article provided additional details regarding the Company's "shill bidding."

On November 27, 2007, the Company issued a press release which reaffirmed its previously announced guidance.

Class Period
8/13/07 - 11/28/07

91.   Because of the news related the Company's illegal and fraudulent schemes during the Class Period, as reported in the Citron Research articles, the Company's stock dropped from a closing price of $19.94 per share on Friday, November 23, 2007, to a low of $10.10 per share on Wednesday, November 28, 2007, for a loss of nearly 50% on unusually heavy trading volume.

92.     Since November 28, 2007, Bidz's securities have not traded above the prices at which Class members purchased those securities during the Class Period prior to November 28, 2007.  As a result, members of the Class who purchased Bidz's securities during the Class Period and continue to hold those securities, have sustained economic injury resulting from the decline(s) in the value of Bidz securities resulting from the revelations on November 28, 2007.

93.     Members of the Class who purchased Bidz securities during the Class Period, and sold those securities after the end of the Class Period, have suffered economic injury caused by Defendants' misrepresentations and/or omissions during the Class Period that did not fully come to light until November 28, 2007.

94.     Thus, the damage suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Bidz securities and the subsequent significant decline in the value of Bidz securities when Citron Research disclosed Defendants' fraudulent and unethical conduct.

95.     The foregoing allegations describe Plaintiff's general theory of damages, demonstrate that Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to Defendants' omissions alleged herein.

## ADDITIONAL SCIENTER ALLEGATIONS

96.     As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal

51

1  securities laws.  As set forth elsewhere herein in detail, the Individual Defendants,

2  by virtue of their receipt of information reflecting the true facts regarding Bidz,

3  their control over, and/or receipt and/or modification of Bidz's allegedly materially

4  misleading misstatements and/or their associations with the Company which made

5  them privy to confidential proprietary information concerning Bidz, participated in

6  the fraudulent scheme alleged herein.

7       97.    In the 2Q 2007 10-Q and the 3Q 2007 10-Q, the Company admits

8  that:

9       ***We depend to a very significant extent on David Zinberg, our***

10       ***Chairman of the Board, President, and Chief Executive Officer***.

11       Our performance depends substantially upon David Zinberg, our

12       Chairman of the Board, President, and Chief Executive Officer, who

13       has extensive experience with the purchase and sale of jewelry. We

14       rely on Mr. Zinberg to make critical operational decisions on a daily

15       basis, such as product offerings and purchases, and to make key

16       strategic plans. We have an employment agreement with Mr. Zinberg

17       extending through 2009. The loss of the services of Mr. Zinberg

18       would adversely affect our business and operations.

19       98.    Further, CW2 stated that defendant Zinberg did everything in private

20  and "no one makes decisions except David [Zinberg]."  CW9, who was a

21  Marketing Executive and online media buyer from May 2003 through April 2005,

22  stated that the environment at Bidz was like a prison: "You have security. If you

23  have to walk outside, then you have to go through scanners.  I could not go and

24  talk with anyone. David [Zinberg] was watching everyone."  CW9 also stated that

25  there were cameras everywhere and defendant Zinberg, she/he was told, listened to

26  every phone call.  Plaintiff was prevented from learning more information from

27  other potential witnesses because they expressed concern over reprisals by

28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
DOCS\519413v1

1  defendant Zinberg that might occur should they cooperate and provide information

2  concerning Defendants' conduct and the Individual Defendants' participation in

3  and knowledge of such conduct.

4       99.   According to CW1, who reported directly to Liu, defendant Kong's

5  wife, defendant Kong was directly involved with the bookkeeping and the

6  preparation of financial statements with a staff accountant and the Chief

7  Compliance Officer.  This was confirmed by CW3 and CW7, a Director of

8  Business Development from February 2000 through June 2007.  CW7 stated that

9  the only person in charge of the book balancing was defendant Kong.  CW8 who

10  reported to Liu and worked in customer service in the billing department from June

11  2002 until August 2004 stated that defendant Kong and Liu had access to the

12  general ledger.

13       100.  The Individual Defendants had substantial motivation to participate in

14  the fraudulent practices alleged herein.  The Individual Defendants sold suspicious

15  amounts of stock at suspicious times during the Class Period.  During the Class

16  Period, defendant Zinberg sold over 90,000 shares of his Bidz stock, for which he

17  received approximately $901,364 in proceeds.  Additionally, defendant Kong's

18  wife and the COO of Bidz, Liu, sold 55,000 shares during the Class Period for

19  proceeds of approximately $941,475.  Marina Zinberg, David Zinberg's sister, also

20  sold 20,000 shares of Bidz stock for proceeds of approximately $212,500.  These

21  sales during the 108-day Class Period, when compared to the 108-day period

22  preceding the Class Period (when the Individual Defendants made no insider

23  sales), were highly unusual and a departure from the Individual Defendants'

24

25

26

27

28

53

conduct during the 108-day period preceding the Class Period.  The insider sales during the Class Period were as follows:

| Filer Name | Number Of Shares | Transaction Type | Price | Market Value | Transaction Date |
|---|---|---|---|---|---|
| LIU CLAUDIA Y | 37,500 | Sale | 16.79 | $629,625 | 16-Nov-07 |
| LIU CLAUDIA Y | 17,500 | Sale | 17.82 | $311,850 | 19-Nov-07 |
| **TOTAL** | **55,000** | | | **$941,475** | |
| ZINBERG DAVID | 13,899 | Sale | 8.18 | $113,694 | 15-Aug-07 |
| ZINBERG DAVID | 8,600 | Sale | 8.04 | $69,144 | 16-Aug-07 |
| ZINBERG DAVID | 7,501 | Sale | 8.04 | $60,308 | 17-Aug-07 |
| ZINBERG DAVID | 24,600 | Sale | 8.93 | $219,678 | 4-Sep-07 |
| ZINBERG DAVID | 5,400 | Sale | 8.6 | $46,440 | 5-Sep-07 |
| ZINBERG DAVID | 30,000 | Sale | 13.07 | $392,100 | 1-Oct-07 |
| **TOTAL** | **90,000** | | | **$901,364** | |
| ZINBERG MARINA | 10,000 | Sale | 8.18 | $81,800 | 6-Sep-07 |
| ZINBERG MARINA | 10,000 | Sale | 13.07 | $130,700 | 1-Oct-07 |
| **TOTAL** | **20,000** | | | **$212,500** | |
| | | | | | |
| **GRAND TOTAL** | **165,000** | | | **$2,055,339** | |

101.  In addition, according to the Company's Proxy Statement, compensation is established as follows:

**Setting Executive Compensation**

Our compensation setting process consists of establishing targeted overall compensation for each executive officer and then allocating that compensation among base salary and incentive compensation. ***At the executive level, we design the incentive compensation to reward company-wide performance through tying awards primarily to specific operational and financial performance***. The Compensation Committee evaluates both performance and compensation to ensure that we maintain the ability to attract and retain employees in key positions and that compensation provided to key employees remains

54

competitive relative to the compensation paid to similarly situated executives of our peer companies.

*      *      *

**Compensation Program**

The primary components of the executive compensation program of our company consist of base salary, annual incentive bonuses, stock option and other equity-based grants, and executive health benefit and perquisite programs.

*Base Salary*

We provide executive officers with a level of base salary that recognizes appropriately each individual officer's scope of responsibility, ***role in the organization, experience, and contributions to the success of our company***. The Board of Directors reviews salaries recommended by the Compensation Committee. In formulating these recommendations, the committee ***considers the overall performance of our company, industry compensation benchmark data, and conducts an evaluation of individual officer performance***. The committee makes, or recommends that the Board of Directors make, final determinations on any adjustments to the base salary for executive officers.

*Management Bonus Program*

Annual bonuses are intended to provide incentive compensation to key officers and employees who contribute substantially to the success of our company. ***The granting of such awards is based upon the achievement of our company's performance objectives and pre-defined individual performance objectives***. Company performance objectives are based upon achieving key financial and operational

55

metrics that are established early in each fiscal year. Individual performance objectives are developed for senior level managers and key employees early in each fiscal year. Upon the close of each fiscal year, executive management and the committee conducts an assessment of individual performance achieved versus individual performance objectives. This assessment includes individual responsibility, performance, and compensation level. Simultaneously, the board conducts an assessment of our company's overall performance, which includes the achievement of operating results and other performance criteria. The combination of these factors determines any incentive bonuses to be paid.

*Stock Option and Restricted Stock Grants*

We grant stock options and restricted stock awards periodically to certain of our key employees to provide additional incentive to work to maximize long-term total return to stockholders. Award levels are determined based on market data and vary among participants based on their positions within the company. Under our 2006 Stock Award Plan, or 2006 Plan, the Board of Directors or a committee appointed by the Board is specified to act as the plan administrator. Our Board of Directors has, pursuant to the 2006 Plan, authorized our Compensation Committee to administer the Plan, including the grant of awards and determination of their terms. In general, stock options and awards of restricted stock are granted to employees at the onset of employment. In establishing award levels, the committee bases the number of stock option and restricted stock awards to be granted on the target percentage of ownership of the recipient, assuming full dilution of outstanding stock option awards. For executive officers,

the committee considers the target percentage of ownership of executive officers in our peer group in setting award levels for our executive officers. If, in the opinion of the committee, the outstanding service of an existing employee merits an increase in the number of options and awards held, the committee may elect to issue additional stock options and restricted stock awards to that employee.

102.   The Individual Defendants thus had significant incentives to make misleading statements and omit material facts to ensure that the Company achieved its performance objectives, which was a factor used to determine the Individual Defendants' salaries and bonuses.   Defendant Zinberg was paid $201,244 in compensation in 2007 (consisting of $181,250 in salary and $19,994 in all other compensation).   Defendant Kong was paid $814,205 in compensation in 2007 (consisting of $235,000 in salary, $338,048 in bonuses, $224,330 in option awards, and $16,828 in all other compensation).   His wife, Liu, was paid $628,614 in 2007 and $524,448 in 2008.

## DEFENDANTS' ASSOCIATIONS AND PROPENSITY TO ENGAGE IN UNLAWFUL CONDUCT CONSISTENT WITH SCIENTER ALLEGATIONS

103.   As alleged in more detail below, the Individual Defendants have demonstrated their propensity to engage in securities fraud and other fraudulent and/or improper business conduct, as well as to associate themselves and the Company with persons with criminal or otherwise questionable backgrounds and/or who have engaged in questionable business practices.

## Bidz Sold Unlicensed Securities Before it Attempted an IPO

104.   CW2 stated that Bidz's former COO, Matthew Mills ("Mills"), sold Bidz stock for years before Bidz attempted its IPO in March 2006.  CW2 stated that, at least as early as March 2000, a crew of 6 to 10 employees sold Bidz stock to strangers over the phone, in a separate room away from the company, in a

"boiler room" type operation.  The crew's only duties were to sell Bidz stock by phone, and report to Mills.

105.   In fact, in a June 29, 2006 SEC Form S-1 filing, Bidz admitted that it illegally sold stock from 1999 through at least mid-2003, and "raised over $20.5 million" by doing so.  Bidz admitted that the stock sales violated federal and state securities laws because the securities were not registered, and because they were sold by unlicensed brokers – among other reasons.

**Bidz Is the Target of Numerous Lawsuits Relating to Its Business Practices**

106.   Bidz's SEC Form 10-Q for the period ending June 30, 2009 reveals that Bidz is the target of numerous lawsuits.  The lawsuits allege securities fraud, unfair business practices, and derivative actions alleging that Bidz's management breached their duties to shareholders.

107.   Bidz is and has been the subject of three investigations from the SEC.  The first occurred in 2005 and concerned Bidz's sale of $20.5 million of unregistered securities via unlicensed brokers.  The second occurred in February 2009 and focused on improper inventory accounting practices and other matters.  What the "other matters" are was not disclosed.   The second investigation is ongoing and has intensified, requiring production of documents and complying with subpoenas for testimony by Bidz's management and certain employees.  The third investigation relates to accounting for marketing contributions and minimum gross profit guarantees and began in October 2009.

**Bidz Has Been Connected to Numerous People With Questionable Backgrounds**

108.   Bidz's practices are unsurprising in light of the histories of some of Bidz's employees, owners and associates.  For example, according to a Citron Research article on November 26, 2007, Saied Aframian, one of Bidz's largest shareholders, and the owner and/or manager of LA Jewelry, one of Bidz's largest

58

suppliers, was convicted of receiving stolen property in 1985 (jewelry stolen during an armed robbery) and served two years in prison.  According to the Citron Research article, Aframian was the "prime fence for a multi-million dollar nationwide ring of stolen watches and jewelry."  Similarly, a September 1, 2008 article in Barron's, entitled "Putting BIDZ.com Shares on Sale," disclosed that Bidz's co-owner and current director Garry Itkin is alleged to have run an illegal strip club on Sunset Boulevard while serving as Bidz's CFO in 1999.

109.   The Barron's article also referenced the criminal histories of others with ties to Bidz and/or defendant Zinberg, including: an individual arrested for sex crimes with a minor; an individual convicted of a felony for receiving stolen property and carrying a concealed weapon; an individual convicted of a felony for engaging in health-care fraud; an individual arrested for "loitering with intent to prostitute, failure to register as a sex offender" and kidnapping; an executive of a health-care company sanctioned by the State of California for fraud; and an individual convicted of a felony relating to buying stolen property and the unlawful sale of a  firearm.

## NO SAFE HARBOR

110.   The statutory safe harbor provided for forward-looking statements does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that

1  the forward-looking statement was false, and/or the forward-looking statement was
2  authorized and/or approved by an executive officer of Bidz who knew that the
3  statement was false when made.

4  **COUNT I**<br>**Violation of Section 10(b) of the Exchange Act**<br>**and Rule 10b-5 Promulgated Thereunder**<br>**(Against Defendants)**

7  111.  Plaintiff repeats and realleges each and every allegation contained
8  above as if fully set forth herein.

9  112.  During the Class Period, Defendants carried out a plan, scheme and
10  course of conduct which was intended to and, throughout the Class Period, did: (i)
11  deceive the investing public, including Plaintiff and other Class members, as
12  alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase
13  Bidz securities at artificially inflated prices. In furtherance of this unlawful
14  scheme, plan and course of conduct, Defendants, and each of them, took the
15  actions set forth herein.

16  113.  Defendants (i) employed devices, schemes, and artifices to defraud;
17  (ii) made untrue statements of material fact and/or omitted to state material facts
18  necessary to make the statements not misleading; and (iii) engaged in acts,
19  practices, and a course of business which operated as a fraud and deceit upon the
20  purchasers of the Company's securities in an effort to maintain artificially high
21  market prices for Bidz securities in violation of Section 10(b) of the Exchange Act
22  and Rule 10b-5.  All of the Defendants are sued either as primary participants in
23  the wrongful and illegal conduct charged herein or as controlling persons as
24  alleged below.

25  114.  Defendants, individually and in concert, directly and indirectly, by the
26  use, means or instrumentalities of interstate commerce and/or of the mails, engaged
27  and participated in a continuous course of conduct to fundamentally misstate the

28

60

business of Bidz, the composition and sources of its revenues and sales, and to conceal adverse material information about Bidz's financial well-being and prospects, as specified herein.

115.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bidz's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bidz, its business, and the composition and sources of its revenues and sales in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Bidz's securities during the Class Period.

116.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Individual Defendants was aware of the Company's dissemination of information to the

61

investing public which they knew or recklessly disregarded was materially false and misleading.

117.  Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bidz's business and the composition and sources of its revenues and sales from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the Company's business and the composition and sources of its revenues and sales throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

118.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Bidz's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Bidz's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Bidz securities during the Class Period at artificially high prices and were damaged thereby.

119.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth about Bidz, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Bidz securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

120.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

121.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

122.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

123.   The Individual Defendants acted as controlling persons of Bidz within the meaning of Section 20(a) of the Exchange Act and are liable thereunder.  As senior officers and/or directors of Bidz, high-level executives of the Company, "hands on" supervisors, decision-makers and participants in Bidz's operations, and owners of Bidz stock, the Individual Defendants had the power and authority to influence and control and did influence and control Bidz to engage in the wrongful conduct complained of herein

124.   In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular

1  transactions giving rise to the securities violations as alleged herein, and exercised
2  the same.

3      125.  As set forth above, Bidz and the Individual Defendants each violated
4  Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this
5  Complaint.  By virtue of their positions as controlling persons, the Individual
6  Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct
7  and proximate result of the Defendants' wrongful conduct, Plaintiff and other
8  members of the Class suffered damages in connection with their purchases of the
9  Company's securities during the Class Period.

10  ## PRAYER FOR RELIEF

11      **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

12      A.  Determining that this action is a proper class action under Rule 23 of
13  the Federal Rules of Civil Procedure;

14      B.  Awarding compensatory damages in favor of Plaintiff and the other
15  Class members against Defendants, jointly and severally, for all damages sustained
16  as a result of Defendants' wrongdoing, in an amount to be proven at trial, including
17  interest thereon;

18      C.  Awarding Plaintiff and the Class their reasonable costs and expenses
19  incurred in this action, including counsel fees and expert fees; and

20      D.  Such other and further relief as the Court may deem just and proper.

21  ## JURY TRIAL DEMANDED

22      Plaintiff hereby demands a trial by jury.

23  Dated:  June 22, 2010

                          **MILBERG LLP**
24                            Jeff S. Westerman
                          David E. Azar
25                            Andrew J. Sokolowski

26

27                         ANDREW J. SOKOLOWSKI

28

64

One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071-3172
Telephone: (213) 617-1200
Facsimile:  (213) 617-1975
E-mail:  jwesterman@milberg.com
dazar@milberg.com
asokolowski@milberg.com

Counsel for Lead Plaintiff and Liaison
Counsel for the Class

**BROWER PIVEN**
 A Professional Corporation
David A.P. Brower
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300
E-mail:  brower@browerpiven.com

**BROWER PIVEN**
 A Professional Corporation
Charles J. Piven
Yelena Trepetin
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300
E-mail:  piven@browerpiven.com
trepetin@browerpiven.com

Counsel for Lead Plaintiff
and Lead Counsel for the Class

65

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, employed in the County of Los Angeles, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One California Plaza, 300 South Grand Avenue, Suite 3900, Los Angeles, California 90071-3149.

2.      That on June 22, 2010, declarant served the CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at Los Angeles, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of June, 2010, at Los Angeles, California.

_____
ANN MARIE GENOVESE

1

## SERVICE LIST

*Ramon Gomez v. Bidz.Com, Inc., and David Zinberg, et al.*

2

Civil Action No. CV09-3216 CBM

| | |
|---|---|
| 3 Jeff S. Westerman<br>David E. Azar<br>Andrew J. Sokolowski<br>MILBERG LLP<br>One California Plaza<br>300 South Grand Avenue, Suite 3900<br>Los Angeles, California 90071<br>Telephone: (213) 617-1200<br>Facsimile:  (213) 617-1975<br>E-mail: jwesterman@milberg.com<br>asokolowski@milberg.com<br><br>Andrei Rado<br>MILBERG LLP<br>One Pennsylvania Plaza, 49th Floor<br>New York, NY 10119<br>Telephone: (212) 594-5300<br>Facsimile:  (212) 868-1229<br>E-mail: arado@milberg.com | **Counsel for Lead Plaintiff Roland Pomfret and Liaison Counsel for the Class** |
| David A.P. Brower<br>BROWER PIVEN<br>  A Professional Corporation<br>488 Madison Avenue, 8th Floor<br>New York, New York 10022<br>Telephone: (212) 501-9000<br>Facsimile:  (212) 501-0300<br>E-mail:  brower@browerpiven.com | **Counsel for Lead Plaintiff Roland Pomfret and Lead Counsel for the Class** |
| Charles J. Piven<br>Yelena Trepetin<br>BROWER PIVEN<br>  A Professional Corporation<br>1925 Old Valley Road<br>Stevenson, Maryland 21202<br>Telephone: (410) 332-0030<br>Facsimile:  (410) 685-1300<br>E-mail:  piven@browerpiven.com<br>trepetin@browerpiven.com | |
| Joseph Gentile<br>Ronen Sarraf<br>SARRAF GENTILE LLP<br>116 John Street Suite 2310<br>New York , NY 10038<br>Telephone: 212-868-3610<br>Facsimile:  212-918-7967<br>E-mail: joseph@sarrafgentile.com<br>ronen@sarrafgentile.com | **Counsel for Plaintiff Ramon Gomez** |

67

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

DOCS\519413v1

| | |
|---|---|
| Samuel M Ward<br>Stephen R Basser<br>BARRACK RODOS AND BACINE<br>600 West Broadway Suite 900<br>San Diego , CA 92101<br>Telephone: 619-230-0800<br>Facsimile:  619-230-1874<br>E-mail: sward@barrack.com<br>sbasser@barrack.com | |
| **_Mark Walczyk v. Bidz.Com, Inc_** | |
| Daniel L Germain<br>ROSMAN AND GERMAIN LLP<br>16311 Ventura Boulevard Suite 1200<br>Encino , CA 91436-2152<br>Telephone: 818-788-0877<br>Facsimile:  818-788-0885<br>E-mail: germain@lalawyer.com | **Counsel for Plaintiff Mark Walczyk** |
| David Promisloff<br>Seamus D. Kaskela<br>Steven D Resnick<br>BARROWAY TOPAZ KESSLER<br>    MELTZER & CHECK LLP<br>280 King of Prussia Road<br>Radnor , PA 19087<br>Telephone: 610-667-7706<br>Facsimile:  610-667-7056<br>E-mail: sresnick@btkmc.com | |
| **_Mitchell v. Bidz.com, Inc._** | |
| Darren J Robbins<br>Brian Oliver O'Mara<br>David C Walton<br>COUGHLIN STOIA GELLER<br>    RUDMAN AND ROBBINS LLP<br>655 West Broadway Suite 1900<br>San Diego , CA 92101-3301<br>Telephone: 619-231-1058<br>Facsimile:  619-231-7423<br>E-mail: e_file_sd@csgrr.com<br>bomara@csgrr.com<br>davew@csgrr.com | **Counsel for Plaintiff James Mitchell** |
| Corey D Holzer<br>Michael Ira Fistel , Jr<br>HOLZER HOLZER AND<br>    FISTEL LLC<br>200 Ashford Center North Suite 300<br>Atlanta , GA 30338<br>Telephone: 770-392-0090<br>Facsimile:  770-392-0029<br>E-mail: cholzer@holzerlaw.com<br>mfistel@holzerlaw.com | |

68

| | |
|---|---|
| Jeffrey A Berens<br>DYER AND BERENS LLP<br>682 Grant Street<br>Denver , CO 80203-3507<br>Telephone: 303-861-1764<br>Facsimile:  303-395-0393<br>E-mail: jeff@dyerberens.com | |
| Samuel H Rudman<br>COUGHLIN STOIA GELLER<br>    RUDMAN AND ROBBINS LLP<br>58 South Service Road Suite 200<br>Melville , NY 11747<br>Telephone: 631-367-7100<br>Facsimile:  631-367-1173<br>E-mail: srudman@lerachlaw.com | |
| **Counsel for Defendants** | |
| Joel A Feuer<br>GIBSON DUNN AND<br>    CRUTCHER LLP<br>2029 Century Park East Suite 4000<br>Los Angeles , CA 90067<br>Telephone: 310-551-8808<br>Facsimile:  310-552-7058<br>E-mail: jfeuer@gibsondunn.com | **Counsel for Defendants Bidz.com, Inc., David Zinberg, Leon Kuperman, Lawrence Y. Kong, and Claudia Y. Liu.** |

69